**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

NIEVES ARAGON, MARC CRAIG,
NATHAN FLEMING, AMANDA JOHNSON,
and SARAH STARKS a/k/a HUNTER
STARKS

       c/o National Center for Law and
       Economic Justice
       50 Broadway, Suite 1500
       New York, NY 10004

                Plaintiffs,

      *-against-*

BROOKE ROLLINS, in her official capacity
as Secretary of Agriculture, and

UNITED STATES DEPARTMENT OF
AGRICULTURE

             Defendants.

Case No. _____

**COMPLAINT**

## PRELIMINARY STATEMENT

1.      This case challenges an unprecedented effort by the United States Department of Agriculture ("USDA") to shrink the Supplemental Nutrition Assistance Program ("SNAP") by authorizing a patchwork of state-by-state food prohibition regimes. These changes deprive SNAP recipients and their families of the food they need to maintain their health and employment, and in some cases, to survive.

2.      By approving twenty-two so-called "food restriction" waivers, Defendants have authorized states to narrow the statutory definition of "food" haphazardly without statutory authority or evaluation methodology, and without notice to or input from the people or businesses directly affected.

3.      The practical effect is to destabilize food access for every SNAP participant in the affected states. The waivers impose ambiguous and scientifically untethered product restrictions that vary not only by state but, in some instances, by store location. Individuals with chronic illnesses are losing access to products they need to manage blood sugar or sustain diets they need to maintain baseline health care needs. Families must choose between using scarce cash to purchase restricted items or foregoing essential household expenses such as rent, utilities, or transportation. These harms are tangible, ongoing, and irreparable.

4.      The challenged waivers also create confusion and conflict at the point of sale by depriving SNAP recipients of clear notice about which products remain eligible for purchase. Because States do not provide comprehensive lists of covered items, recipients are left to guess whether the foods and beverages they rely upon will be approved at checkout, while frontline cashiers are forced to interpret and enforce waiver restrictions in real time. If a retailer denies a purchase and the recipient disagrees, there is no meaningful mechanism to challenge that determination.

5.      The December 30, 2025 guidance issued by USDA (the "USDA Guidance")
significantly increases the burdens imposed by the challenged waivers.  It does so by requiring
retailer compliance after only a brief grace period, authorizing undercover investigations, and
threatening escalating sanctions that culminate in involuntary withdrawal from SNAP for
continued noncompliance. The guidance further imposes complex operational requirements on
both walk-in and online retailers, making compliance turn on where a retailer is located, whether
an order is fulfilled from a warehouse or a retail store, and which State's waiver applies to the
transaction. As a result, retailers must make difficult, product-level eligibility determinations
across differing state regimes under threat of investigation and removal from the program,
making even minor errors potentially devastating.

6.      The USDA Guidance, as a result, increases the likelihood that retailers will be
involuntarily ejected from the program, or choose to pull out due to the administrative costs and
burdens. This will worsen food deserts and SNAP recipients will lose effective access to their
benefits.

7.      This action challenges the Secretary of Agriculture's improper approval of five
SNAP pilot or demonstration projects in the following states: Colorado, Iowa, Nebraska,
Tennessee, and West Virginia.

8.      SNAP provides funds that low-income households use to purchase food they
would otherwise be unable to afford. It is an essential lifeline for many families nationwide.

9.      SNAP also serves as a critical economic engine. Benefits are spent in retail shops
where groceries are sold. Every dollar spent on SNAP creates more than $1.50 of economic
activity in communities across the country.

10.     For more than sixty years, Congress has maintained a uniform definition of "food" that has allowed SNAP participants to buy the food they need and retailers to accept SNAP benefits for payment without undue confusion or complication. The challenged waivers permit twenty-two states to scale back the program and complicate a clear statutory and regulatory framework, throwing SNAP into disarray.

11.     Plaintiffs are SNAP recipients in waiver states whose health, food security, and livelihoods are or will be directly and adversely affected by the challenged waiver approvals.

12.     In 2018, USDA rejected materially similar state proposals to restrict SNAP purchases, concluding that such restrictions would increase administrative costs, impose significant burdens on retailers, force the government to draw arbitrary lines among food products, and restrict household food choices without clear evidence of meaningful health benefits. Even though the challenged waivers present the same defects USDA previously recognized, they were approved without any attempt to address, let alone resolve, those concerns.

13.     In approving these waivers, Defendants are imposing, or threatening to impose, irreparable harm on Plaintiffs.

14.     In doing so, Defendants exceeded their authority under 7 U.S.C. § 2026, failed to engage in reasoned decision-making, and disregarded mandatory procedural safeguards. The approvals, therefore, violate the Administrative Procedure Act, and must be set aside.

## JURISDICTION AND VENUE

15.     This is an action for declaratory and injunctive relief for violations of the Administrative Procedures Act and the Food and Nutrition Act of 2008.

16.    The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1361, and 5 U.S.C. §§ 702 to 705. This action and the remedies it seeks are further authorized by 28 U.S.C. §§ 1651, 2201, and 2202, and Federal Rule of Civil Procedure 65.

17.    Venue is proper under 28 U.S.C. §§ 1391(b)(2) and (e).

## PARTIES

18.    Plaintiff Nieves Aragon resides in Brighton, Colorado. She is a single mother living with Type 1 diabetes. Plaintiff Aragon has relied on SNAP to feed herself and her son for five years. Under Colorado's food restriction waiver, she will be unable to use SNAP to purchase the sugary beverages she relies on to manage her blood sugar while at work.

19.    Plaintiff Marc Craig resides in Des Moines, Iowa. He is living with diabetes and chronic kidney disease, and until recently was homeless. Under Iowa's waiver, Plaintiff Craig cannot purchase many of the foods he needs to manage his health, forcing him to over-rely on high sodium convenience foods that exacerbate his health conditions.

20.    Plaintiff Nathan Fleming resides in Lincoln, Nebraska. He has a chronic spine condition, chronic insomnia, and numerous serious allergies. Plaintiff Fleming is unable to work due to his health conditions and has relied on SNAP to afford groceries for more than four years. Plaintiff Fleming needs caffeine during the day because of his insomnia. Under Nebraska's waiver, he can no longer use SNAP to buy energy drinks, which are the only caffeine source that do not trigger his allergies.

21.    Plaintiff Amanda Johnson resides in Knoxville, Tennessee. Her nineteen-year-old daughter has multiple disabilities that severely limit the foods she can eat. Plaintiff Johnson is unable to work because she is her daughter's full-time caretaker, and relies on SNAP to buy groceries. Under the Tennessee waiver, Plaintiff Johnson will be unable buy most of the foods

her daughter is able to eat. Without these foods, Plaintiff Johnson's daughter will go hungry and risk a medical crisis.

22.    Plaintiff Sarah Starks, a/k/a Hunter Starks resides in Charleston, West Virginia. Plaintiff Starks is a single parent who has received SNAP on and off since their nine-year-old daughter was born. Plaintiff Starks works part-time and goes to school full-time. Prior to the West Virginia waiver, Plaintiff Starks relied on SNAP to purchase the groceries their family needs, including sodas to maintain the energy they need to balance parenting, work, and school.

23.    Defendant Brooke Rollins is the Secretary of the United States Department of Agriculture ("USDA") and is sued in her official capacity. Secretary Rollins ("the Secretary") has overall responsibility for implementation of the SNAP program, including responsibility for federal review and approval of state requests for waivers.

24.    Defendant USDA is a department of the executive branch of the United States government and an agency of the federal government within the meaning of 5 U.S.C. § 551(1). The USDA is headquartered in Washington, D.C.

## STATUTORY BACKGROUND
### The Supplemental Nutrition Assistance Program

25.    In 1964, Congress established the federally funded, state-administered Food Stamp Program in order to "safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households," and to "permit low income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation." 7 U.S.C. § 2011; 7 C.F.R. § 271.1

26.    Effective October 1, 2008, the federal Food Stamp Program was renamed the Supplemental Nutrition Assistance Program, and the federal Food Stamp Act was renamed the

Food and Nutrition Act of 2008 ("SNAP Act"). Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, §§ 4001–02, 122 Stat. 1853 (2008).

27.    SNAP serves households with very low incomes, who cannot otherwise afford adequate food.

28.    Once a household applies for and is approved for SNAP, benefits are loaded onto EBT cards. EBT cards can be used at participating SNAP retailers on authorized products in the same manner as a debit card.

29.    Participating States designate a single state agency responsible for administering the program and complying with federal SNAP requirements. 7 U.S.C. § 2020(a), (d), (e). While state agencies have some latitude in how they administer SNAP, the program is governed in every State by certain basic nationwide requirements, including the definition of "food" for SNAP purposes.

30.    7 U.S.C. § 2012(k) defines "food" for purposes of SNAP as "any food or food product for home consumption except alcoholic beverages, tobacco, hot foods, or hot food products ready for immediate consumption." SNAP benefits may be used only to purchase food as defined by statute. 7 C.F.R. § 274.8.

31.    The statute also includes limited exceptions that expand access for certain populations. For example, in specified circumstances, elderly individuals, persons with disabilities, and individuals residing in certain treatment facilities may use SNAP benefits to purchase prepared meals provided by nonprofit organizations or served in facilities in which they reside. In addition, SNAP benefits may, in certain circumstances, be used to purchase supplies for growing or hunting food.

32.     This statutory definition has consistently permitted SNAP households to purchase a broad range of foods, enabling families to meet individualized nutritional and medical needs.

33.     To the extent Congress has amended the statutory definition of "food" since the program's establishment in 1964, it has done so to expand—rather than restrict—eligible purchases.

34.     In doing so, it has always maintained a consistent definition of "food" across the country, allowing SNAP recipients and participating retailers alike to have clarity on which products can and cannot be purchased with SNAP benefits, no matter where in the country the purchase takes place.

35.     USDA's regulations mirror the statute. 7 C.F.R. § 271.2 defines "eligible food" in terms that are substantively identical to 7 U.S.C. § 2012(k).

36.     SNAP recipients can be subjected to temporary disqualification, permanent disqualification, and criminal penalties if they are determined to have used SNAP benefits for impermissible purposes. 7 U.S.C. § 2015(b); 7 U.S.C. § 2024(b).

37.     In order to use SNAP benefits, recipients purchase eligible food items at authorized retailers. To become authorized, a retail store must apply to the Food and Nutrition Service ("FNS"), a subagency of USDA. 7 C.F.R. § 278.1(a). USDA regulations set forth detailed criteria governing retailer eligibility. 7 C.F.R. § 278.1. Among other requirements, retailers must demonstrate that they offer a variety of staple foods or that a substantial portion of their total sales consists of staple foods. *Id*. USDA regulations define "staple food" as "[m]eat, poultry, or fish; bread or cereals; vegetables or fruits; and dairy products." 7 C.F.R. § 271.2.

38.     FNS may withdraw a store's authorization if it no longer satisfies these eligibility requirements. 7 C.F.R. § 278.1(b)(1)(iv).

39.     SNAP retailers can be subjected to involuntary withdrawal and civil monetary penalties if they are determined to have accepted SNAP benefits in exchange for anything other than a permissible product. 7 U.S.C. § 2021(a)(1); *see* infra ¶¶ 183–87.

### Permissible Demonstration Projects

40.     Under 7 U.S.C. § 2026(b), the Secretary of Agriculture is authorized to approve "pilot or experimental projects designed to test program changes" to "increase the efficiency" of SNAP and "improve the delivery" of benefits to eligible households.

41.     A project approved under § 2026(b) must serve one of four permissible purposes: (1) improving program administration; (2) increasing the self-sufficiency of SNAP recipients; (3) testing innovative welfare reform strategies; or (4) allowing greater conformity with the rules of other programs. 7 U.S.C. § 2026(b)(1)(B)(ii). These have been the only four permissible bases for a pilot project under § 2026(b) since 1996.

42.     The Secretary "may waive any requirement of this chapter to the extent necessary" for an allowable pilot project to be conducted, 7 U.S.C. § 2026(b)(1)(A).

43.     Each pilot or experimental project approved under § 2026(b) must also include "an evaluation method to determine the effects of the project." 7 U.S.C. § 2026(b)(1)(B)(i)(II).

44.     Separate statutory authority allows the Secretary to carry out pilot projects to develop and test methods of using SNAP to improve the dietary health status of households and reducing overweight, obesity, and associated co-morbidities. 7 U.S.C. § 2026 (k)(1).

45.     However, projects conducted under § 2026(k) must be evaluated against publicly disseminated criteria. 7 U.S.C. § 2026(k)(2)(C). Specifically, Section 2026(k) identifies specific types of health-focused interventions that may be tested, including projects that increase benefit allotments, expand access to farmers' markets, incentivize the purchase of healthy foods, impose

stricter retailer stocking requirements for healthy foods, or provide nutrition education to households. 7 U.S.C. § 2026(k)(3).

46.     Congress further required that § 2026(k) projects employ "rigorous" evaluation methodologies capable of producing "scientifically valid information" regarding effectiveness. 7 U.S.C. § 2026(k)(4).

### Notice and Comment Requirement

47.     7 C.F.R. § 282.1(b) requires that, for demonstration projects approved pursuant to 7 U.S.C. § 2026, the Secretary publish a General Notice in the Federal Register if the project "will likely have a significant impact on the public." That notice must set forth "specific operational procedures" and "explain the basis and purpose" of the project. *Id*. If significant comments are received, the Department must take appropriate action before implementation and must publish an additional notice 30 days before implementation if significant changes are made in response to the comments. *Id.*

### FACTUAL BACKGROUND

### Improper Modifications of the Definition of "Food"

48.     Since May 2025, USDA has approved demonstration projects in twenty-two different states that modify the definition of "food" found in 7 USC § 2012(k). These states include Colorado, Iowa, Nebraska, Tennessee, and West Virginia.

49.     These demonstration projects are colloquially referred to as "food restriction waivers" and have the effect of imposing new restrictions on the foods and beverages that retailers may sell, and SNAP recipients may purchase, in exchange for SNAP benefits. USDA specifically encourages states to submit such waivers. *See* https://www.fns.usda.gov/snap/waivers/foodrestriction.

50.     Defendants approved the food restriction waivers pursuant to 7 U.S.C. § 2026(b)(1)(B)(i)–(ii) and they did not invoke or purport to satisfy any other statutory authority. The waivers do not satisfy the statutory criteria for pilot projects because they are not "pilot or experimental projects designed to test program changes" that "increase the efficiency" of SNAP or "improve the delivery" of benefits to eligible households, as required by 7 U.S.C. § 2026(b). Moreover, the approval letters do not identify how the waivers serve any of the four permissible statutory purposes.

51.     The food restriction waivers contain no exceptions for individual medical, nutritional, or household circumstances. Instead, the food restriction waivers place on recipients and retailers the responsibility for determining whether a particular product is a permissible SNAP purchase under each state's altered definition of "food."

52.     The food restriction waivers apply to all SNAP participants in the respective States in which they are in effect and allow no one to opt out. All retailers in waiver States are likewise prohibited from accepting SNAP benefits in exchange for items prohibited under the relevant State's waiver. As a result, the food restriction waivers directly impact every SNAP recipient and every SNAP-authorized retailer in each State where a waiver has been approved.

53.     Despite their wide-ranging impact, USDA did not follow the notice-and-comment procedures set forth in 7 C.F.R. § 282.1 before approving any of the food restriction waivers. None of the waivers contains any assessment of whether it would likely have a significant impact on the public, and USDA neither published a General Notice in the Federal Register nor provided any opportunity for SNAP recipients, retailers, or other stakeholders to submit comments before approval. As a result, affected households, including Plaintiffs, and retailers

and their representatives, were denied any opportunity to address the waivers' statutory deficiencies or their foreseeable harms.

54.     The approved food restriction waivers vary in the specific products that they restrict, but many of the waiver terms and legal deficiencies are identical.

55.     Although 7 U.S.C. § 2026 expressly requires that approved projects include an "evaluation to determine the effects of the project," the challenged waivers contain no such evaluation method. They likewise include no rigorous methodology capable of producing scientifically valid information. Instead, the waivers require States to "provide a finalized evaluation plan" at some unspecified later date.

56.     As a result, important details such as how the State will mitigate SNAP client reporting bias, define waiver "success," identify the data points and metrics to be collected, and explain how those data will be analyzed will not be determined, if at all, until some later unspecified date.  And the waivers do not identify finalized metrics, data-collection mechanisms, baseline measures, analytic methodologies, or any standard by which success will be defined or evaluated.

57.     The waivers refer to "SNAP participants' surveys" but fail to specify critical details such as when, how often, or in what manner participants will be surveyed, or how survey responses will be used in evaluating the waiver. Nor do the waivers include the evaluation reporting template they reference, even though States are required to submit quarterly reports using a USDA-provided template "based upon finalized data collection points, defined key metrics, and data analysis." The referenced template is not included in or attached to the waivers.

58.     Although the waivers state that "continued approval of the Project is contingent upon the results of the ongoing [waiver] evaluation," they contain no explanation of how success or failure will be measured.

59.     The challenged waivers do not serve any of the four permissible project purposes listed in 7 U.S.C. § 2026. They do not improve program administration, increase the self-sufficiency of SNAP recipients, test innovative welfare reform strategies, or allow greater conformity with the rules of other programs, and they do not describe or explain how they could do so. Nor do they allow greater conformity with the rules of other programs because the definition of "food" in SNAP has no interaction with the rules of other programs.

60.     USDA's website identifies purposes of the waivers that have nothing to do with the four permissible purposes listed in 7 U.S.C. § 2026—namely, "restor[ing] nutritional value" within SNAP and ensuring "that taxpayer dollars provide nutritious options that improve health outcomes within SNAP." *See* https://www.fns.usda.gov/snap/waivers/foodrestriction.

61.     In January 2018, USDA rejected materially similar proposals submitted by Maine and Nevada. Maine sought to disallow "sugar sweetened beverages and candy." Nevada sought to disallow "sugary drinks," or "sugar sweetened drinks."

62.     USDA rejected those proposals on the grounds that they would:

- Increase administrative costs of administering the SNAP program for states and retailers;
- Impose significant burdens on small businesses and private retailers;
- Require the government to select "winners and losers" in the food industry;
- Present difficulty in delineating nutritional benefits for allowable and excluded foods; and
- Restrict what individuals may eat in their own homes without clear evidence of meaningful health outcomes.

63.     The waiver applications and USDA's letters approving them fail to address the concerns USDA itself identified when rejecting materially similar proposals in 2018.

12

**The Food Restriction Waivers Utilize Inconsistent Definitions of "Food"**

64.     The food restriction waivers constitute a significant deviation from more than sixty years of precedent, during which the definition of "food" for the purposes of SNAP was consistent across the country.

65.     Under a consistent definition of "food," recipients could buy the same foods with their SNAP benefits wherever they lived or shopped. Crossing state lines did not impact the value and use of their essential subsistence benefits. The same products could be purchased with SNAP benefits when shopping in person and online.

66.     All of the challenged waivers specifically state that the relevant waiver "may not in any way impede inter-operability of SNAP program benefits, as detailed in 7 CFR 274.8 (b)(10). The food restriction waivers impede this inter-operability.

67.     Under the food restriction waivers, the definition of "food" for SNAP purposes varies from state to state. For example, a SNAP recipient in Iowa cannot use their SNAP benefits to buy the same foods as a recipient in Nebraska.

**Colorado Food Restriction Waiver**

68.     Colorado participates in SNAP. The Colorado Department of Human Services is the single state agency responsible for administering SNAP in Colorado. Colo. Rev. Stat. Ann. § 26-2-301.

69.     On May 13, 2025, the Colorado Department of Human Services ("DHS") submitted a request for approval of a demonstration project.

70.     USDA approved the demonstration project (hereinafter "Colorado waiver") on August 4, 2025.

71.     The Colorado waiver allows Colorado DHS to modify the statutory exceptions to the definition of "food" and the regulatory exceptions to the definition of "eligible foods."

13

Specifically, Colorado DHS is authorized to prohibit the use of SNAP benefits for the purchase of "soft drinks."

72.    The Colorado waiver defines "soft drinks" as "nonalcoholic beverages that contain natural or artificial sweeteners. 'Soft drinks' do not include beverages that contain milk or milk products, soy, rice, or similar milk substitutes, or greater than fifty percent of vegetable or fruit juice by volume."

73.    The Colorado waiver provides no further guidance as to the definition of a "natural or artificial sweeteners." The definitions provided by the Colorado waiver are ambiguous. These ambiguities make it extremely onerous, if not impossible, for recipients and retailers to determine which categories of "food" are eligible for SNAP benefits.

74.    The Colorado waiver's approved implementation date was March 1, 2026. The state has chosen to delay implementation to April 30, 2026. The Colorado waiver is authorized for a period of two years. Colorado DHS may request three annual extensions, which if approved would bring the total length of the Colorado waiver to five years.

75.    The Colorado waiver suffers from each of the specific deficiencies alleged in paragraphs 50 through 67. These allegations are incorporated herein by reference.

## Iowa Food Restriction Waiver

76.    Iowa participates in SNAP. The Iowa Department of Health and Human Services is the single state agency responsible for administering SNAP in Iowa. Iowa Code Ann. § 234.12.

77.    On April 1, 2025, the Iowa Department of Health and Human Services ("Iowa DHHS") submitted a request for approval of a demonstration project.

78.    USDA approved the demonstration project ("Iowa waiver") on May 22. 2025.

14

79.     The Iowa waiver allows Iowa DHS to modify the statutory exceptions to the definition of "food" and the regulatory exceptions to the definition of "eligible foods."

80.     Specifically, the Iowa waiver authorizes Iowa DHHS to prohibit the use of SNAP benefits for the purchase of "all taxable food items as defined by the Iowa Department of Revenue." The Iowa waiver states that Iowa "will use Chapter 423 of the Code of Iowa and Iowa Administrative Code Chapter 701220 to define taxable and nontaxable food items."

81.     The Iowa waiver further states that "In Iowa, sugar sweetened beverages with less than 50% juice and items designated as candy are taxable, as are seeds for food producing plants and food producing plants." As a result, these items are rendered ineligible for purchase with SNAP benefits.

82.     The Iowa waiver also lists several general categories of foods and beverages that are taxable under Iowa state law and thus ineligible for purchase with SNAP benefits under the terms of the waiver.

83.     Determining which general categories of foods and beverages are taxable under state law, and therefore ineligible for SNAP benefits, requires a complex analysis of several provisions of Iowa tax law. Iowa state law imposes a default six percent sales tax on retail sales Iowa Code Ann. § 423.2. The provisions of the Code of Iowa and the Iowa Administrative Code cited by the Iowa waiver set forth this default sales tax, as well as defining which items are and are not taxable. "Food and food ingredients" are not taxable.

84.     However, candy, prepared foods, and soft drinks are excluded from the definition of "food" for purposes of the exemption to the default state sales.  As a result, those categories are taxable, and thus ineligible for purchase with SNAP benefits. 423.3(57).

85.    But the definitions of candy, prepared foods, and soft drinks, which are ambiguous and complicated, make it difficult to discern what is and what is not captured by these categories.

86.    "Candy" is defined as "a preparation of sugar, honey, or other natural or artificial sweeteners in combination with chocolate, fruits, nuts, or other ingredients or flavorings in the form of bars, drops, or pieces. Candy shall not include any preparation containing flour and shall require no refrigeration." 423.3 (57)(b).

87.    Iowa state regulations provide examples of whether a product is "candy" or not. Barbeque flavored peanuts are considered candy; a breakfast bar that contains "whole grain" but not "flour" on the ingredient list is considered candy; but a box of chocolate that lists flour as an ingredient is *not* considered candy. 701—220.3(423)

88.    "Prepared food" is statutorily defined as "[f]ood sold in a heated state or heated by the seller, including food sold by a caterer [or] [t]wo or more food ingredients mixed or combined by the seller for sale as a single item," or "[f]ood sold with eating utensils provided by the seller, including plates, knives, forks, spoons, glasses, cups, napkins, or straws," but not food "[o]nly cut, repackaged, or pasteurized by the seller…[e]ggs, fish, meat, poultry, and foods containing these raw animal foods requiring cooking by the consumer as recommended by the United States food and drug administration…[b]akery items sold by the seller which baked them…[f]ood sold without eating utensils provided by the seller in an unheated state as a single item which is priced by weight or volume [and] [f]ood sold that ordinarily requires additional cooking by the consumer prior to consumption." 423.3 (57)(f).

89.    Iowa state regulations elaborate on this definition, adding that "[i]f food is sold for consumption on the premises of a retailer, the food is rebuttably presumed to be prepared

food." "Premises of a retailer" means the total space and facilities under control of the retailer or available to the retailer, including buildings, grounds, and parking lots that are made available or that are available for use by the retailer, for the purpose of sale of prepared food and drink or for the purpose of consumption of prepared food and drink sold by the retailer. Availability of self-service heating or other preparation facilities or eating facilities such as tables and chairs and knives, forks, and spoons, indicates that food, food products, and drinks are sold for consumption on the premises of the retailer and are subject to tax as sales of prepared food." 701—220.4(423).

90.    Under the Iowa waiver, certain foods may be purchased with SNAP from one retailer but not another based on whether the retailer has seating or eating utensils available on site.

91.    "Soft drinks" is defined in statute as "nonalcoholic beverages that contain natural or artificial sweeteners. "Soft drinks" does not include beverages that contain milk or milk products; soy, rice, or similar milk substitutes; or greater than fifty percent of vegetable or fruit juice by volume." 423.3 (57)(g).

92.    These ambiguities make it extremely onerous, if not impossible, for recipients and retailers to determine which categories of "food" are eligible for SNAP benefits.

93.    The Iowa waiver went into effect on January 1, 2026. The Iowa waiver is authorized for a period of two years. Iowa DHHS may request three annual extensions, which if approved would bring the total length of the Iowa waiver to five years.

94.    The Iowa waiver suffers from each of the specific deficiencies alleged in paragraphs 50 through 67. These allegations are incorporated herein by reference.

**Nebraska Food Restriction Waiver**

95.    Nebraska participates in SNAP. The Nebraska Department of Health and Human Services is the single state agency responsible for administering SNAP in Nebraska. Neb. Rev. Stat. § 68-309.

96.    On April 14, 2025, the Nebraska Department of Health and Human Services ("DHHS") submitted a request for approval of a demonstration project.

97.    USDA approved the demonstration project (hereinafter "Nebraska waiver") on May 19. 2025.

98.    The Nebraska waiver allows Nebraska DHHS to modify the statutory exceptions to the definition of "food" and the regulatory exceptions to the definition of "eligible foods." Specifically, Nebraska DHHS is authorized to prohibit the use of SNAP benefits for the purchase of "soda, soft drinks, and energy drinks."

99.    The definitions of "soda, soft drinks, and energy drinks" utilized by the Nebraska waiver are ambiguous.

100.    The Nebraska waiver defines "soda" and "soft drinks" as "any carbonated non-alcoholic beverage that contains water, a sweetening agent (including but not limited to sugar, high-fructose corn syrup, or artificial sweeteners), flavoring, and carbon dioxide gas to create carbonation."

101.    The Nebraska waiver provides no further guidance as to the definition of a "sweetening agent."

102.    The Nebraska waiver provides no further guidance as to the definition of "flavoring."

103.    The Nebraska waiver defines "energy drinks" as "carbonated or non-carbonated beverages containing a stimulant such as fortified caffeine, guarana, glucuronolactone, or

taurine. They may also include herbal extracts such as ginseng, mineral salts, and vitamins, or high doses of organic acids, amino acids, inositol, sugars, or other similar compounds in addition to sweeteners. Juices or natural fruit pulp or concentrates may also be added. Energy drinks are specifically formulated to enhance energy, alertness, or physical performance."

104.    The Nebraska waiver specifically states that "beverages marketed primarily as sports drinks to increase hydration, like Gatorade or medically necessary nutritional products, are not included."

105.    The Nebraska waiver provides no guidance as to the definition of "medically necessary nutritional products."

106.    The Nebraska waiver provides no guidance as to how to determine if beverages are "marketed primarily as sports drinks to increase hydration."

107.    These ambiguities make it extremely onerous, if not impossible, for recipients and retailers to determine which categories of "food" are eligible for SNAP benefits.

108.    The Nebraska waiver went into effect on January 1, 2026. The Nebraska waiver is authorized for a period of two years. Nebraska DHHS may request three annual extensions, which if approved would bring the total length of the Nebraska waiver to five years.

109.    The Nebraska waiver suffers from each of the specific deficiencies alleged in paragraphs 50 through 67. These allegations are incorporated herein by reference.

### Tennessee Food Restriction Project

110.    Tennessee participates in SNAP. The Tennessee Department of Human Services is the single state agency responsible for administering SNAP in Tennessee. Tenn. Code Ann. § 71-5-304.

111.    On September 29, 2025, the Tennessee Department of Human Services ("Tennessee DHS") submitted a request for approval of a demonstration project.

19

112.    USDA approved the demonstration project (hereinafter "Tennessee waiver") on December 10, 2025.

113.    The Tennessee waiver allows Tennessee DHS to modify the statutory exceptions to the definition of "food" and the regulatory exceptions to the definition of "eligible foods." Specifically, Tennessee DHS is authorized to prohibit the use of SNAP benefits for the purchase of "processed foods and beverages such as soda, energy drinks, and candy."

114.    The definitions of excluded foods and excluded beverages utilized by the Tennessee waiver are ambiguous.

115.    The Tennessee waiver defines "excluded foods" as "'Processed foods' that list sugar, cane sugar, com syrup, or high fructose com syrup as the first ingredient, excluding granulated sugar, raw sugar, and other single-ingredient sugars used for cooking and baking. 'Processed foods' are foods that include any food altered from its natural state through processes including, but not limited to, heating, mixing, milling, canning, freezing or adding ingredients."

116.    The Tennessee waiver does not provide any additional clarity as to the definition of "processed foods" or "processes."

117.    The Tennessee waiver defines "excluded beverages" as "'Beverages' that list carbonated water and sugar, cane sugar, com syrup, and high fructose com syrup as the first two ingredients. Beverages that list aspartame or other low-or-non-caloric sweeteners as the first two ingredients remain eligible for purchase."

118.    These ambiguities will make it extremely onerous, if not impossible, for recipients and retailers to determine which categories of "food" are eligible for SNAP benefits.

119.    The designated start date for the Tennessee waiver is July 31, 2026. The Tennessee waiver is authorized for a period of two years. Tennessee DHS may request three

annual extensions, which if approved would bring the total length of the Tennessee waiver to five years.

120.    The Tennessee waiver suffers from each of the specific deficiencies alleged in paragraphs 50 through 67. These allegations are incorporated herein by reference.

### West Virginia Food Restriction Project

121.    West Virginia participates in SNAP. The West Virginia Department of Human Services is the single state agency responsible for administering SNAP in West Virginia. W. Va. Code Ann. § 9-2-3.

122.    On June 10, 2025, the West Virginia Department of Human Services ("DHS") submitted a request for approval of a demonstration project.

123.    USDA approved the demonstration project (hereinafter "West Virginia waiver") on August 4, 2025.

124.    The West Virginia waiver allows West Virginia DHS to modify the statutory exceptions to the definition of "food" and the regulatory exceptions to the definition of "eligible foods." Specifically, West Virginia DHS is authorized to prohibit the use of SNAP benefits for the purchase of "soda pop or soda."

125.    The definition of "soda pop or soda" utilized by the West Virginia waiver is ambiguous.

126.    The West Virginia waiver defines "soda pop or soda" as "any carbonated non-alcoholic beverage that contains water, a sweetening agent (including but not limited to sugar, high –fructose corn syrup, or artificial sweeteners), flavoring, and carbon dioxide gas to create carbonation. This term includes beverages with added caffeine or other ingredients but does not include carbonated water without sweeteners or flavoring."

127.    The West Virginia waiver specifies that "milk and milk products, fruit and vegetable juice, and water or water products" are "not included in the waiver" and "remain available for purchase with SNAP."

128.    The West Virginia waiver provides no further guidance as to the definition of "artificial sweeteners."

129.    The West Virginia waiver provides no further guidance as to the definition of "flavoring."

130.    These ambiguities make it extremely onerous, if not impossible, for recipients and retailers to determine which categories of "food" are eligible for SNAP benefits.

131.    The West Virginia waiver went into effect on January 1, 2026. The West Virginia waiver is authorized for a period of two years. West Virginia DHS may request three annual extensions, which if approved would bring the total length of the West Virginia waiver to five years.

132.    The West Virginia waiver suffers from each of the specific deficiencies alleged in paragraphs 50 through 67. These allegations are incorporated herein by reference.

**<u>Plaintiffs Will Suffer Irreparable Harm Absent Relief</u>**

133.    Plaintiffs will suffer irreparable harm if the effective date of the challenged waivers are not postponed. As alleged herein and discussed more fully below, the waivers have already, or will immediately, deprive Plaintiffs of access to foods and beverages that are necessary to manage serious medical conditions, maintain adequate nutrition, and avoid significant deterioration in health and daily functioning.

134.    Plaintiffs are individuals and families with limited incomes and resources who rely on SNAP benefits to obtain groceries and who, in many cases, have no practical ability to replace lost purchasing power with cash.

135.    The challenged waivers prohibit Plaintiffs from using SNAP benefits to purchase specific items on which they depend to manage diabetes, maintain hydration, manage chronic illnesses, and provide medically necessary "safe foods" for family members with serious disabilities and eating disorders.

136.    Because of the waivers, Plaintiffs are, or will be, forced either to forgo essential items or to divert scarce funds away from rent, utilities, transportation, and other basic necessities in order to obtain the food they need to maintain their health, and in some cases, to survive.

**Plaintiff Amanda Johnson**

137.    Plaintiff Amanda Johnson lives in Tennessee and relies on SNAP benefits to afford to buy groceries for herself and her daughter.

138.    Plaintiff Johnson is currently able to purchase the foods her family needs, but once the Tennessee waiver takes effect, she will not be able to do so.

139.    Plaintiff Johnson's daughter has specific food needs, and the family has extremely limited income. Plaintiff Johnson's daughter is 19 years old, lives with Plaintiff Johnson, and has autism, intellectual disabilities, obsessive compulsive disorder, and avoidant/restrictive food intake disorder ("ARFID"). Because of these conditions, her daughter requires round-the-clock care, and Plaintiff Johnson is unable to work outside the home because she serves as her daughter's full-time caregiver. Tennessee does not pay caretakers who provide full-time care for their own family. Avoidant/restrictive food intake disorder, or ARFID, is a serious eating disorder that causes a person to have a diet that is so limited it leads to medical, nutritional, and/or psychosocial problems. It can cause weight loss, stalled growth, significant nutritional deficiencies, and interference in relationships, school, or work due to difficulties eating.

23

140.     Plaintiff Johnson's daughter receives $994 per month in Supplemental Security Income, and the household has no other income. That income is insufficient to cover household expenses. SNAP benefits are therefore the only means by which Plaintiff Johnson can purchase food for herself and her daughter.

141.     Because of her daughter's ARFID, she can safely consume only a very limited number of "safe foods." If she is unable to eat those foods, the only alternative is nutrition through a feeding tube. Her physicians have advised Plaintiff Johnson to provide her daughter with whatever foods she is able to eat in order to avoid nutritional deterioration and invasive medical intervention.

142.     At the time of this filing, Plaintiff Johnson's daughter can consume only the following foods and beverages: On-Cor Chicken Nibblers; Ore-Ida Extra Crispy Fast Food Fries; Pop-Tarts (Frosted Hot Fudge Sundae); Welch's Fruit Snacks (Berries 'n Cherries); Mott's Fruit Snacks (Assorted Fruit); and M&Ms. Her safe beverages are Hawaiian Punch (Lemon Berry Squeeze), Welch's Fruit Punch, and Kroger brand bottled water.

143.     Once the Tennessee waiver goes into effect, Plaintiff Johnson will not be able to use SNAP to purchase most of these medically necessary items for her daughter. She will only be able to purchase two of these foods—On-Cor Chicken Nibblers and Ore-Ida Extra Crispy Fast Food Fries—and one of these beverages— Kroger brand bottled water—with her SNAP benefits.

144.     As a result, Plaintiff Johnson will be unable to obtain the groceries her family needs with SNAP. Without access to her safe foods, Plaintiff Johnson's daughter will require invasive medical intervention. The harm to Plaintiff Johnson and her daughter will be devastating and irreparable.

145.    Plaintiff Johnson was not provided notice of, or any opportunity to comment on, the Tennessee waiver before USDA approved it. If Plaintiff Johnson had been given the opportunity to comment, she would have done so.

## Plaintiff Marc Craig

146.    Plaintiff Marc Craig resides in Iowa and relies on SNAP benefits to afford to buy groceries for himself.

147.    Before the Iowa waiver took effect, Plaintiff Craig was able to purchase the foods he needed. Since the waiver went into effect, however, his food purchases have been subject to significant restrictions, and there are many foods and beverages he can no longer buy with SNAP benefits.

148.    Plaintiff Craig has specific food needs and extremely limited income, and until recently was unhoused. He drives for UberEats and usually earns around $500 per month, which he uses for gas, car insurance, rental insurance, loan repayment, and his cell phone bill. His rent and utilities are currently subsidized by a nonprofit organization, but he will begin paying those expenses himself over the course of this year.

149.    Plaintiff Craig has chronic kidney failure and diabetes, and to manage his kidney disease he must strictly limit his intake of sugar and sodium. While he was unhoused, he slept in his car and had no access to a kitchen. As a result, the only foods he could consume were those that did not require cooking or refrigeration. Even before the Iowa waiver took effect, maintaining a medically appropriate diet was difficult under those circumstances because many shelf-stable or ready-to-eat foods available to him were high in sugar and sodium.

150.    Plaintiff Craig is now living in an apartment with a kitchen. However, he is still working to acquire kitchen supplies that would help him cook healthy meals.

151.    Under the Iowa waiver, SNAP eligibility now depends not only on the type of food, but also on complex factors such as whether a retailer has a seating area and whether the food was prepared on-site. Plaintiff Craig has found it difficult to follow these rules given their inherent ambiguity. Because of these ambiguities, Plaintiff Craig may purchase certain foods with SNAP at some stores but not at others.

152.    Since the waiver took effect, Plaintiff Craig has been deprived of access to food because of this inconsistency: at some retailers he was not able to purchase sandwiches and salads, while at other retailers he was able to do so. Many of the items that remain consistently SNAP-eligible across retail locations are either nutritionally inappropriate, such as ice cream, or prohibitively expensive, such as pre-cut fruit.

153.    Since the Iowa waiver took effect, Plaintiff Craig's diet has worsened, and he is consuming more highly processed foods that are high in sugar and sodium. As a result, he is increasingly reliant on medication to manage conditions that he previously helped control through diet.

154.    An important part of managing Plaintiff Craig's kidney disease is staying well hydrated. While he was homeless, he was chronically dehydrated because he had limited access to bathrooms, and now that he is living in an apartment, he is working to improve his hydration by drinking Gatorade or Pedialyte. Under the Iowa waiver, however, Plaintiff Craig cannot use his SNAP benefits to buy Gatorade or Pedialyte. The Iowa waiver thus prevents Plaintiff Craig from purchasing the foods and beverages he needs to manage his health conditions safely.  The harm he is suffering is devastating and irreparable.

155.    Before the Iowa waiver went into effect, Plaintiff Craig sent emails to all 150 Iowa state legislators, his Congressperson, his Senators, the governor of Iowa, and the mayor of

Des Moines to try to explain how the Iowa waiver would harm him and other Iowans who rely on SNAP.

156.    Defendants did not provide Plaintiff Craig any notice of, or opportunity to comment on, the waiver before approving it. If Plaintiff Craig had been given the opportunity to comment, he would have done so.

**Plaintiff Nathan Fleming**

157.    Plaintiff Nathan Fleming relies on SNAP benefits to afford to buy groceries for himself.

158.    Before the Nebraska waiver took effect, Plaintiff Fleming was able to purchase the foods he needed, but since the waiver went into effect he has been unable to do so.

159.    Plaintiff Fleming has specific food needs and extremely limited income. He is disabled and unable to work, and receives $407 per month in Supplemental Security Income and $607 per month in Social Security Disability Insurance, with no other source of income. His fixed income is insufficient to cover his household expenses and buy groceries. Plaintiff Fleming therefore relies on SNAP to purchase adequate food, and SNAP benefits are essential to his ability to meet his nutritional needs.

160.    Plaintiff Fleming has a chronic spine condition and chronic insomnia. To manage his insomnia and remain functional during the day, he must consume caffeine; without it, he is unable to stay awake and cannot effectively manage his other medical conditions. Plaintiff Fleming is allergic to most plant-based products, including coffee and tea, and as a result the only caffeinated products he can safely consume are certain energy drinks. He works with a dietician to manage his weight and health conditions, and his dietician has identified specific low- or no-sugar energy drinks that meet his medical and dietary needs without triggering allergic reactions.

161.    Before the Nebraska waiver took effect, Plaintiff Fleming was able to purchase these energy drinks with SNAP benefits. Since the waiver took effect, however, he has been unable to use SNAP to purchase any of the energy drinks recommended by his dietician, and without access to those products he is unable to manage his insomnia safely and consistently. The Nebraska waiver, thus, prevents Plaintiff Fleming from purchasing medically necessary items that he previously relied upon. The harm he is suffering is devastating and irreparable.

162.    Plaintiff Fleming was not provided notice of, or any opportunity to comment on, the waiver impacts him before Defendants approved it. If Plaintiff Fleming had been given the opportunity to comment, he would have done so.

### Plaintiff Nieves Aragon

163.    Plaintiff Nieves Aragon resides in Colorado. She relies on SNAP benefits to purchase groceries for herself and her child.

164.    Once the Colorado waiver takes effect, Plaintiff Nieves will be unable to purchase the items she needs to maintain her health. Plaintiff Aragon has diabetes, with which she was diagnosed as a child. Her income is limited. She earns approximately $1,300 per month after taxes, has no other source of income, and her wages are only enough to cover household expenses. SNAP benefits are the only money Plaintiff Aragon has available to feed herself and her child.

165.    To prevent dangerous drops in blood sugar due to her diabetes, Plaintiff Aragon regularly uses small juice boxes and small cans of soda as fast-acting glucose sources.

166.    Plaintiff Aragon's job requires her to remain on her feet for extended periods and move throughout the Colorado State Capitol building, making effective and immediate management of her blood sugar essential to her ability to work safely.

167.    Based on years of managing her condition and participating in educational programming about nutrition, Plaintiff Aragon has determined that small, sugary beverages are the most reliable and efficient means of raising her blood sugar quickly, but under the Colorado waiver, she is unable to use her SNAP benefits to purchase many of the beverages on which she relies to manage her diabetes.

168.    To obtain these medically necessary items, Plaintiff Aragon will be forced to divert limited cash income from other essential household expenses, including gasoline and her child's extracurricular activities.

169.    Plaintiff Aragon will suffer devastating and irreparable harm as a result of the waiver. She will be unable to use her SNAP benefits to buy medically necessary items, and must choose between spending money needed for other household essentials and risking her health.

170.    Plaintiff Aragon was not provided notice of, or any opportunity to comment on, the Colorado waiver and how it impacts her and her community before Defendants approved it. If Plaintiff Aragon had been given the opportunity to comment, she would have done so.

**Plaintiff Hunter Starks**

171.    Plaintiff Hunter Starks resides in West Virginia and relies on SNAP benefits to purchase groceries for themself and their child.

172.    Before the West Virginia waiver took effect, Plaintiff Starks was able to purchase the beverages Plaintiff Starks needs, including certain beverages such as soda, with SNAP benefits. Since the waiver went into effect, Plaintiff Starks has been unable to do so.

173.    Plaintiff Starks is enrolled in school full time and has limited income. Plaintiff Starks works part-time and earns approximately $800 every two weeks, which is the household's only source of income. Occasionally, Plaintiff Starks picks up an extra shift at night to supplement the household's income. Plaintiff Starks wages are only just enough to cover

household expenses, and SNAP benefits are therefore essential to ensuring that Plaintiff Starks and their child have adequate food.

174.    Plaintiff Starks is the sole caregiver for their child, and SNAP benefits are the only money available to purchase the food the household needs. Because of Plaintiff Stark's work, school obligations, and parenting responsibilities, Plaintiff Starks's daily schedule is physically and mentally demanding. Prior to implementation of the West Virginia waiver, Plaintiff Starks relied on certain beverages, including soda, as a moderate source of caffeine to maintain the energy and alertness necessary to meet those work, school, and parenting obligations. Plaintiff Starks avoids consuming coffee in the afternoon because of its higher caffeine content. Since the West Virginia waiver took effect, Plaintiff Starks has been unable to use SNAP benefits to purchase the beverages Plaintiff Starks previously relied upon.

175.    As a result, Plaintiff Starks' ability to maintain the energy necessary to work, attend school, and care for Plaintiff Stark's child has been impaired. This is imposing irreparable harm on Plaintiff Stark.

176.    Plaintiff Starks was not provided notice of, or any opportunity to comment on, the waiver impacts them and their community before Defendants approved it. If Plaintiff Starks had been given the opportunity to comment, they would have done so.

**The Waivers Burden Retailers and Create Confusion at the Point of Sale**

177.    The participation of retailers is an essential component of SNAP, because recipients such as Plaintiffs can utilize their nutrition benefits only if retailers accept payment in the form of SNAP benefits.

178.    In order to comply with food restriction waivers, retailers must ensure that they do not accept SNAP benefits in exchange for products disallowed by the applicable waiver. To accomplish this, each product sold by a retailer must be evaluated to determine whether it may

be purchased with SNAP benefits in a given waiver State. This designation process requires significant work up front by the retailer, because initial determinations must be made by the store, and it requires ongoing work because new products and new or special-edition versions of existing products must also be designated as allowable or not allowable for SNAP.

179.    Many retailers use Universal Product Codes ("UPCs") to track and identify products for sale. For retailers that use UPCs, waiver compliance requires designating UPCs as allowable or not allowable for SNAP. Only one State, Oklahoma, has created a list of UPC codes that are not allowable for SNAP under its waiver. In waiver States that have not created a list of non-allowable UPC codes, retailers must make their own assessment as to whether a given product is or is not allowable for SNAP under their State's waiver. None of the challenged waivers require the State to provide a list of allowable products. Because of the significant ambiguities in the various waiver definitions of "food," absolute compliance with the waivers will be impossible for many retailers.

180.    Retailer staff must be retrained regarding food restriction waivers, and retailers with locations across multiple waiver States must undertake these burdens with respect to multiple different, and often inconsistent, sets of food restrictions.

181.    Pursuant to USDA Guidance, retailers with online ordering capacity that fulfill orders directly from warehouses must undertake these burdens for every waiver State into which they sell products through their websites. See infra ¶ 186. A study conducted by food retailer trade groups estimates the upfront cost of waiver compliance at $1.558 billion, and the cost of ongoing compliance at more than $759.1 million per year. These costs were not studied or evaluated before any of the above-described waivers were approved. Moreover, retailers and

their trade association representatives were not given an opportunity to provide comments on the compliance costs of these waivers before the waivers were approved.

182.    SNAP recipients must guess whether products are allowable for SNAP based on their own understanding of their State's waiver. If a SNAP recipient attempts to buy a product that is not allowable for SNAP in their State, it is up to a retail cashier to explain that the product is not allowable. Frontline retail workers are thus put in the position of enacting and enforcing the food restriction waivers on SNAP recipients. If a retailer believes a product is not allowable for SNAP under the State's waiver and a SNAP recipient disagrees, that SNAP recipient has no recourse, because none of the waivers contains any mechanism for recipients to challenge retailer determinations made pursuant to the State's food restrictions.

### Federal Enforcement of Food Restriction Waivers on Retailers

183.    On December 30, 2025, USDA issued the USDA Guidance "clarify[ying] FNS policies and plans for SNAP-retailer compliance with [food restriction] waivers, including guidance on which SNAP retailers must comply, online orders and deliveries, and the consequences for non-compliance."

184.    The USDA Guidance states that, "[a]s of December 30, 2025, FNS has approved 18 State agency requests to implement a SNAP Food Restriction Waiver and is poised to approve more in the future." It further states that, after the expiration of a 90-day grace period, SNAP retailers "will be subject to investigation to determine compliance with the applicable SNAP Food Restriction Waiver(s)." According to the Guidance, USDA intends to use undercover investigations to determine whether a retailer is complying with the relevant waiver or waivers. The Guidance states that while states are not required to conduct their own compliance monitoring, they may do so via secret shopper programs. According to the Guidance, any waiver noncompliance discovered by states must be reported to USDA.

32

185.    Following a first instance of noncompliance, USDA plans to send the retailer a warning letter, and 30 days after issuance of that warning letter, USDA intends to conduct additional investigations. If additional or continuing noncompliance is found, USDA plans to remove the retailer from the SNAP program through involuntary withdrawal. When a retailer is subject to involuntary withdrawal, it can take years to regain status as an authorized SNAP retailer.

186.    The USDA Guidance further states that all walk-in SNAP retailers located within a State with a food restriction waiver must comply with the waiver in effect in that State. It also states that when an online SNAP retailer fulfills an order paid with SNAP benefits from a warehouse, the retailer must comply with the food restriction waiver in place, if any, in the purchaser's State, regardless of where the warehouse is located or whether the order reaches the customer through in-person pickup or delivery. And when an online SNAP retailer fulfills an order paid with SNAP benefits from the stock of a walk-in retail location, the retailer must comply with the waiver in place, if any, in the State where the retail location is located, again regardless of whether the order reaches the customer through in-person pickup or delivery.

187.    The USDA Guidance thus adds further onerous compliance burdens on retailers, while threatening severe consequences for even minor noncompliance. The compliance obligations imposed by the waivers are more strict than other, existing legal compliance obligations managed by retailers. In addition, retailers face reputational risk from inadvertent violations of the waiver terms. These burdens materially increase the possibility that retailers will leave the program, voluntarily or involuntarily. When that happens, many SNAP recipients will be unable to purchase any of the food they need.

## COUNT ONE: VIOLATION OF ADMINISTRATIVE PROCEDURES ACT (ACTION IN VIOLATION OF STATUTORY AUTHORITY)

188.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

189.    The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(D).

190.    USDA exceeded its statutory authority in approving the food restriction waivers as demonstration projects under 7 U.S.C. § 2026 (b)(1)(B) because the waivers do not meet any of the four allowable purposes listed in the statute.

191.    USDA further exceeded its statutory authority by approving the food restriction waivers as demonstration projects under 7 U.S.C. § 2026 (b)(1)(B) without any method for evaluation.

192.    Approval of the food restriction waivers should thus be set aside.

## COUNT TWO: VIOLATION OF ADMINISTRATIVE PROCEDURES ACT (ARBITRARY AND CAPRICIOUS AGENCY ACTION)

193.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

194.    The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A)-(D).

195.    The food restriction waivers do not comply with basic statutory requirements. They are not designed to test program changes that might increase the efficiency of [SNAP] and improve the delivery of [SNAP] benefits to eligible households." 7 U.S.C. § 2026 (b)(1).

196.    The food restriction waivers lack a method for evaluation as required by 7 U.S.C. § 2026 (b)(1)(B).

197.    In approving the food restriction waivers, Defendants relied on factors which Congress did not intend them to consider, entirely failed to consider factors Congress required them to consider, offered an explanation for the decision that runs counter to the evidence, and failed to acknowledge or explain changes in agency position.

198.    The approval of the food restriction waivers were arbitrary and capricious, an abuse of discretion, and were not in accordance with the law.

199.    Approval of the food restriction waivers should thus be set aside.

**COUNT THREE: ABSENCE OF NOTICE AND OPPORTUNITY TO COMMENT, A PROCEDURE REQUIRED BY LAW**

200.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

201.    The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are made "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

202.    USDA may not approve a SNAP demonstration project that will likely have a significant impact on the public under 7 U.S.C. § 2026 without first according the public notice of, and an opportunity to comment upon, a proposed project. 7 C.F.R. § 282.1 (b).

203.    USDA did not observe this notice-and-comment requirement before approving the food restriction waivers.

204.    Members of the public, including the Plaintiffs, did not have any opportunity to comment on the restriction of products that may be purchased with SNAP benefits.

205.    USDA's approval of the food restriction waivers, without observing the regulatory requirements for public notice and comment, was without observance of a procedure required by law.

206.    Approval of the food restriction waivers accordingly should be set aside.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully ask that this Court:

1.    Declare that Defendants' approval of the food restriction waivers violates the Administrative Procedures Act and the Food and Nutrition Act of 2008 in the respects set forth above;

2.    Postpone the effective date of the challenged food restriction waivers;

3.    Hold unlawful and set aside Defendants' approval of the food restriction waivers;

4.    Temporarily restrain and then permanently enjoin the continued application or enforcement of any waiver that has already gone into effect;

5.    Temporarily restrain and permanently enjoin the implementation of any waiver that has not already gone into effect;

6.    Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

7.    Grant such other relief as may be just and proper.

Dated:  March 11, 2026
      New York, New York

Respectfully submitted,

  /s/Meegan Hollywood
Meegan Hollywood (NY0206)
Jeffery Shinder*
Ellison Snider*
Lindsay Maher*
Shinder Cantor Lerner LLP
14 Pennsylvania Plaza, 19th Floor
New York, NY 10122
(646) 960-8601
meegan@scl-llp.com
jeffrey@scl-llp.com
esnider@scl-llp.com
lmaher@scl-llp.com

Katharine Deabler-Meadows*
National Center for Law and
Economic Justice
50 Broadway, Suite 1500
New York, NY 10004
(212) 633-6967
deabler@nclej.org

*Motion for Admission Pro Hac Vice forthcoming