# SNAP FOOD RESTRICTION WAIVERS DOCUMENTATION

GOV000181

**USDA Food and Nutrition Service**
U.S. DEPARTMENT OF AGRICULTURE

DATE:          December 30, 2025

SUBJECT:       Supplemental Nutrition Assistance Program – Clarifications on Food Restriction
               Waivers and Retailer Compliance

TO:            All SNAP State Agencies Approved to Implement Food Restriction Waivers
               All Regions

The primary purpose of the Supplemental Nutrition Assistance Program (SNAP) is "to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households" [7 U.S.C. § 2011]. SNAP Food Restriction Waivers further that purpose, as part of broader State and Federal Government efforts to fight the obesity epidemic and Make America Healthy Again. The U.S. Department of Agriculture Food and Nutrition Service (FNS) has approved waivers for an initial 2-year period under the authority of Section 17(b) of the Food and Nutrition Act of 2008, which allows SNAP State agencies to test changes designed to improve the effectiveness and efficiency of the program.

As of December 30, 2025, FNS has approved 18 State agency requests to implement a SNAP Food Restriction Waiver and is poised to approve more in the future. These State agencies will prohibit purchasing foods such as candy and sugar-sweetened beverages with SNAP benefits. Several State agencies will implement waivers beginning January 1, 2026, with others following in Spring and Summer 2026. FNS posts each waiver approval on its public website (https://www.fns.usda.gov/snap/waivers/foodrestriction). State agency definitions of restricted items and implementation dates vary, requiring close coordination between State agencies and affected retailers. Implementing State agencies have been engaging directly with retailers to prepare them to comply with their SNAP Food Restriction Waivers, as required by FNS. To implement waivers successfully, SNAP retailers must update Point of Sale (POS) equipment, train employees, and make other preparations.

This memorandum clarifies FNS policies and plans for SNAP-retailer compliance with these SNAP waivers, including guidance on which SNAP retailers must comply, online orders and deliveries, and the consequences for non-compliance.

Food and Nutrition Service, Braddock Metro Center, 1320 Braddock Place, Alexandria, VA 22314
USDA is an equal opportunity provider, employer, and lender.

Guidance documents lack the force and effect of law, unless expressly authorized by statute or incorporated into a contract. USDA may not cite, use, or rely on any guidance that is not available through their guidance portal, except to establish historical facts.

GOV000182

The success of these projects will hinge on the collaborative efforts of SNAP State agencies, retailers, and FNS. FNS applauds the many State agencies and thousands of retailers that have been engaged in preparing for these bold projects thus far, and we are excited to continue this important work.

Sincerely,

Patrick A. Penn
Acting Administrator, Food and Nutrition Service
Deputy Under Secretary, Food, Nutrition, and Consumer Services
U.S. Department of Agriculture

Enclosure

Guidance documents lack the force and effect of law, unless expressly authorized by statute or incorporated into a contract. USDA may not cite, use, or rely on any guidance that is not available through their guidance portal, except to establish historical facts.

# CLARIFICATIONS ON SNAP FOOD RESTRICTION WAIVERS AND RETAILER COMPLIANCE

**SNAP Retailers Required to Comply**

All walk-in SNAP retailer stores physically located within a State implementing a SNAP Food Restriction Waiver must comply with the State's waiver for all SNAP transactions, consistent with 7 CFR 278.2. This refers to all SNAP retailers with a physical store location for in-person shopping in a waiver implementing State. These stores may also offer online ordering for pick-up or delivery, potentially through a third party.

- Example:

  o Iowa has an approved SNAP Food Restriction Waiver.
  o All walk-in SNAP-authorized retailers located in Iowa must comply with Iowa's SNAP Food Restriction Waiver.

Certain other retailers are also required to comply when fulfilling online orders from a warehouse (fulfillment center), regardless of their location. When a SNAP participant from an implementing State places an online order using SNAP benefits and the retailer fulfills any part of the order from a warehouse, the retailer must comply with the restrictions of that participant's State, consistent with 7 CFR 278.2. This applies to all transactions in which the order is fulfilled from a warehouse not open to customers, whether shipped directly to the customer's address or to a designated pick-up location. Some retailers will therefore be required to comply with multiple States' waivers. Retailers fulfilling orders from warehouses can use the State-issued SNAP EBT card's Bank Identification Number (BIN) to determine SNAP participants' States.

- Example:

  o Iowa, Nebraska, and Colorado each have an approved SNAP Food Restriction Waiver.
  o When fulfilling an online order from a warehouse, a SNAP retailer must comply with:
    - Iowa's waiver for purchases made with an Iowa EBT card;
    - Nebraska's waiver for purchases made with a Nebraska EBT card; and
    - Colorado's waiver for purchases made with a Colorado EBT card.

| SNAP Online Transactions and Food Restriction Waivers Policy Summary | | |
|---|---|---|
| Fulfilled from: | Order made available to the customer by: | Restrict the purchase based on: |
| Walk-in store | In-person pick-up or delivery* | Store address |
| Warehouse | In-person pick-up or delivery* | EBT card State, based on BIN |

*Includes online orders that are purchased online and delivered through the store's own staff or via a third-party.*

Guidance documents lack the force and effect of law, unless expressly authorized by statute or incorporated into a contract. USDA may not cite, use, or rely on any guidance that is not available through their guidance portal, except to establish historical facts.

GOV000184

FNS will continuously review this policy to make certain it adheres to States' goals of restricting certain items from purchase with SNAP benefits.

## FNS Retailer Monitoring and Compliance Policy

The FNS Office of Retailer Operations and Compliance (ROC) is responsible for administering oversight of retailer participation in SNAP. This includes the authorization of stores to accept SNAP benefits, the monitoring of SNAP retailers for compliance, and the sanctioning of stores that violate program laws and regulations.

Federal law explains that the primary purpose of SNAP is "to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households" [7 U.S.C. § 2011] and specifically requires that FNS only authorize those retailers that "will effectuate the purposes" of SNAP [7 U.S.C. § 2018]. Considering these laws, FNS has determined that SNAP-authorized retailers must comply with SNAP Food Restriction Waivers.

FNS has developed plans for monitoring SNAP retailers' compliance with these waivers and the consequences for non-compliance. FNS seeks to fulfill its statutory responsibility to ensure that retailers' participation is consistent with applicable laws while also taking into consideration the significant technical challenges associated with these bold, innovative waivers.

## FNS Notifications to SNAP Retailers Required to Comply

In advance of each State agency's Food Restriction Waiver implementation date, FNS will issue electronic notifications to SNAP authorized retailers required to comply with the waiver. The notifications will explain that compliance with these waiver restrictions is required to effectuate the purpose of SNAP and maintain authorization as a SNAP retailer.  The notifications will also explain that retailers found to be non-compliant will be subject to Involuntary Withdrawal for failure to effectuate the purpose of SNAP.

FNS will also add a hard copy letter to its retailer training and informational materials and make them publicly available on its retailer training page. In addition, FNS plans to update the retailer application to make clear that compliance with these waivers is a mandatory condition of SNAP authorization.

These activities will supplement the ongoing project implementation collaboration and planning between implementing State agencies and retailers.

## FNS Monitoring of SNAP Retailers Required to Comply

ROC authorizes and administers federal oversight of SNAP retailers. Through existing fraud detection practices, ROC initiates and conducts undercover investigations to determine if a retailer is complying with program requirements. Following the implementation of a SNAP Food Restriction Waiver, ROC investigators will incorporate attempts to purchase restricted items according to the State's SNAP Food Restriction policy, beginning 90 days after the

Guidance documents lack the force and effect of law, unless expressly authorized by statute or incorporated into a contract. USDA may not cite, use, or rely on any guidance that is not available through their guidance portal, except to establish historical facts.

implementation date. In the event ROC obtains evidence of non-compliance with applicable, waiver-based food restrictions, findings will be addressed through administrative actions.

Though not required by FNS, State agencies may also employ resources to monitor SNAP retailer compliance after implementation in close coordination with FNS. State EBT coordinators may provide designated State personnel with SNAP EBT cards for the purpose of performing transactions to determine retailer compliance with its SNAP Food Restriction Waiver. State agencies will be required to send results of compliance monitoring to FNS. In the event evidence of non-compliance with applicable, waiver-based food restrictions is found, FNS will take administrative action.

FNS has sole authority for administrative actions against retailers that commit SNAP violations. State agencies are not permitted to administer penalties to retailers that would adversely impact their ability to participate in SNAP for failing to comply. States agencies interested in pursuing criminal investigations associated with SNAP EBT violations must have a signed State Law Enforcement Bureau (SLEB) Memorandum of Understanding (MOU) with FNS. Per the SLEB standard operating procedures, each individual investigation requires clearance from FNS ROC prior to commencement. If interested, contact SM.FNS.ROC.SLEB.correspondence@usda.gov.

**Consequences for Retailers that Fail to Comply**

SNAP retailers found to be non-compliant with a SNAP Food Restriction Waiver are subject to the following framework of administrative actions and consequences:

<u>90-Day Grace Period</u>

Following implementation of each State agency's SNAP Food Restriction Waiver, existing SNAP authorized retailers that are required to comply with that State's waiver will have a 90-day grace period. Each waiver will have its own 90-day grace period tied to the implementation date. This grace period recognizes the significant challenges associated with implementation of these projects and allows a reasonable period in which retailers can identify and address issues that may arise, prior to being subject to investigation. The grace period will only be in effect for 90 days following implementation and will not be applied to new stores authorized to accept SNAP after that time-period.  For example, if a State agency's implementation of a SNAP Food Restriction Waiver begins on January 1, 2026, the one-time grace period begins on this date and ends April 1, 2026.

<u>First Offense – Warning Letter</u>

After the 90-day grace period, SNAP authorized retailers will be subject to investigation to determine compliance with the applicable SNAP Food Restriction Waiver(s). If evidence of non-compliance is found, following the first offense, ROC will issue the retailer a Warning Letter, consistent with 7 CFR 278.6(e). This letter will serve as an official warning for the infraction and will advise the retailer to take corrective action to avoid possible future consequences.

Guidance documents lack the force and effect of law, unless expressly authorized by statute or incorporated into a contract. USDA may not cite, use, or rely on any guidance that is not available through their guidance portal, except to establish historical facts.

GOV000186

<u>Second Offense – Involuntary Withdrawal</u>

Following the issuance of the Warning Letter, after a period of 30 days, the retailer will be subject to future investigations to determine compliance with applicable SNAP Food Restriction Waiver(s). If evidence of non-compliance is found a second time, the retailer will be subject to an Involuntary Withdrawal for failure to effectuate the purpose of SNAP, consistent with 7 CFR 278.1($l$)(1)(i).

Following an Involuntary Withdrawal, the retailer may reapply to become authorized to accept SNAP. As a prerequisite to their reinstatement, the owner(s) will be required to sign an attestation acknowledging the expectation of adherence to applicable SNAP Food Restriction Waiver(s).

<u>Administrative Review</u>

Following the notification of an Involuntary Withdrawal action, the retailer may request Administrative Review, consistent with 7 CFR 279.1. FNS has existing procedures in place for Administrative Review processes.  An Involuntary Withdrawal action will be held in abeyance pending the outcome of Administrative Review.

Guidance documents lack the force and effect of law, unless expressly authorized by statute or incorporated into a contract. USDA may not cite, use, or rely on any guidance that is not available through their guidance portal, except to establish historical facts.

GOV000187

Case 1:26-cv-00861-ABJ    Document 17-4    Filed 04/03/26    Page 8 of 72

 Outlook

---

## FW: FNCS Thanks: Food Restriction Waivers and General Notice Rule Awareness Note

---

**From** Patyk, Karen - FNS <karen.patyk@usda.gov>

**Date** Fri 1/2/2026 3:16 PM

**To** McConnell, Casey - FNS <casey.mcconnell@usda.gov>

**Cc** Adams, Anna - FNS <Anna.Adams@usda.gov>; Bazile, Anita - FNS <anita.bazile@usda.gov>; Magee, Robin - FNS <robin.magee@usda.gov>; Moody, Brianna - FNS <Brianna.Moody@usda.gov>

---

FYI

---

**From:** White, Alicia - FNS <alicia.white@usda.gov>

**Sent:** Friday, January 2, 2026 2:09 PM

**To:** Pagnozzi, Melissa - FNS <Melissa.Pagnozzi@usda.gov>

**Cc:** FNS-SNAP-FO <FNS-SNAP-FO@usda.gov>; Cole, Susan - FNS <Susan.Cole2@usda.gov>

**Subject:** FNCS Thanks: Food Restriction Waivers and General Notice Rule Awareness Note

| 186 | 12/30/2025 | **[SNAP] Food Restriction Waivers and General Notice Rule**<br><br>Informational update on the General Notice Rule and SNAP demonstration waiver projects that temporarily waive the definition of SNAP eligible foods, referred to as SNAP Food Restriction Waivers.<br><br>**No approval necessary, informational only**<br><br>Program POC: Melissa Pagnozzi<br><br>📄 SNAP Food Restriction Waivers and General Notice Rule_Short Form_12_30_2025.docx | 12/30 TAO: Coordinated with OGC? | SDC (1/2/26)- thanks for the information. |
|---|---|---|---|---|

Alicie "Alicia" White

Director

Office of Strategic Initiatives



**U.S. DEPARTMENT OF AGRICULTURE**

Food and Nutrition Service

GOV000188

Case 1:26-cv-00861-ABJ Document 17-4 Filed 04/03/26 Page 9 of 72

1320 Braddock Place, Alexandria, VA 22314

703-305-2841

GOV000189

| Organization:  SNAP | Date of Submission: 12/30/2025 |
|---|---|
| **Informational Memo for FNS Policy Officials** | |

**Food Restriction Waivers and General Notice Rule**

To date, FNS has approved 18 State agencies to implement SNAP demonstration waiver projects that temporarily waive the definition of SNAP eligible foods, referred to as SNAP Food Restriction Waivers. FNS has approved these 18 State agencies to restrict the food items that SNAP households can purchase using SNAP benefits. Each State agency's waiver is unique, but generally restricts non-nutritious, accessory food items such as sweetened beverages, candies, and prepared desserts.

If FNS determines that a SNAP demonstration project waiver "will likely have a significant impact on the public," federal rules of 7 CFR 282.1(b) require FNS to publish a General Notice in the Federal Register at least 30 days prior to implementation. Appendix 1 provides the rule text.

**Applicability of General Notice Rule to SNAP Food Restriction Waivers**

SNAP has determined that the General Notice Rule of 7 CFR 282.1(b) is not applicable to the Food Restriction Waivers. Food Restriction Waivers will limit the accessory food items that SNAP households residing in implementing States can purchase with SNAP, but they will not change SNAP eligibility criteria, allotment levels or access to staple foods. Moreover, SNAP benefits are supplemental, calculated to cover only 70 percent of the household's monthly food budget. SNAP households will remain free to use cash to purchase SNAP restricted items.

**Background**

- Each State agency's Food Restriction Waiver is unique, but generally they restrict non-nutritious, accessory food items such as sweetened beverages, candies, and prepared desserts.
- Five State agencies (IA, IN, NE, UT, and WV) will begin implementing these waivers effective January 1, 2026, with the other approved State agencies following at various points in 2026. Appendix 2 provides a chart of the 18 approved States and implementation dates.
- FNS is approving these waivers for a 2-year initial period, with the opportunity to extend for a total of up to 5 years.
- In FY 2025, approximately 1 in 8 Americans participated in SNAP. SNAP households residing in the 18 States implementing a Food Restriction Waiver represent a considerably smaller share of that minority.
- Prior to waiver implementation, State agencies have been engaging intensively with SNAP retailers to coordinate implementation and incorporate retailer feedback.
- State agencies are also providing notification and informational materials about the changes to SNAP households and other stakeholders and have developed websites to inform the public about the changes. All States have issued press releases regarding the waivers and media coverage has been extensive both locally and nationally.
- FNS has also created a webpage which posts all approved Food Restriction Waivers publicly, summarizes restricted foods, and provides implementation dates.
- Prior to waiver implementation, FNS plans to issue State-specific notices to retailers that serve SNAP participants of States implementing Food Restriction Waivers.

GOV000190

**Appendix 1: 7 CFR 282.1(b) Regulatory Text**

Federal rules at 7 CFR 282.1(b) include the below regarding SNAP demonstration waiver projects and noticing in the Federal Register:

> *Notices.* At least 30 days prior to the initiation of a demonstration project, FNS shall publish a General Notice in the Federal Register if the demonstration project will likely have a significant impact on the public. The notice shall set forth the specific operational procedures and shall explain the basis and purpose of the demonstration project. If significant comments are received in response to this General Notice, the Department will take such action as may be appropriate prior to implementing the project. If the operational procedures contained in the General Notice described above are significantly changed because of comments, an amended General Notice will be published in the Federal Register at least 30 days prior to the initiation of the demonstration project, except where good cause exists supporting a shorter effective date. The explanation for the determination of good cause will be published with the amended General Notice. The amended General Notice will also explain the basis and purpose of the change.

**Appendix 2: Table illustrating approved SNAP Food Restriction Waiver State agencies**

| State | Target Implementation Date | Summary |
|---|---|---|
| Indiana | 1/1/2026 | Restricts purchase of soft drinks and candy. |
| Iowa | 1/1/2026 | Restricts all taxable food items as defined by the Iowa Department of Revenue except food producing plants and seeds for food producing plants. |
| Nebraska | 1/1/2026 | Restricts purchase of soda and energy drinks. |
| Utah | 1/1/2026 | Restricts purchase of soft drinks. |
| West Virginia | 1/1/2026 | Restricts purchase of soda. |
| Idaho | 2/15/2026 | Restricts purchase of soda and candy. |
| Oklahoma | 2/15/2026 | Restricts purchase of soft drinks and candy. |
| Louisiana | 2/18/2026 | Restricts purchase of soft drinks, energy drinks, and candy. |
| Colorado | 3/1/2026 | Restricts purchase of soft drinks. |
| Texas | 4/1/2026 | Restricts purchase of sweetened drinks and candy. |
| Virginia | 4/1/2026 | Restricts purchase of "sweetened beverages." |
| Florida | 4/20/2026 | Restricts purchase of soda, energy drinks, candy, and prepared desserts. |
| Arkansas | 7/1/2026 | Restricts purchase of soda, fruit and vegetable drinks with less than 50% natural juice, unhealthy drinks, and candy. |
| Tennessee | 7/31/2026 | Restricts purchase of processed foods and beverages such as soda, energy drinks, and candy. |
| Hawaii | 8/1/2026 | Restricts purchase of soft drinks. |
| South Carolina | 8/31/2026 | Restricts purchase of candy, energy drinks, soft drinks, and sweetened beverages. |
| North Dakota | 9/1/2026 | Restricts purchase of soft drinks, energy drinks, and candy. |
| Missouri | 10/1/2026 | Restricts purchase of candy, prepared desserts, and certain unhealthy beverages. |



THE SECRETARY OF AGRICULTURE
WASHINGTON, D.C.
20250-0100

February 13, 2025

Dear State, Tribal, Territory, and Local Government Partners,

I write to express my gratitude for all you do for the communities across your states, particularly for rural communities. I am deeply honored President Trump has put his trust in me to lead the U.S. Department of Agriculture, and I will honor and uphold that trust each and every day by working closely with you and your teams to address the pressing challenges facing rural communities, and to open a new chapter of prosperity in rural America.

Paramount to this effort is close collaboration with you, the leaders that, know your states and territories better than anyone in Washington—you know the difficulties farmers and ranchers face and the complexities around many of those issues. Our agricultural communities are experiencing a confluence of circumstances that make their already difficult profession even harder:

- The agricultural trade deficit is $32 billion and is set to hit a record $45.5 billion in 2025.
- Between 2017 and 2022, the number of farms in the U.S. declined by 141,733 or 7 percent.
- In 2024, the cost of production was up 30 percent over pre-pandemic levels.
- Since October 2024, more than 40 million layers and pullets have been depopulated due to the avian flu.
- The average age of an American farmer is 58.

As your Secretary of Agriculture, I am committed to addressing these challenges head on and to partnering with you to find innovative solutions. That is why I will be refocusing the entire Department on its core mission of serving farmers and ranchers and ensuring that we have the safest, most affordable, and abundant food supply in the world.

Furthermore, I am inviting every State, territory, and tribal leader in the nation to participate in our "Laboratories of Innovation" initiative to serve as policy incubators and bring greater efficiency to government programs. We encourage you propose bold ideas to address challenges that have long plagued our nation, particularly rural communities.

Just as many of you already are, we encourage you as leaders to be pioneers of creative solutions to better serve our citizens. This includes bold plans to combat avian flu and make food prices more affordable; new initiatives to bring more jobs and economic opportunities to rural communities and ensure that we equip and empower the next generation of American farmers;

1

GOV000193



THE SECRETARY OF AGRICULTURE

WASHINGTON, D.C.

20250-0100

create partnerships to improve infrastructure and internet connectivity in remote areas; and much-needed reforms to nutrition assistance programs to promote the dignity of work and healthy eating habits to ensure our citizens live longer, more abundant lives. These are just a few of the many areas of possibility for innovation. I look forward to meeting with you in the coming months, and to partnering with you on bold solutions. I know that many of the best ideas will come from the states, and your leadership will serve as a model for the nation.

Please do not hesitate to reach out to me or my staff, and we will be as responsive as possible.

Together, we will create a future of unimagined promised for communities across this country and we will ensure that American Agriculture is the most competitive now and for generations to come.

Sincerely,

Brooke L. Rollins
Secretary
U.S. Department of Agriculture

2

GOV000194

# LEGAL
# AUTHORITIES

GOV000195

This content is from the eCFR and is authoritative but unofficial.

**Title 7 —Agriculture**
**Subtitle B —Regulations of the Department of Agriculture**
**Chapter II —Food and Nutrition Service, Department of Agriculture**
**Subchapter C —Supplemental Nutrition Assistance and Food Distribution Program**

**Part 271**   General Information and Definitions
   **§ 271.1**   General purpose and scope.
   **§ 271.2**   Definitions.
   **§ 271.3**   Delegations to FNS for administration.
   **§ 271.4**   Delegations to State agencies for administration.
   **§ 271.5**   Benefits as obligations of the United States, crimes and offenses.
   **§ 271.6**   Complaint procedure.
   **§ 271.7**   Allotment reduction procedures.
   **§ 271.8**   Information collection/recordkeeping—OMB assigned control numbers.
   **§ 271.9**   Promotional activities.

**Editorial Note:**  Nomenclature changes to subchapter C appear by Amdt. 381, 65 FR 64586, Oct. 30, 2000.

# PART 271—GENERAL INFORMATION AND DEFINITIONS

**Authority:**  7 U.S.C. 2011-2036.

**Editorial Note:**  Nomenclature changes to part 271 appear at 78 FR 11972, Feb. 21, 2013.

## § 271.1 General purpose and scope.

(a)  *Purpose of SNAP.* SNAP is designed to promote the general welfare and to safeguard the health and well-being of the Nation's population by raising the levels of nutrition among low-income households. In keeping with section 2 of the Food and Nutrition Act of 2008, the USDA established SNAP under the Act as the limited food purchasing power of low-income households contributes to hunger and malnutrition among members of such households. The increased utilization of food in establishing and maintaining adequate national levels of nutrition also promotes the distribution in a beneficial manner of the Nation's agricultural abundance and strengthens the Nation's agricultural economy, as well as result in more orderly marketing and distribution of foods. To alleviate hunger and malnutrition, SNAP permits low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation. SNAP includes as a purpose to assist low-income adults in obtaining employment and increasing their earnings. Such employment and earnings, along with program benefits, permits low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation.

GOV000196

Case 1:26-cv-00861-ABJ    Document 17-4    Filed 04/03/26    Page 17 of 72

(b) *Scope of the regulations.* Part 271 contains general information, definitions, and other material applicable to all parts of this subchapter. Part 272 sets forth policies and procedures governing State agencies which participate in the program. Part 273 describes the eligibility criteria to be applied by State agencies and related processing requirements and standards. Part 274 provides requirements for the issuance of SNAP benefits to eligible households and establishes related issuance responsibilities. Part 275 sets forth guidelines for monitoring SNAP, analyzing the results and formulating corrective action. Part 276 establishes State agency liability and certain Federal sanctions. Part 277 outlines procedures for payment of administrative costs of State agencies. Part 278 delineates the terms and conditions for the participation of retail food stores, wholesale food concerns, meal services, and insured financial institutions. Part 279 establishes the procedures for administrative and judicial reviews requested by food retailers, food wholesalers, and meal services. Part 280 explains procedures for issuing emergency benefit allotments to certain victims of disasters unable to purchase adequate amounts of food. Part 281 sets forth guidelines for designating Indian tribes as State agencies. Part 282 provides guidelines for initiation, selection, and operation of demonstration, research, and evaluation projects. Part 284 provides for a nutrition assistance program for the Commonwealth of the Northern Mariana Islands (CNMI). Part 285 describes the general terms and conditions under which grant funds are provided to the Commonwealth of Puerto Rico.

[Amdt. 132, 43 FR 47882, Oct. 17, 1982, as amended by Amdt. 216, 47 FR 23461, May 28, 1982; Amdt. 248, 48 FR 16832, Apr. 19, 1983; Amdt. 356, 59 FR 29713, June 9, 1994; 85 FR 52031, Aug. 24, 2020; 89 FR 102362, Dec. 17, 2024]

## § 271.2 Definitions.

*Access device* means any card, plate, code, account number, or other means of access that can be used alone, or in conjunction with another access device, to obtain payments, allotments, benefits, money, goods, or other things of value, or that can be used to initiate a transfer of funds under the Food and Nutrition Act of 2008, as amended.

*Active case* means a household which was certified prior to, or during, the sample month and issued SNAP benefits for the sample month.

*Active case error rate* means an estimate of the proportion of cases with an error in the determination of eligibility or basis of issuance. This estimate will be expressed as a percentage of the completed active quality control reviews excluding all results from cases processed by SSA personnel or participating in a demonstration project identified by FNS as having certification rules that are significantly different from standard requirements.

*Adequate notice* in a periodic reporting system such as monthly reporting or quarterly reporting means a written notice that includes a statement of the action the agency has taken or intends to take; the reason for the intended action; the household's right to request a fair hearing; the name of the person to contact for additional information; the availability of continued benefits; and the liability of the household for any overissuances received while awaiting a fair hearing if the hearing official's decision is adverse to the household. Depending on the timing of a State's system and the timeliness of report submission by participating households, such notice may be received prior to agency action, at the time reduced benefits are received, or, if benefits are terminated, at the time benefits would have been received if they had not been terminated. In all cases, however, participants will be allowed ten days from the mailing date of the notice to contest the agency action and to have benefits restored to their previous level. If the 10-day period ends on a weekend or a holiday and a request is received the day after the weekend or holiday, the State agency shall consider the request to be timely.

GOV000197

Case 1:26-cv-00861-ABJ    Document 17-4    Filed 04/03/26    Page 18 of 72

*Alien Status Verification Index (ASVI)* means the automated database maintained by the United States Citizenship and Immigration Services (USCIS) which may be accessed by State agencies to verify immigration status.

*Allotment* means the total value of benefits a household is authorized to receive during each month or other time period.

*Application form* means:

(1) The application form designed or approved by FNS, which is completed by a household member or authorized representative; or

(2) For households consisting solely of public assistance or general assistance recipients, it may also mean the application form used to apply for public assistance or general assistance, including attachments approved by FNS, which is completed by a household member or authorized representative.

*Assessment* an in-depth evaluation of employability skills coupled with counseling on how and where to search for employment. If combined with work experience, employment search or training, an assessment of this nature could constitute part of an approvable employment and training component.

*Authorization document* means an intermediary document issued by the State agency and used in an issuance system to authorize a specific benefit amount for a household.

*Beginning month(s)* in a Monthly Reporting and Retrospective Budgeting system means either the first month for which the household is certified for SNAP benefits (where the State agency has adopted a one month accounting system) or the first month for which the household is certified for SNAP benefits and the month thereafter (where the State agency has adopted a two month accounting system). Except for beginning months in sequence as described in the preceding sentences, a beginning month cannot be any month which immediately follows a month in which a household is certified. The month following the month of termination resulting from a one-month temporary change in household circumstances shall not be considered a beginning month.

*Benefit* means the value of supplemental nutrition assistance provided to a household by means of an EBT system or other means of providing assistance, as determined by the Secretary.

*Benefit issuer* means any office of the State agency or any person, partnership, corporation, organization, political subdivision or other entity with which a State agency has contracted for, or to which it has delegated functional responsibility, in connection with the issuance of benefits to households.

*Budget month* in a Monthly Reporting and Retrospective Budgeting system means the fiscal or calendar month from which the State agency uses income and other circumstances of the household to calculate the household's SNAP allotment to be provided for the corresponding issuance month.

*Communal dining facility* means a public or nonprofit private establishment, approved by FNS, which prepares and serves meals for elderly persons, or for supplemental security income (SSI) recipients, and their spouses, a public or private nonprofit establishment (eating or otherwise) that feeds elderly persons or SSI recipients, and their spouses, and federally subsidized housing for the elderly at which meals are prepared for and served to the residents. It also includes private establishments that contract with an appropriate State or local agency to offer meals at concessional prices to elderly persons or SSI recipients, and their spouses.

GOV000198

*Completion of participation in E&T* means that an E&T participant has not received any E&T services for at least 90 days and no future services are planned.

*Coupon* means any coupon, stamp, type of certificate, authorization card, cash or check issued in lieu of a coupon, or access device, including an electronic benefit transfer card or personal identification number issued pursuant to the provisions of the Food and Nutrition Act of 2008, as amended, for the purchase of eligible food.

*Deficiency* means any aspect of a State's program operations determined to be out of compliance with the Food and Nutrition Act of 2008, FNS Regulations, or program requirements as contained in the State agency's manual, the State agency's approved Plan of Operation or other State agency plans.

*Department* means the U.S. Department of Agriculture.

*Drug addiction or alcoholic treatment and rehabilitation program* means any drug addiction or alcoholic treatment and rehabilitation program conducted by a private, nonprofit organization or institution, or a publicly operated community mental health center, under part B of title XIX of the Public Health Service Act (42 U.S.C. 300x *et seq.*). Under part B of title XIX of the Public Health Service Act is defined as meeting the criteria which would make it eligible to receive funds, even if it does not actually receive funding under part B of title XIX.

*Elderly or disabled member* means a member of a household who:

(1)  Is 60 years of age or older;

(2)  Receives supplemental security income benefits under title XVI of the Social Security Act or disability or blindness payments under titles I, II, X, XIV, or XVI of the Social Security Act;

(3)  Receives federally or State-administered supplemental benefits under section 1616(a) of the Social Security Act provided that the eligibility to receive the benefits is based upon the disability or blindness criteria used under title XVI of the Social Security Act;

(4)  Receives federally or State-administered supplemental benefits under section 212(a) of Pub. L. 93-66;

(5)  Receives disability retirement benefits from a governmental agency because of a disability considered permanent under section 221(i) of the Social Security Act.

(6)  Is a veteran with a service-connected or non-service-connected disability rated by the Veteran's Administration (VA) as total or paid as total by the VA under title 38 of the United States Code;

(7)  Is a veteran considered by the VA to be in need of regular aid and attendance or permanently housebound under title 38 of the United States Code;

(8)  Is a surviving spouse of a veteran and considered by the VA to be in need of regular aid and attendance or permanently housebound or a surviving child of a veteran and considered by the VA to be permanently incapable of self-support under title 38 of the United States Code;

(9)  Is a surviving spouse or surviving child of a veteran and considered by the VA to be entitled to compensation for a service-connected death or pension benefits for a nonservice-connected death under title 38 of the United States Code *and* has a disability considered permanent under section 221(i) of the Social Security Act. "Entitled" as used in this definition refers to those veterans' surviving spouses and surviving children who are receiving the compensation or pension benefits stated or have been approved for such payments, but are not yet receiving them; or

GOV000199

(10) Receives an annuity payment under: section 2(a)(1)(iv) of the Railroad Retirement Act of 1974 *and* is determined to be eligible to receive Medicare by the Railroad Retirement Board; or section 2(a)(1)(v) of the Railroad Retirement Act of 1974 and is determined to be disabled based upon the criteria used under title XVI of the Social Security Act.

(11) Is a recipient of interim assistance benefits pending the receipt of Supplemented Security Income, a recipient of disability related medical assistance under title XIX of the Social Security Act, or a recipient of disability-based State general assistance benefits *provided* that the eligibility to receive any of these benefits is based upon disability or blindness criteria established by the State agency which are at least as stringent as those used under title XVI of the Social Security Act (as set forth at 20 CFR part 416, subpart I, Determining Disability and Blindness as defined in Title XVI).

*Electronic Benefit Transfer (EBT) account* means a set of records containing demographic, card, benefit, transaction and balance data for an individual household within the EBT system that is maintained and managed by a State or its contractor as part of the client case record.

*Electronic Benefit Transfer (EBT) card* means a method to access EBT benefits issued to a household member or authorized representative through the EBT system by a benefit issuer. This method may include an on-line magnetic stripe card, an off-line smart card, a chip card, a contactless digital wallet with a stored card, or any other similar benefit access technology approved by FNS.

*Electronic Benefit Transfer (EBT) contractor or vendor* means an entity that is selected to perform EBT-related services for the State agency.

*Electronic Benefit Transfer (EBT) system* means an electronic payments system under which household benefits are issued from and stored in a central databank, maintained and managed by a State or its contractor, and uses electronic funds transfer technology for the delivery and control of food and other public assistance benefits.

*Eligible foods* means:

(1) Any food or food product intended for human consumption except alcoholic beverages, tobacco, and hot foods and hot food products prepared for immediate consumption and any deposit fee in excess of the amount of the State fee reimbursement (if any) required to purchase any food or food product contained in a returnable bottle, can, or other container, regardless of whether the fee is included in the shelf price posted for the food or food product;

(2) Seeds and plants to grow foods for the personal consumption of eligible households;

(3) Meals prepared and delivered by an authorized meal delivery service to households eligible to use SNAP benefits to purchase delivered meals; or meals served by an authorized communal dining facility for the elderly, for SSI households or both, to households eligible to use SNAP benefits for communal dining;

(4) Meals prepared and served by a drug addict or alcoholic treatment and rehabilitation center to narcotic addicts or alcoholics and their children who live with them;

(5) Meals prepared and served by a group living arrangement facility to residents who are blind or disabled as defined in paragraphs (2) through (11) of the definition of "Elderly or disabled member" contained in this section;

(6) Meals prepared by and served by a shelter for battered women and children to its eligible residents;

GOV000200

Case 1:26-cv-00861-ABJ     Document 17-4     Filed 04/03/26     Page 21 of 72

(7) In the case of certain eligible households living in areas of Alaska where access to food stores is extremely difficult and the households rely on hunting and fishing for subsistence, equipment for the purpose of procuring food for eligible households, including nets, lines, hooks, fishing rods, harpoons, knives, and other equipment necessary for subsistence hunting and fishing but not equipment for the purpose of transportation, clothing or shelter, nor firearms, ammunition or other explosives;

(8) In the case of homeless SNAP households, meals prepared for and served by an authorized public or private nonprofit establishment (e.g. soup kitchen, temporary shelter), approved by an appropriate State or local agency, that feeds homeless persons; and

(9) In the case of homeless SNAP households, meals prepared by a restaurant which contracts with an appropriate State agency to serve meals to homeless persons at concessional (low or reduced) prices.

*Employment and Training (E&T) component* a work experience, work training, supervised job search or other program described in section 6(d)(4)(B)(i) of the Food and Nutrition Act of 2008 (7 U.S.C. 2015(d)(4)(B)(i)) designed to help SNAP participants move promptly into unsubsidized employment.

*Employment and Training (E&T) mandatory participant* a supplemental nutrition assistance program applicant or participant who is required to work register under 7 U.S.C. 2015(d)(1) or (2) and who the State determines should not be exempted from participation in an employment and training program and is required to participate in E&T.

*Employment and Training (E&T) participant* means an individual who meets the definition of a mandatory or voluntary participant who is referred to E&T and begins at least one part of an E&T program, including orientation, assessment, case management services or a component.

*Employment and Training (E&T) program* means a program operated by each State agency consisting of case management and one or more E&T components.

*Employment and Training (E&T) voluntary participant* means a supplemental nutrition assistance program applicant or participant who volunteers to participate in an employment and training (E&T) program.

*Error* for active cases results when a determination is made by a quality control reviewer that a household which received SNAP benefits during the sample month is ineligible or received an incorrect allotment. Thus, errors in active cases involve dollar loss to either the participant or the government. For negative cases, an "error" means that the reviewer determines that the decision to deny, suspend, or terminate a household was incorrect.

*Exempted* for purposes of § 273.7 excluding paragraphs (a) and (b)—this term refers to a work registered person or persons excused by the State, under the conditions in § 273.7(e) from participation in an employment and training program.

*Exercises governmental jurisdiction* means the active exercise of the legislative, executive or judicial powers of government by an Indian tribal organization.

*Federal fiscal year* means a period of 12 calendar months beginning with each October 1 and ending with September 30 of the following calendar year.

*Firm.*

(1) *Firm* means:

GOV000201

Case 1:26-cv-00861-ABJ    Document 17-4    Filed 04/03/26    Page 22 of 72

    (i)   A retail food store that is authorized to accept or redeem SNAP benefits;

    (ii)   A retail food store that is not authorized to accept or redeem SNAP benefits; or

    (iii)   An entity that does not meet the definition of a retail food store.

(2)   For purposes of the regulations in this subchapter and SNAP policies, the terms firm, entity, retailer, and store are used interchangeably.

*Firm's practice* means the usual manner in which personnel of a firm or store accept SNAP benefits as shown by the actions of the personnel at the time of the investigation.

*FNS* means the Food and Nutrition Service of the U.S. Department of Agriculture.

*Food and Nutrition Act of 2008* means the Food and Nutrition Act of 2008 (Pub. L. 95-113), including any subsequent amendments thereto.

*Former E&T participant* means an individual who is no longer participating in E&T services because the individual is no longer receiving SNAP benefits.

*General assistance (GA)* means cash or another form of assistance, excluding in-kind assistance, financed by State or local funds as part of a program which provides assistance to cover living expenses or other basic needs intended to promote the health or well-being of recipients.

*Group living arrangement* means a public or private nonprofit residential setting that serves no more than sixteen residents that is certified by the appropriate agency or agencies of the State under regulations issued under section 1616(e) of the Social Security Act or under standards determined by the Secretary to be comparable to standards implemented by appropriate State agencies under section 1616(e) of the Social Security Act. To be eligible for SNAP benefits, a resident of such a group living arrangement must be blind or disabled as defined in paragraphs (2) through (11) of the definition of "Elderly or disabled member" contained in this section.

*Homeless individual* means

(1)   An individual who lacks a fixed and regular nighttime residence, including, but not limited to, an individual who will imminently lose their nighttime residence; or

(2)   An individual whose primary nighttime residence is:

    (i)   A supervised shelter designed to provide temporary accommodations (such as a welfare hotel or congregate shelter);

    (ii)   A halfway house or similar institution that provides temporary residence for individuals intended to be institutionalized;

    (iii)   A temporary accommodation for not more than 90 days in the residence of another individual; or

    (iv)   A public or private place not designed for, or ordinarily used, as a regular sleeping accommodation for human beings (a hallway, a bus station, a lobby, or similar places).

*Homeless meal provider* means:

(1)   A public or private nonprofit establishment (e.g., soup kitchens, temporary shelters) that feeds homeless persons; or

GOV000202

Case 1:26-cv-00861-ABJ    Document 17-4    Filed 04/03/26    Page 23 of 72

(2) A restaurant which contracts with an appropriate State agency to offer meals at concessional (low or reduced) prices to homeless persons.

*House-to-house trade route* means any retail food business operated from a truck, bus, pushcart, or other mobile vehicle.

*Identification (ID) card* means a card for the purposes of 7 CFR 278.2(j).

*Indian tribe* means:

(1) Any Indian tribe, Band, Nation, or other organized Indian group on a reservation for example, a Rancheria, Pueblo or Colony, and including any Alaska Native Village or regional or village corporation (established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688)), that is on a reservation and is recognized as eligible for Federal programs and services provided to Indians because of their status as Indians; or

(2) any Indian tribe or Band on a reservation holding a treaty with a State government.

*Indian tribal organization (ITO)* means:

(1) The recognized governing body of any Indian tribe on a reservation; or

(2) the tribally recognized intertribal organization which the recognized governing bodies of two or more Indian tribes on a reservation authorizes to operate SNAP or a Food Distribution Program on their behalf.

*Insured financial institution* means a financial institution insured by the Federal Deposit Insurance Corporation (FDIC) or financial institutions which are insured under the Federal Credit Union Act and which have retail food stores or wholesale food concerns in their field of membership.

*Interoperability* means a system that enables program benefits issued to be redeemed outside the State that issued the benefits.

*Issuance month* in a Monthly Reporting and Retrospective Budgeting system means the fiscal or calendar month for which the State agency shall issue a SNAP allotment. Issuance is based upon income and circumstances in the corresponding budget month. In prospective budgeting, the budget month and issuance month are the same. In retrospective budgeting, the issuance month follows the budget month and the issuance month shall begin within 32 days after the end of the budget month.

*Large project area* means those project areas/management units with monthly active caseloads of more than 25,000 households based on the most current information available at the time the large project area review schedule is developed.

*Low-income household* means a household whose annual income does not exceed 125 percent of the Office of Management and Budget poverty guidelines.

*Management Evaluation (ME) reviews* means reviews conducted by States at the project area level to determine if State agencies are administering and operating SNAP in accordance with program requirements.

*Management unit* means an area based on a welfare district, region, or other administrative structure designated by the State agency and approved by FNS to be reviewed for ME review purposes.

*Manual transaction* means an EBT transaction that is processed with the use of a paper manual voucher when there is an EBT system outage.

GOV000203

*Manual voucher* means a paper document signed by the EBT cardholder that allows a retailer to redeem benefits through a manual transaction.

*Master issuance file* means a cumulative file containing the individual records and status of households, and the amount of benefits, if any, each household is authorized to receive.

*Meal delivery service* means a political subdivision, a private nonprofit organization, or a private establishment with which a State or local agency has contracted for the preparation and delivery of meals at concessional prices to elderly persons, and their spouses, and to the physically or mentally handicapped and persons otherwise disabled, and their spouses, such that they are unable to adequately prepare all of their meals.

*Medicaid* means medical assistance under title XIX of the Social Security Act, as amended.

*Medium project area* means those project areas/management units with monthly active caseloads of 5,000 to 25,000 households based on the most current information available at the time the medium project area review schedule is developed.

*Minimum benefit* means the minimum monthly amount of SNAP benefits that one- and two-person households receive. The amount of the minimum benefit shall be determined according to the provisions of § 273.10 of this chapter.

*National performance measure* means the sum of the products of each State agency's payment error rate times that State agency's proportion of the total value of the national allotments issued for the fiscal year using the most recent issuance data available at the time the State agency is notified of its performance error rate.

*Negative case* means any action taken to deny, suspend, or terminate a case.

*Negative case error rate* means an estimate of the proportion of denied, suspended, or terminated cases where the household was incorrectly denied, suspended, or terminated. This estimate will be expressed as a percentage of completed negative quality control reviews excluding all results from cases processed by SSA personnel or participating in a demonstration project identified by FNS as having certification rules that are significantly different from standard requirements.

*Newly work registered* SNAP participants work registered at the point of application.

*Nonprofit cooperative food purchasing venture* means any private nonprofit association of consumers whose members pool their resources to buy food.

*Offset year* means the calendar year during which offsets may be made to collect certain recipient claims from individuals' Federal income tax refunds.

*Overissuance* means the amount by which benefits issued to a household exceeds the amount it was eligible to receive.

*Overpayment error rate* means the percentage of the value of all allotments issued in a fiscal year that are either:

(1) Issued to households that fail to meet basic program eligibility requirements, or

(2) Overissued to eligible households.

GOV000204

Case 1:26-cv-00861-ABJ    Document 17-4    Filed 04/03/26    Page 25 of 72

*Payment error rate* means the sum of the point estimates of two component error rates: an overpayment error rate and an underpayment error rate. Each component error rate is the value of allotments either overissued or underissued expressed as a percentage of all allotments issued to completed active sample cases, excluding those cases processed by SSA personnel or participating in certain demonstration projects designated by FNS.

*Personal identification number (PIN)* means a numeric code selected by or assigned to a household and used to verify the identity of an EBT cardholder when performing an EBT transaction.

*Point-of-Sale (POS) terminal* means a range of devices deployed at authorized retail food stores for redeeming benefits by initiating electronic debits and credits of household EBT accounts and retailer bank accounts.

*Primary account number (PAN)* means a number embossed or printed on the EBT card and encoded onto the card to identify the State and EBT account holder.

*Project area* means the county or similar political subdivision designated by a State as the administrative unit for program operations. Upon prior FNS approval, a city, Indian reservation, welfare district, or any other entity with clearly defined geographic boundaries, or any combination of such entities, may be designated as a project area, or a State as a whole may be designated as a single project area.

*Prospective budgeting* in a Monthly Reporting and Retrospective Budgeting system means the computation of a household's SNAP allotment for an issuance month based on an estimate of income and circumstances which will exist in that month.

*Public assistance (PA)* means any of the following programs authorized by the Social Security Act of 1935, as amended: Old-age assistance, Temporary Assistance for Needy Families (TANF), including TANF for children of unemployed fathers, aid to the blind, aid to the permanently and totally disabled and aid to aged, blind, or disabled.

*Quality control review* means a review of a statistically valid sample of active and negative cases to determine the extent to which households are receiving the SNAP allotments to which they are entitled, and to determine the extent to which decisions to deny, suspend, or terminate cases are correct.

*Record-for-issuance file* means a file which is created monthly from the master issuance file, which shows the amount of benefits each eligible household is to receive for the issuance month, and the amount actually issued to the household.

*Regulations* means the provisions of this subchapter. Regulatory citations refer to provisions of this subchapter unless otherwise specified.

*Reservation* means the geographically defined area or areas over which an ITO exercises governmental jurisdiction so long as such area or areas are legally recognized by the Federal or a State government as being set aside for the use of Indians.

*Retail food store* means:

(1) An establishment or house-to-house trade route that sells food for home preparation and consumption normally displayed in a public area, and either offers for sale qualifying staple food items on a continuous basis, evidenced by having no fewer than seven different varieties of food items in each of the four staple food categories with a minimum depth of stock of three stocking units for each qualifying staple variety, including at least one variety of perishable foods in at least three such categories, (Criterion A) as set forth in § 278.1(b)(1) of this chapter, or has more than 50 percent of its total gross retail sales in staple foods (Criterion B) as set forth in § 278.1(b)(1) of this

GOV000205

chapter as determined by visual inspection, marketing structure, business licenses, accessibility of food items offered for sale, purchase and sales records, counting of stockkeeping units, or other accounting recordkeeping methods that are customary or reasonable in the retail food industry as set forth in § 278.1(b)(1) of this chapter. Entities that have more than 50 percent of their total gross retail sales in: Food cooked or heated on-site by the retailer before or after purchase; and hot and/or cold prepared foods not intended for home preparation and consumption, including prepared foods that are consumed on the premises or sold for carry-out are not eligible for SNAP participation as retail food stores under § 278.1(b)(1) of this chapter. Establishments that include separate businesses that operate under one roof and share the following commonalities: Ownership, sale of similar foods, and shared inventory, are considered to be a single firm when determining eligibility to participate in SNAP as retail food stores.

(2) Public or private communal dining facilities and meal delivery services; private nonprofit drug addict or alcoholic treatment and rehabilitation programs; publicly operated community mental health centers which conduct residential programs for drug addicts and/or alcoholics; public or private nonprofit group living arrangements; public or private nonprofit shelters for battered women and children; public or private nonprofit establishments, approved by an appropriate State or local agency, that feed homeless persons; or a restaurant that contracts with an appropriate State agency to provide meals at concessional (low or reduced) prices to homeless SNAP households;

(3) Any stores selling equipment for procuring food by hunting and fishing to eligible households in Alaska, as specified in the definition of eligible foods;

(4) Any private nonprofit cooperative food purchasing venture, including those whose members pay for food prior to receipt of the food; and

(5) A farmers' market.

*Retailer EBT Data Exchange (REDE) system* means the FNS system that allows the automated exchange of authorized retailer demographic data between FNS and the State and/or EBT contractor for notification of changes in retailer Program participation.

*Retrospective budgeting* in a Monthly Reporting and Retrospective Budgeting system means the computation of a household's SNAP allotment for an issuance month based on actual income and circumstances which existed in a previous month, the "budget month."

*Review date* for quality control active cases means a day within the sample month, either the first day of the calendar or fiscal month or the day a certification action was taken to authorize the allotment, whichever is later. The "review date" for negative cases, depending on the characteristics of individual State systems, could be the date on which the eligibility worker makes the decision to suspend, deny, or terminate the case, the date on which the decision is entered into the computer system, the date of the notice to the client or the date the negative action becomes effective. For no case is the "review date" the day the quality control review is conducted.

*Review period* means the 12-month period from October 1 of each calendar year through September 30 of the following calendar year.

*Sample frame* means a list of all units from which a sample is actually selected.

*Sample month* means the month of the sample frame from which a case is selected (e.g., for all cases selected from a frame consisting of households participating in January, the sample month is January).

GOV000206

Case 1:26-cv-00861-ABJ    Document 17-4    Filed 04/03/26    Page 27 of 72

*Screening* means an evaluation by an eligibility worker of an individual for all exemptions from the general work requirements, all exceptions from the able-bodied adults without dependents time limit, and whether the individual should be referred for participation in an employment and training program. Screening for participation in employment and training programs is not considered a part of the E&T program.

*Secretary* means the Secretary of the U.S. Department of Agriculture.

*Shelter for battered women and children* means a public or private nonprofit residential facility that serves battered women and their children. If such a facility serves other individuals, a portion of the facility must be set aside on a long-term basis to serve only battered women and children.

*Small project area* means those project areas/management units with monthly active caseloads of 4,999 households or fewer based on the most current information available at the time the small project area review schedule is developed.

*SSA processed/demonstration case* means a case that is participating or has been denied based upon processing by SSA personnel or is participating or has been denied/terminated based upon the rules of a demonstration project with significantly different certification rules (as identified by FNS).

*Staple food* means those food items intended for home preparation and consumption in each of the following four categories: Meat, poultry, or fish; bread or cereals; vegetables or fruits; and dairy products. The meat, poultry, or fish staple food category also includes up to three types of plant-based protein sources (*i.e.,* nuts/seeds, beans, and peas) as well as varieties of plant-based meat analogues (e.g., tofu). The dairy products staple food category also includes varieties of plant-based dairy alternative staple food items such as, but not limited to, almond milk and soy yogurt. Hot foods are not eligible for purchase with SNAP benefits and, therefore, do not qualify as staple foods for the purpose of determining eligibility under § 278.1(b)(1) of this chapter. Commercially processed foods and prepared mixtures with multiple ingredients that do not represent a single staple food category shall only be counted in one staple food category. For example, foods such as cold pizza, macaroni and cheese, multi-ingredient soup, or frozen dinners, shall only be counted as one staple food item and will be included in the staple food category of the main ingredient as determined by FNS. Accessory food items include foods that are generally considered snack foods or desserts such as, but not limited to, chips, ice cream, crackers, cupcakes, cookies, popcorn, pastries, and candy, and other food items that complement or supplement meals, such as, but not limited to, coffee, tea, cocoa, carbonated and uncarbonated drinks, condiments, spices, salt, and sugar. Items shall not be classified as accessory food exclusively based on packaging size but rather based on the aforementioned definition and as determined by FNS. A food product containing an accessory food item as its main ingredient shall be considered an accessory food item. Accessory food items shall not be considered staple foods for purposes of determining the eligibility of any firm.

*State* means any one of the fifty States, the District of Columbia, Guam, the Virgin Islands of the United States, and the reservation of an Indian tribe whose ITO meets the requirements of the Food and Nutrition Act of 2008 for participation as a State agency.

*State agency* means:

(1) The agency of State government, including the local offices thereof, which is responsible for the administration of the federally aided public assistance programs within the State, and in those States where such assistance programs are operated on a decentralized basis, it includes the counterpart local agencies which administer such assistance programs for the State agency, and

GOV000207

(2) the Indian tribal organization of any Indian tribe determined by the Department to be capable of effectively administering a supplemental nutrition assistance program or a Food Distribution Program in accordance with provisions of the Food and Nutrition Act of 2008.

*State Income and Eligibility Verification System (IEVS)* means a system of information acquisition and exchange for purposes of income and eligibility verification which meets the requirements of section 1137 of the Social Security Act, generally referred to as the IEVS.

*State Wage Information Collection Agency (SWICA)* means the State agency administering the State unemployment compensation law, another agency administering a quarterly wage reporting system, or a State agency administering an alternative system which has been determined by the Secretary of Labor, in consultation with the Secretary of Agriculture and the Secretary of Health and Human Services, to be as effective and timely in providing employment related income and eligibility data as the two just mentioned agencies.

*Sub-units* means the physical location of an organizational entity within a project area/management unit involved in the operation of SNAP, excluding Post Offices.

*Supplemental Nutrition Assistance Program (SNAP or Program)* means the program operated pursuant to the Food and Nutrition Act of 2008.

*Supplemental Security Income (SSI)* means monthly cash payments made under the authority of:

(1) Title XVI of the Social Security Act, as amended, to the aged, blind and disabled;

(2) section 1616(a) of the Social Security Act; or

(3) section 212(a) of Pub. L. 93-66.

*Systematic Alien Verification for Entitlements (SAVE)* means the INS program whereby State agencies may verify the validity of documents provided by aliens applying for SNAP benefits by obtaining information from a central data file.

*Thrifty food plan* means the diet required to feed a family of four persons consisting of a man and a woman 20 through 50, a child 6 through 8, and a child 9 through 11 years of age, determined in accordance with the Secretary's calculations. The cost of such diet shall be the basis for uniform allotments for all households regardless of their actual composition. In order to develop maximum SNAP allotments, the Secretary shall make household size and other adjustments in the Thrifty Food Plan taking into account economies of scale and other adjustments as required by law.

*Trafficking* means:

(1) The buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards, card numbers and personal identification numbers (PINs), or by manual voucher and signature, for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone;

(2) The exchange of firearms, ammunition, explosives, or controlled substances, as defined in section 802 of title 21, United States Code, for SNAP benefits;

(3) Purchasing a product with SNAP benefits that has a container requiring a return deposit with the intent of obtaining cash by discarding the product and returning the container for the deposit amount, intentionally discarding the product, and intentionally returning the container for the deposit amount;

GOV000208

Case 1:26-cv-00861-ABJ    Document 17-4    Filed 04/03/26    Page 29 of 72

(4) Purchasing a product with SNAP benefits with the intent of obtaining cash or consideration other than eligible food by reselling the product, and subsequently intentionally reselling the product purchased with SNAP benefits in exchange for cash or consideration other than eligible food; or

(5) Intentionally purchasing products originally purchased with SNAP benefits in exchange for cash or consideration other than eligible food.

(6) Attempting to buy, sell, steal, or otherwise affect an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards, card numbers and personal identification numbers (PINs), or by manual voucher and signatures, for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone.

*Underissuance* means the amount by which the allotment to which the household was entitled exceeds the allotment which the household received.

*Underissuance error rate.* (See *Underpayment error rate.*)

*Underpayment error rate* means the ratio of the value of allotments underissued to recipient households to the total value of allotments issued in a fiscal year by a State agency.

*United States Citizenship and Immigration Services (USCIS)* means the U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security.

*Universe* means all units for which information is desired.

*Variance* means the incorrect application of policy and/or a deviation between the information that was used to authorize the sample month issuance and the verified information that should have been used to calculate the sample month issuance.

*Wholesale food concern* means an establishment which sells eligible food to retail food stores or to meal services for resale to households.

[Amdt. 132, 43 FR 47882, Oct. 17, 1978]

**Editorial Note:** For FEDERAL REGISTER citations affecting § 271.2, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.govinfo.gov*.

## § 271.3 Delegations to FNS for administration.

(a) *Delegation.* Within the Department, FNS acts on behalf of the Department in the administration of SNAP with the exception of those functions, which may be delegated to other agencies within the Department. The right is reserved at any time to withdraw, modify, or amend any delegation of authority. When authority is delegated to FNS, the responsibilities may be carried out by the Administrator or by another official of FNS, or by State agencies with respect to claims against households, as designated.

(b) *Claims settlement.* FNS shall have the power to determine the amount of and to settle and adjust any claim arising under the provisions of the act or this subchapter, and to compromise or deny all or part of any claim.

(c) *Demonstration authority.* FNS is authorized to undertake demonstration projects which test new methods designed to improve program administration and benefit delivery. FNS is authorized to initiate program research and evaluation efforts for the purposes of improving and assessing program administration and effectiveness. The procedure for initiating and conducting these projects is established in part 282.

GOV000209

*[Amdt. 132, 43 FR 47882, Oct. 17, 1982]*

## § 271.4 Delegations to State agencies for administration.

(a) *General delegation.* The State agency shall be responsible for the administration of the program within the State, including, but not limited to:

   (1) Certification of applicant households;

   (2) Issuance, control, and accountability of SNAP benefits and EBT cards;

   (3) Developing and maintaining complaint procedures;

   (4) Developing, conducting, and evaluating training;

   (5) Conducting performance reporting reviews;

   (6) Keeping records necessary to determine whether the program is being conducted in compliance with these regulations; and

   (7) Submitting accurate and timely financial and program reports.

(b) *Claims delegation.* FNS delegates to the State agency, subject to the standards in § 273.18, the authority to determine the amount of, and settle, adjust, compromise or deny all or part of any claim which results from fraudulent or nonfraudulent overissuances to participating households.

*[Amdt. 132, 43 FR 47882, Oct. 17, 1978, as amended by Amdt. 207, 47 FR 52333, Nov. 19, 1982; 85 FR 52032, Aug. 24, 2020]*

## § 271.5 Benefits as obligations of the United States, crimes and offenses.

(a) *Benefits as obligations.* Pursuant to section 15(d) of the Food and Nutrition Act of 2008, benefits are an obligation of the United States within the meaning of 18 United States Code (U.S.C.) 8. The provisions of Title 18 of the United States Code, "Crimes and Criminal Procedure," relative to counterfeiting, misuse and alteration of obligations of the United States are applicable to benefits and EBT cards.

(b) *Penalties.* Any unauthorized issuance, redemption, use, transfer, acquisition, alteration, or possession of benefits, EBT cards, or other program access device may subject an individual, partnership, corporation, or other legal entity to prosecution under sections 15 (b) and (c) of the Food and Nutrition Act of 2008 or under any other applicable Federal, State or local law, regulation or ordinance.

(c) *Security for benefits and EBT cards.* All individuals, partnerships, corporations, or other legal entities including State agencies and their delegatees (referred to in this paragraph as "persons") having custody, care and control of benefits and EBT cards shall, at all times, take all precautions necessary to avoid acceptance, transfer, negotiation, or use of spurious, altered, or counterfeit benefits and EBT cards and to avoid any unauthorized use, transfer, acquisition, alteration or possession of benefits and EBT cards. These persons shall safeguard benefits and EBT cards from theft, embezzlement, loss, damage, or destruction.

(d) *Benefit issuers.*

   (1) Any benefit issuer or any officer, employee or agent, thereof convicted of failing to provide the monthly reports required in § 274.5 or convicted of violating part 274 shall be subject to a fine of not more than $1,000, or imprisoned for not more than 1 year, or both.

GOV000210

(2) Any benefit issuer or any officer, employee or agent, thereof convicted of knowingly providing false information in the reports required under § 274.5 shall be subject to a fine of not more than $10,000, or imprisoned not more than 5 years, or both.

(e) *Forfeiture and denial of property rights —*

(1) *General.*

(i) Any nonfood items, moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for food benefits, authorization cards, or other program benefit instruments or access devices in any manner not authorized by the Food and Nutrition Act of 2008 or regulations issued pursuant to the Act, shall be subject to forfeiture and denial of property rights. Such property is deemed forfeited to the United States Department of Agriculture (USDA) at the time it is either exchanged or offered in exchange.

(ii) These forfeiture and denial of property rights provisions shall apply to property exchanged or offered in exchange during investigations conducted by the Inspector General, USDA, and by other authorized Federal law enforcement agencies.

(iii) These forfeiture and denial of property rights provisions shall not apply to property exchanged or intended to be exchanged during the course of internal investigations by retail firms, during investigations conducted solely by State and local law enforcement agencies and without the participation of an authorized Federal law enforcement agency, or during compliance investigations conducted by the Food and Nutrition Service.

(2) *Custodians and their responsibilities.*

(i) The Inspector General, USDA, the Inspector General's designee, and other authorized Federal law enforcement officials shall be custodians of property acquired during investigations.

(ii) Upon receiving property subject to forfeiture the custodian shall:

(A) Place the property in an appropriate location for storage and safekeeping, or

(B) Request that the General Services Administration (GSA) take possession of the property and remove it to an appropriate location for storage and safekeeping.

(iii) The custodian shall store property received at a location in the judicial district where the property was acquired unless good cause exists to store the property elsewhere.

(iv) Custodians shall not dispose of property prior to the fulfillment of the notice requirements set out in paragraph 3, or prior to the conclusion of any related administrative, civil, or criminal proceeding, without reasonable cause. Reasonable cause to dispense with notice requirements might exist, for example, where explosive materials are being stored which may present a danger to persons or property.

(v) Custodians may dispose of any property in accordance with applicable statutes or regulations relative to disposition. The custodian may:

(A) Retain the property for official use;

(B) Donate the property to Federal, State, or local government facilities such as hospitals or to any nonprofit charitable organizations recognized as such under section 501(c)(3) of the Internal Revenue Code; or

GOV000211

    (C)   Request that GSA take custody of the property and remove it for disposition or sale.

  (vi)  Proceeds from the sale of forfeited property and any moneys forfeited shall be used to pay all proper expenses of the proceedings for forfeiture and sale including expenses of seizure, maintenance of custody, transportation costs, and any recording fees. Moneys remaining after payment of such expenses shall be deposited into the general fund of the United States Treasury.

(3)  *Notice requirements.*

  (i)  The custodian shall make reasonable efforts to notify the actual or apparent owner(s) of or person(s) with possessory interests in the property subject to forfeiture except for the good cause exception if the owner cannot be notified.

  (ii)  The notice shall:

    (A)   Include a brief description of the property;

    (B)   Inform the actual or apparent owner(s) of or person(s) with possessory interests in the property subject to forfeiture of the opportunity to request an administrative review of the forfeiture;

    (C)   Inform the actual or apparent owner(s) of or person(s) with possessory interests in the property subject to forfeiture of the requirements for requesting administrative review of the forfeiture; and

    (D)   State the title and address of the official to whom a request for administrative review of the forfeiture may be addressed.

  (iii)  Except as provided in paragraphs (e)(3) (iv) and (v) of this section, notice shall be given within 45 days from the date the United States convicts, acquits, or declines to act against the person who exchanged the property.

  (iv)  Notice may be delayed if it is determined that such action is likely to endanger the safety of a law enforcement official or compromise another ongoing criminal investigation conducted by OIG, the United States Secret Service, the United States Postal Inspection Service, or other authorized Federal law enforcement agency.

  (v)  Notice need not be given to the general public.

(4)  *Administrative review.*

  (i)  The actual or apparent owner(s) of or person(s) with possessory interests in the property shall have 30 days from the date of the delivery of the notice of forfeiture to make a request for an administrative review of the forfeiture.

  (ii)  The request shall be made in writing to the Assistant Inspector General for Investigations, Office of Inspector General, USDA, or to his/her designee, hereinafter referred to as the reviewing official.

  (iii)  A request for an administrative review of the forfeiture of property shall include the following:

    (A)   A complete description of the property, including serial numbers, if any;

    (B)   Proof of the person's property interest in the property; and,

GOV000212

(C)   The reason(s) the property should not be forfeited.

(iv)   The requestor may, at the time of his/her written request for administrative review, also request an oral hearing of the reasons the property should not be forfeited.

(v)   The burden of proof will rest upon the requestor, who shall be required to demonstrate, by a preponderance of the evidence, that the property should not be forfeited.

(vi)   Should the administrative determination be in their favor, the actual or apparent owner(s) of or person(s) with possessory interests in the property subject to forfeiture may request that forfeited items be returned or that compensation be made if the custodian has already disposed of the property.

(vii)   The reviewing official shall not remit or mitigate a forfeiture unless the requestor:

(A)   Establishes a valid, good faith property interest in the property as owner or otherwise; and

(B)   Establishes that the requestor at no time had any knowledge or reason to believe that the property was being or would be used in violation of the law; and

(C)   Establishes that the requestor at no time had any knowledge or reason to believe that the owner had any record or reputation for violating laws of the United States or of any State for related crimes.

(viii)   The reviewing official may postpone any decision until the conclusion of any related administrative, civil, or criminal proceeding.

(ix)   The decision of the reviewing official as to the disposition of the property shall be the final agency determination for purposes of judicial review.

[Amdt. 132, 43 FR 47882, Oct. 17, 1978, as amended by Amdt. 221, 47 FR 35168, Aug. 13, 1982; Amdt. 269, 51 FR 10782, Mar. 28, 1986; Amdt. 334, 57 FR 3911, Feb. 3, 1992; 59 FR 51354, Oct. 11, 1994; 85 FR 52032, Aug. 24, 2020]

## § 271.6 Complaint procedure.

(a)   *State agency responsibility —*

(1)   *General scope.* The State agency shall maintain a system of its choosing for handling program complaints filed by participants, potential participants, or other concerned individuals or groups. This shall not include complaints alleging discrimination on the basis of race, sex, age, religious creed, national origin, political beliefs or disability; such complaints shall be handled in accordance with § 272.6. This procedure also need not include complaints that can be pursued through a fair hearing. Complaints regarding such areas as processing standards and service to participants and potential participants would generally be handled under this complaint procedure.

(2)   *Minimum requirements.* The State agency shall follow up on complaints, resolve complaints and take corrective action where warranted, and respond to the complainant on the State agency's disposition of the complaint. The State agency shall make information on the complaint system and how to file a complaint available to participants, potential participants and other interested persons. The State agency may make the information available through written materials or posters at certification offices or other appropriate means.

GOV000213

Case 1:26-cv-00861-ABJ    Document 17-4    Filed 04/03/26    Page 34 of 72

(3) *Complaint analysis.* The State agency shall maintain records of complaints received and their disposition, and shall review records at least annually to assess whether patterns of problems may be present in local offices, project areas, or throughout the State. The results of this review shall be provided to the Performance Reporting System coordinator for appropriate action, and for inclusion, if appropriate, in the State Corrective Action Plan in accordance with § 275.16 of this chapter. The information provided to the Performance Reporting System Coordinator shall include the identification, if any, of potential or actual patterns of deficiencies in local offices, project areas, or throughout the State, and any identification of causes of these problems.

(4) *Monitoring.* FNS shall monitor State compliance with these requirements through the Performance Reporting System.

(b) *Regional office responsibility.*

(1) Persons or agencies desiring program information or wishing to file a complaint may contact the appropriate FNS Regional Office.

(i) For Delaware, the District of Columbia, Maryland, New Jersey, Pennsylvania, Puerto Rico, Virginia, the Virgin Islands of the United States, and West Virginia: Mid-Atlantic Regional Office, U.S. Department of Agriculture, Food and Nutrition Service, CN 02150, Trenton, NJ 08650.

(ii) For Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, and Tennessee: Southeast Regional Office, U.S. Department of Agriculture, Food and Nutrition Service, 77 Forsyth Street SW., suite 112, Atlanta, GA 30303-3427.

(iii) For Illinois, Indiana, Michigan, Minnesota, Ohio and Wisconsin: Midwest Regional Office, U.S. Department of Agriculture, Food and Nutrition Service, 77 West Jackson Blvd., 20th Floor, Chicago, IL 60604-3507.

(iv) For Arkansas, Louisiana, New Mexico, Oklahoma, and Texas: Southwest Regional Office, U.S. Department of Agriculture, Food and Nutrition Service, 1100 Commerce Street, suite 5-C-30, Dallas, TX 75242.

(v) For Alaska, Arizona, California, Guam, Hawaii, Idaho, Nevada, Oregon and Washington: Western Regional Office, U.S. Department of Agriculture, Food and Nutrition Service, 550 Kearny Street, room 400, San Francisco, CA 94108.

(vi) For Connecticut, Maine, Massachusetts, New Hampshire, New York, Rhode Island, and Vermont: Northeast Regional Office, U.S. Department of Agriculture, Food and Nutrition Service, 10 Causeway St., Boston, MA 02222-1069.

(vii) For Colorado, Iowa, Kansas, Missouri, Montana, Nebraska, North Dakota, South Dakota, Utah, and Wyoming: Mountain Plains Regional Office, U.S. Department of Agriculture, Food and Nutrition Service, 1244 Speer Blvd., suite 903, Denver, CO 80204-3581.

(2) Complainants shall be advised of the appropriate State complaint handling and fair hearing procedures. Upon household request, other complaints shall be pursued by the Department rather than the State agency, unless the complaint is one upon which the complainant wishes to request a fair hearing.

*[Amdt. 132, 43 FR 47882, Oct. 17, 1978, as amended at 45 FR 71350, Oct. 28, 1980; Amdt. 187, 45 FR 85699, Dec. 30, 1980; Amdt. 211, 47 FR 53315, Nov. 26, 1982; Amdt. 237, 47 FR 57668, Dec. 28, 1982; Amdt. 250, 48 FR 22130, May 17, 1983; Amdt. 269, 51 FR 10782, Mar. 28, 1986; Amdt. 356, 59 FR 29713, June 9, 1994; 76 FR 27606, May 12, 2011]*

GOV000214

# § 271.7 Allotment reduction procedures.

(a) *General purpose.* This section sets forth the procedures to be followed if the monthly SNAP allotments determined in accordance with the provisions of § 273.10 must be reduced, suspended, or cancelled to comply with section 18 of the Food and Nutrition Act of 2008, as amended. The best available data pertaining to the number of people participating in the program and the amounts of benefits being issued shall be used in deciding whether such action is necessary.

(b) *Nature of reduction action.* Action to comply with section 18 of the Food and Nutrition Act of 2008, as amended, may be a suspension or cancellation of allotments for one or more months, a reduction in allotment levels for one or more months or a combination of these three actions. If a reduction in allotments is deemed necessary, allotments shall be reduced by reducing maximum SNAP allotments amounts for each household size by the same percentage. This results in all households of a given size having their benefits reduced by the same dollar amount. The dollar reduction would be smallest for one-person households and greatest for the largest households. Since the dollar amount would be the same for all households of the same size, the rate of reduction would be lowest for zero net income households and greatest for the highest net income households. All one- and two-person households affected by a reduction action shall be guaranteed the minimum benefit unless the action is a cancellation of benefits, a suspension of benefits, or a reduction of benefits of 90 percent or more of the total amount of benefits projected to be issued in the affected month.

(c) *Reduction method.* If a reduction in allotments is deemed necessary, the maximum SNAP allotments amounts for all household sizes shall be reduced by a percentage specified by FNS. For example, if it is determined that a 25 per cent reduction in the maximum SNAP allotments amount is to be made, the reduction for all four-person households would be calculated as follows: The maximum SNAP allotments amount for a four-person household ($209 in November 1980) would be reduced by 25% to $157. Then 30 percent of the household's net SNAP income would be deducted from the reduced maximum SNAP allotments amount. For example, 30 per cent of a net SNAP income of $200, $60, would be deducted from the reduced maximum SNAP allotments amount ($157), resulting in a reduced allotment of $97.

(d) *Implementation of allotment reductions* —

(1) *Reductions.*

(i) If a decision is made to reduce monthly SNAP allotments, FNS shall notify State agencies of the date the reduction is to take effect and by what percentage maximum SNAP allotments amounts are to be reduced.

(ii) Upon receiving notification that a reduction is to be made in an upcoming month's allotment, State agencies shall act immediately to implement the reduction. Such action could differ from State to State depending on the nature of the issuance system in use. Where there are computerized issuance systems, the program used for calculating allotments shall be altered to reflect the appropriate percentage reduction in the maximum SNAP allotments for each household size and the computer program shall be adjusted to allow for the minimum benefit for one- and two-person households. The computer program shall also be adjusted to provide for the rounding of benefit levels of $1, $3 and $5 to $2, $4 and $6, respectively. FNS will provide State agencies with revised issuance tables reflecting the percentage reductions to be made in the maximum SNAP allotments amounts and reduce maximum SNAP allotments levels. In States where manual issuance is used, State agencies shall reproduce the issuance tables provided by FNS and distribute them to issuance personnel. State agencies shall ensure that the revised issuance tables are distributed to issuance agents and personnel in time to

GOV000215

Case 1:26-cv-00861-ABJ    Document 17-4    Filed 04/03/26    Page 36 of 72

allow benefit reductions during the month ordered by FNS. In an HIR card system State agencies have the option of enacting the reduction in benefits either by changing all HIR cards before issuance activity for the affected month begins or by adjusting allotments at the point of issuance as each household appears at the issuance office.

(2) *Suspensions and cancellations.*

(i) If a decision is made to suspend or cancel the distribution of SNAP benefits in a given month, FNS shall notify State agencies of the date the suspension or cancellation is to take effect. In the event of a suspension or cancellation of benefits, the provision for the minimum benefit for households with one or two members only shall be disregarded and all households shall have their benefits suspended or cancelled. Upon receiving notification that an upcoming month's issuance is to be suspended or cancelled, State agencies shall take immediate action to effect the suspension or cancellation. This action would involve making necessary computer adjustments, and notifying issuance agents and personnel.

(ii) Upon being notified by FNS that a suspension of benefits is over, State agencies shall act immediately to resume issuing benefits to certified households and shall resume benefit issuance as soon as practicable.

(3) *Affected allotments.* Whenever a reduction of allotments is ordered for a particular month, reduced benefits shall be calculated for all households for the designated month. However, any household with one or two members whose reduced benefits would be less than the minimum benefit shall receive the minimum benefit except as provided in § 273.10(e)(2). Allotments or portions of allotments representing restored or retroactive benefits for a prior unaffected month would not be reduced, suspended, or cancelled even though they are issued during an affected month.

(4) *Notification of eligible households.* Reductions, suspensions and cancellations of allotments shall be considered to be Federal adjustments to allotments. As such, State agencies shall notify households of reductions, suspensions and cancellations of allotments in accordance with the notice provisions of § 273.12(e)(1), except that State agencies shall not provide notices of adverse action to households affected by reductions, suspensions or cancellations of allotments.

(5) *Restoration of benefits.* Households whose allotments are reduced or cancelled as a result of the enactment of these procedures are not *entitled* to the restoration of the lost benefits at a future date. However, if there is a surplus of funds as a result of the reduction or cancellation, FNS shall direct State agencies to provide affected households with restored benefits unless the Secretary determines that the amount of surplus funds is too small to make this practicable. The procedures implemented by State agencies for reducing and cancelling benefits shall be designed so that in the event FNS directs the restoration of benefits, such benefits are issued promptly.

(e) *Effects of reductions, suspensions and cancellations on the certification of eligible households.*

(1) Except as provided in paragraph (e)(2) of this section, determinations of the eligibility of applicant households shall not be affected by reductions, suspensions or cancellations of allotments. State agencies shall accept and process applications during a month(s) in which a reduction, suspension or cancellation is in effect in accordance with the requirements of part 273. Determinations of eligibility shall also be made according to the provisions of part 273. If an applicant is found to be eligible for benefits and a reduction is in effect, the amount of benefits shall be calculated by reducing the maximum SNAP allotments amount by the appropriate percentage for the applicant's household size and then deducting 30 percent of the household's net SNAP income from the

GOV000216

Case 1:26-cv-00861-ABJ    Document 17-4    Filed 04/03/26    Page 37 of 72

reduced maximum SNAP allotments amount. If an applicant is found to be eligible for benefits while a suspension or cancellation is in effect, no benefits shall be issued to the applicant until issuance is again authorized by FNS.

(2) *Expedited service.*

   (i) Households eligible to receive expedited processing who apply for program benefits during months in which reductions or suspensions are in effect, shall have their cases processed in accordance with the expedited processing provisions of § 273.2(i).

      (A) Those households that receive expedited service in months in which reductions are in effect and that are determined to be eligible shall be issued allotments that are reduced in accordance with the reduction in effect. These reduced allotments shall be made available to the households within the benefit delivery timeframe specified in § 273.2(i).

      (B) Those households that receive expedited service in months in which suspensions are in effect and that are determined to be eligible shall have benefits issued to them within the timeframe specified in § 273.2(i). However, if the suspension is still in effect at the time issuance is to be made, the issuance shall be suspended until the suspension is ended.

   (ii) Households eligible to receive expedited processing who apply for Program benefits during months in which cancellations are in effect shall receive expedited service. However, the deadline for completing the processing of such cases shall be five calendar days or the end of the month of application, whichever date is later. All other rules pertaining to expedited service, contained in § 273.2(i), shall be applicable to these cases.

(3) The reduction, suspension or cancellation of allotments in a given month shall have no effect on the certification periods assigned to households. Those participating households whose certification periods expire during a month in which allotments have been reduced, suspended or cancelled shall be recertified according to the provisions of § 273.14. Households found eligible to participate during a month in which allotments have been reduced, suspended or cancelled shall have certification periods assigned in accordance with the provisions of § 273.10.

(f) *Fair hearings.* Any household that has its allotment reduced, suspended or cancelled as a result of an order issued by FNS in accordance with these rules may request a fair hearing if it disagrees with the action, subject to the following conditions. State agencies shall not be required to hold fair hearings unless the request for a fair hearing is based on a household's belief that its benefit level was computed incorrectly under these rules or that the rules were misapplied or misinterpreted. State agencies shall be allowed to deny fair hearings to those households who are merely disputing the fact that a reduction, suspension or cancellation was ordered. Furthermore, since the reduction, suspension or cancellation would be necessary to avoid an expenditure of funds beyond those appropriated by Congress, households do not have a right to a continuation of benefits pending the fair hearing. A household may receive retroactive benefits in an appropriate amount if it is determined that its benefits were reduced by more than the amount by which the State agency was directed to reduce benefits.

(g) *Issuance services.* State agencies must have issuance services available to serve housholds receiving restored or retroactive benefits for a prior, unaffected month.

(h) *Penalties.* Notwithstanding any other provision of this subchapter, FNS may take one or more of the following actions against a State agency that fails to comply with a directive to reduce, suspend or cancel allotments in a particular month.

GOV000217

Case 1:26-cv-00861-ABJ    Document 17-4    Filed 04/03/26    Page 38 of 72

(1)  If FNS ascertains that a State agency does not plan to comply with a directive to reduce, suspend or cancel allotments for a particular month, a warning will be issued advising the State agency that if it does not comply, FNS may cancel 100 percent of the Federal share of the State agency's administrative costs for the affected month(s). If, after receiving such a warning, a State agency does not comply with a directive to reduce, suspend or cancel allotments, FNS may cancel 100 percent of the Federal share of the State agency's administrative costs for the affected month(s).

(2)  If FNS ascertains after warning a State agency as provided in paragraph (h)(1) of this section, that the State agency does not plan to comply with a directive to reduce, suspend or cancel allotments, a court injunction may be sought to compel compliance.

(3)  If a State agency fails to reduce, suspend or cancel allotments as directed, FNS will bill the State agency for all over issuances that result. If a State agency fails to remit the billed amount to FNS within a prescribed period of time the funds will be recovered through offsets against the Federal share of the State agency's administrative costs, or any other means available under law.

[Amdt. 146, 46 FR 1426, Jan. 6, 1981, as amended by Amdt. 207, 47 FR 52333, Nov. 19, 1982; Amdt. 211, 47 FR 53315, Nov. 26, 1982; Amdt. 233, 47 FR 53830, Nov. 30, 1982; Amdt. 269, 51 FR 10782, Mar. 28, 1986; 54 FR 24154, June 6, 1989; 56 FR 63596, Dec. 4, 1991; Amdt. 356, 59 FR 29713, June 9, 1994; 78 FR 11972, Feb. 21, 2013]

## § 271.8 Information collection/recordkeeping—OMB assigned control numbers.

| 7 CFR section where requirements are described | Current OMB control No. |
|---|---|
| 272.1(f) | 0584-0010 |
|  | 0584-0025 |
|  | 0584-0034 |
|  | 0584-0037 |
|  | 0584-0064 |
|  | 0584-0069 |
|  | 0584-0074 |
|  | 0584-0080 |
|  | 0584-0081 |
|  | 0584-0083 |
|  | 0584-0299 |
|  | 0584-0303 |
|  | 0584-0336 |
|  | 0584-0339 |
| 272.2(d) | 0584-0064 |
| 272.2(a), (c), (d), (e), (f) | 0584-0083 |
| 272.5(c) | 0584-0083 |
| 272.3(a), (b), (c) | 0584-0083 |
| 272.6(g), (h) | 0584-0025 |
| 273.2(a), (b), (c), (e), (f), (h) | 0584-0064 |

GOV000218

| 7 CFR section where requirements are described | Current OMB control No. |
| --- | --- |
| 273.5(b) | 0584-0064 |
| 273.7(a), (d), (e) | 0584-0339 |
| 273.7(c) | 0584-0083 |
| | 0584-0339 |
| 273.7(c)(17) | 0584-0614 |
| 273.8(b), (e ) | 0584-0064 |
| 273.9(d) | 0584-0496 |
| 273.9(d) (c) | 0584-0064 |
| 273.10(e), (g)(1) | 0584-0064 |
| 273.11(b) | 0584-0496 |
| 273.11(i)(1)-(4) | 0584-0080 |
| | 0584-0081 |
| 273.11(i)(5) | 0584-0081 |
| 273.11(i)(6) | 0584-0080 |
| | 0584-0081 |
| 273.12(a), (b), (c), (d) | 0584-0064 |
| 273.13(a), (b) | 0584-0064 |
| 273.14(b) | 0584-0064 |
| 273.16(a), (b), (d), (e), (f), (g), (h), (i) | 0584-0064 |
| 273.18(h) | 0584-0069 |
| 273.21(h) | 0584-0064 |
| 273.24(f) | 0584-0479 |
| 274.3(d) | 0584-0069 |
| | 0584-0080 |
| 274.4(a) | 0584-0080 |
| 274.4(b) | 0584-0080 |
| | 0584-0081 |
| 274.6(a), (b) and (e) | 0584-0080 |
| | 0584-0081 |
| 275.2(a) | 0584-0010 |
| | 0584-0303 |
| 275.4(a) | 0584-0010 |
| | 0584-0303 |
| 275.4(b) | 0584-0010 |
| 275.4(c) | 0584-0034 |
| | 0584-0074 |
| | 0584-0299 |
| 275.5(a), (b) | 0584-0010 |
| 275.6(b) | 0584-0010 |

GOV000219

Case 1:26-cv-00861-ABJ    Document 17-4    Filed 04/03/26    Page 40 of 72

| 7 CFR section where requirements are described | Current OMB control No. |
|---|---|
| 275.8(a) | 0584-0010 |
| 275.9(b), (g) | 0584-0010 |
| 275.10(a) | 0584-0074 |
|  | 0584-0299 |
|  | 0584-0303 |
| 275.11(a) | 0584-0303 |
| 275.12(b), (c), (d), (e) | 0584-0074 |
| 275.12(f), (g) | 0584-0299 |
| 275.13(b), (d), (e) | 0584-0034 |
| 275.14(c), (d) | 0584-0034 |
|  | 0584-0074 |
|  | 0584-0299 |
| 275.16(b), (c), (d) | 0584-0010 |
| 275.17(a), (b) | 0584-0010 |
| 275.18(a), (b) | 0584-0010 |
| 275.19(a), (b), (c) | 0584-0010 |
| 275.20(a) | 0584-0010 |
| 275.21(b) | 0584-0034 |
|  | 0584-0074 |
|  | 0584-0299 |
| 275.21(c), (d), (e) | 0584-0034 |
| 275.22(a), (b) | 0584-0010 |
| 275.23 | 0584-0010 |
|  | 0584-0034 |
|  | 0584-0074 |
|  | 0584-0299 |
| 277.18(a), (c), (d), (f), (i) | 0584-0083 |
| 278.1(a), (b), (l) | 0584-0008 |
| 278.5(c), (d), (f) | 0584-0008 |
| 278.6(b) | 0584-0008 |
| 278.7(b), (c) | 0584-0008 |
| 278.8(a) | 0584-0008 |
| 280.7(c), (d), (g) | 0584-0336 |
| 280.9(b) | 0584-0037 |
| 280.10(a) | 0584-0336 |

[*82 FR 2034, Jan. 6, 2017, as amended at 89 FR 90568, Nov. 18, 2024*]

GOV000220

Case 1:26-cv-00861-ABJ    Document 17-4    Filed 04/03/26    Page 41 of 72

## § 271.9 Promotional activities.

No funds authorized to be appropriated under the Food and Nutrition Act of 2008, as amended, shall be used for recruitment or promotion activities as described in § 277.4(b)(5). No entity receiving funds under the Food and Nutrition Act of 2008, as amended, shall be permitted to perform activities described in § 277.4(b)(6) of this chapter.

*[81 FR 92556, Dec. 20, 2016]*

GOV000221

Case 1:26-cv-00861-ABJ    Document 17-4    Filed 04/03/26    Page 42 of 72

This content is from the eCFR and is authoritative but unofficial.

Title 7 —Agriculture
Subtitle B —Regulations of the Department of Agriculture
Chapter II —Food and Nutrition Service, Department of Agriculture
Subchapter C —Supplemental Nutrition Assistance and Food Distribution Program

**Part 282**  Demonstration, Research, and Evaluation Projects
  **§ 282.1**  Legislative authority and notice requirements.
  **§ 282.2**  Funding.

**Editorial Note:**  Nomenclature changes to subchapter C appear by Amdt. 381, 65 FR 64586, Oct. 30, 2000.

# PART 282—DEMONSTRATION, RESEARCH, AND EVALUATION PROJECTS

**Authority:**  7 U.S.C. 2011-2036.

**Source:**  Amdt. 134, 43 FR 54215, Nov. 21, 1978, unless otherwise noted.

## § 282.1 Legislative authority and notice requirements.

(a)  *Legislative authority.* Section 17 of the Act authorizes the Secretary to conduct demonstration, research, and evaluation projects. In conducting such projects, the Secretary may waive all or part of the requirements of the Act and implementing regulations necessary to conduct such projects, except that no project, other than a project involving the payment of the average value of allotments by household size in the form of cash to eligible households or a project conducted to test improved consistency or coordination between the SNAP employment and training program and the Job Opportunities and Basic Skills program under Title IV of the Social Security Act, may be undertaken which would lower or further restrict the established income and resource standards or benefit levels.

(b)  *Notices.* At least 30 days prior to the initiation of a demonstration project, FNS shall publish a General Notice in the FEDERAL REGISTER if the demonstration project will likely have a significant impact on the public. The notice shall set forth the specific operational procedures and shall explain the basis and purpose of the demonstration project. If significant comments are received in response to this General Notice, the Department will take such action as may be appropriate prior to implementing the project. If the operational procedures contained in the General Notice described above are significantly changed because of comments, an amended General Notice will be published in the FEDERAL REGISTER at least 30 days prior to the initiation of the demonstration project, except where good cause exists supporting a shorter effective date. The explanation for the determination of good cause will be published with the amended General Notice. The amended General Notice will also explain the basis and purpose of the change.

GOV000222

Case 1:26-cv-00861-ABJ   Document 17-4   Filed 04/03/26   Page 43 of 72

*[Amdt. 371, 61 FR 60012, Nov. 26, 1996]*

## § 282.2 Funding.

Federal financial participation may be made available to demonstration, research, and evaluation projects awarded by FNS through grants and contracts. Funds may not be transferred from one project to another. FNS will pay all costs incurred during the project, up to the level established in the grant, or in the terms and conditions of the contract. FNS may grant time extensions of the project upon approval. Funding for additional costs is subject to existing Federal grant and contract procedures.

*[Amdt. 371, 61 FR 60012, Nov. 26, 1996]*

GOV000223

🚩 KeyCite Yellow Flag

Unconstitutional or Preempted  Prior Version Held Unconstitutional by   Pena Martinez v. U.S. Department of Health and Human Services,   D.Puerto Rico, Aug. 03, 2020

🚩 KeyCite Yellow Flag

Proposed Legislation

United States Code Annotated
  Title 7. Agriculture (Refs & Annos)
    Chapter 51. Supplemental Nutrition Assistance Program (Refs & Annos)

7 U.S.C.A. § 2012

§ 2012. Definitions

Effective: July 4, 2025
Currentness

As used in this chapter, the term:

**(a)** "Access device" means any card, plate, code, account number, or other means of access, including point of sale devices, that can be used, alone or in conjunction with another access device, to obtain payments, allotments, benefits, money, goods, or other things of value, or that can be used to initiate a transfer of funds under this chapter.

**(b)** "Allotment" means the total value of benefits a household is authorized to receive during each month.

**(c)** "Allowable medical expenses" means expenditures for (1) medical and dental care, (2) hospitalization or nursing care (including hospitalization or nursing care of an individual who was a household member immediately prior to entering a hospital or nursing home), (3) prescription drugs when prescribed by a licensed practitioner authorized under State law and over-the-counter medication (including insulin) when approved by a licensed practitioner or other qualified health professional, (4) health and hospitalization insurance policies (excluding the costs of health and accident or income maintenance policies), (5) medicare premiums related to coverage under title XVIII of the Social Security Act, (6) dentures, hearing aids, and prosthetics (including the costs of securing and maintaining a seeing eye dog), (7) eye glasses prescribed by a physician skilled in eye disease or by an optometrist, (8) reasonable costs of transportation necessary to secure medical treatment or services, and (9) maintaining an attendant, homemaker, home health aide, housekeeper, or child care services due to age, infirmity, or illness.

**(d) Benefit**

The term "benefit" means the value of supplemental nutrition assistance provided to a household by means of--

**(1)** an electronic benefit transfer under section 2016(h) of this title; or

**(2)** other means of providing assistance, as determined by the Secretary.

GOV000224

**(e) Benefit Issuer**

The term "benefit issuer" means any office of the State agency or any person, partnership, corporation, organization, political subdivision, or other entity with which a State agency has contracted for, or to which it has delegated functional responsibility in connection with, the issuance of benefits to households.

**(f)** "Certification period" means the period for which households shall be eligible to receive benefits. The certification period shall not exceed 12 months, except that the certification period may be up to 24 months if all adult household members are elderly or disabled. A State agency shall have at least 1 contact with each certified household every 12 months. The limits specified in this subsection may be extended until the end of any transitional benefit period established under section 2020(s) of this title.

**(g)** "Coupon" means any coupon, stamp, type of certificate, authorization card, cash or check issued in lieu of a coupon.

**(h)** "Drug addiction or alcoholic treatment and rehabilitation program" means any such program conducted by a private nonprofit organization or institution, or a publicly operated community mental health center, under part B of title XIX of the Public Health Service Act (42 U.S.C. 300x et seq.) to provide treatment that can lead to the rehabilitation of drug addicts or alcoholics.

**(i) EBT Card**

The term "EBT card" means an electronic benefit transfer card issued under section 2016(h) of this title.

**(j)** "Elderly or disabled member" means a member of a household who--

**(1)** is sixty years of age or older;

**(2)(A)** receives supplemental security income benefits under title XVI of the Social Security Act (42 U.S.C. 1381 et seq.), or Federally or State administered supplemental benefits of the type described in section 212(a) of Public Law 93-66 (42 U.S.C. 1382 note), or

**(B)** receives Federally or State administered supplemental assistance of the type described in section 1616(a) of the Social Security Act (42 U.S.C. 1382e(a)), interim assistance pending receipt of supplemental security income, disability-related medical assistance under title XIX of the Social Security Act (42 U.S.C. 1396 et seq.), or disability-based State general assistance benefits, if the Secretary determines that such benefits are conditioned on meeting disability or blindness criteria at least as stringent as those used under title XVI of the Social Security Act;

**(3)** receives disability or blindness payments under title I, II, X, XIV, or XVI of the Social Security Act or receives disability retirement benefits from a governmental agency because of a disability considered permanent under section 221(i) of the Social Security Act (42 U.S.C. 421(i));

GOV000225

Case 1:26-cv-00861-ABJ    Document 17-4    Filed 04/03/26    Page 46 of 72

**(4)** is a veteran who--

**(A)** has a service-connected or non-service-connected disability which is rated as total under Title 38; or

**(B)** is considered in need of regular aid and attendance or permanently housebound under such title;

**(5)** is a surviving spouse of a veteran and--

**(A)** is considered in need of regular aid and attendance or permanently housebound under Title 38; or

**(B)** is entitled to compensation for a service-connected death or pension benefits for a non-service-connected death under Title 38, and has a disability considered permanent under section 221(i) of the Social Security Act (42 U.S.C. 421(i));

**(6)** is a child of a veteran and--

**(A)** is considered permanently incapable of self-support under section 1314 of Title 38; or

**(B)** is entitled to compensation for a service-connected death or pension benefits for a non-service-connected death under Title 38, and has a disability considered permanent under section 221(i) of the Social Security Act (42 U.S.C. 421(i)); or

**(7)** is an individual receiving an annuity under section 2(a)(1)(iv) or 2(a)(1)(v) of the Railroad Retirement Act of 1974 (45 U.S.C. 231a(a)(1)(iv) or 231a(a)(1)(v)), if the individual's service as an employee under the Railroad Retirement Act of 1974, after December 31, 1936, had been included in the term "employment" as defined in the Social Security Act, and if an application for disability benefits had been filed.

**(k)** "Food" means (1) any food or food product for home consumption except alcoholic beverages, tobacco, hot foods or hot food products ready for immediate consumption other than those authorized pursuant to clauses (3), (4), (5), (7), (8), and (9) of this subsection, and any deposit fee in excess of the amount of the State fee reimbursement (if any) required to purchase any food or food product contained in a returnable bottle or can, regardless of whether the fee is included in the shelf price posted for the food or food product, (2) seeds and plants for use in gardens to produce food for the personal consumption of the eligible household, (3) in the case of those persons who are sixty years of age or over or who receive supplemental security income benefits or disability or blindness payments under title I, II, X, XIV, or XVI of the Social Security Act, and their spouses, meals prepared by and served in senior citizens' centers, apartment buildings occupied primarily by such persons, public or private nonprofit establishments (eating or otherwise) that feed such persons, private establishments that contract with the appropriate agency of the State to offer meals for such persons at concessional prices subject to section 2018(h) of this title, and meals prepared for and served to residents of federally subsidized housing for the elderly, (4) in the case of persons sixty years of age or over and persons who are physically or mentally handicapped or otherwise so disabled that they are unable adequately to prepare all of their meals, meals prepared for and delivered to them (and their spouses) at their home by a public or private nonprofit organization or by a private establishment that contracts with the appropriate State agency to perform such services at concessional prices subject to section 2018(h) of this title, (5) in the case of narcotics addicts or alcoholics, and their children, served by drug addiction or alcoholic treatment and rehabilitation programs, meals prepared

GOV000226

and served under such programs, (6) in the case of certain eligible households living in Alaska, equipment for procuring food by hunting and fishing, such as nets, hooks, rods, harpoons, and knives (but not equipment for purposes of transportation, clothing, or shelter, and not firearms, ammunition, and explosives) if the Secretary determines that such households are located in an area of the State where it is extremely difficult to reach stores selling food and that such households depend to a substantial extent upon hunting and fishing for subsistence, (7) in the case of disabled or blind recipients of benefits under title I, II, X, XIV, or XVI of the Social Security Act, and individuals described in paragraphs (2) through (7) of subsection (j), who are residents in a public or private nonprofit group living arrangement that serves no more than sixteen residents and is certified by the appropriate State agency or agencies under regulations issued under section 1616(e) of the Social Security Act or under standards determined by the Secretary to be comparable to standards implemented by appropriate State agencies under such section, meals prepared and served under such arrangement, (8) in the case of women and children temporarily residing in public or private nonprofit shelters for battered women and children, meals prepared and served, by such shelters, and (9) in the case of households that do not reside in permanent dwellings and households that have no fixed mailing addresses, meals prepared for and served by a public or private nonprofit establishment (approved by an appropriate State or local agency) that feeds such individuals and by private establishments that contract with the appropriate agency of the State to offer meals for such individuals at concessional prices subject to section 2018(h) of this title.

**(l)** "Homeless individual" means--

**(1)** an individual who lacks a fixed and regular nighttime residence; or

**(2)** an individual who has a primary nighttime residence that is--

**(A)** a supervised publicly or privately operated shelter (including a welfare hotel or congregate shelter) designed to provide temporary living accommodations;

**(B)** an institution that provides a temporary residence for individuals intended to be institutionalized;

**(C)** a temporary accommodation for not more than 90 days in the residence of another individual; or

**(D)** a public or private place not designed for, or ordinarily used as, a regular sleeping accommodation for human beings.

**(m)(1)** "Household" means--

**(A)** an individual who lives alone or who, while living with others, customarily purchases food and prepares meals for home consumption separate and apart from the others; or

**(B)** a group of individuals who live together and customarily purchase food and prepare meals together for home consumption.

**(2)** Spouses who live together, parents and their children 21 years of age or younger who live together, and children (excluding foster children) under 18 years of age who live with and are under the parental control of a person other than their parent

GOV000227

together with the person exercising parental control shall be treated as a group of individuals who customarily purchase and prepare meals together for home consumption even if they do not do so.

**(3)** Notwithstanding paragraphs (1) and (2), an individual who lives with others, who is sixty years of age or older, and who is unable to purchase food and prepare meals because such individual suffers, as certified by a licensed physician, from a disability which would be considered a permanent disability under section 221(i) of the Social Security Act (42 U.S.C. 421(i)) or from a severe, permanent, and disabling physical or mental infirmity which is not symptomatic of a disease shall be considered, together with any of the others who is the spouse of such individual, an individual household, without regard to the purchase of food and preparation of meals, if the income (as determined under section 2014(d) of this title) of the others, excluding the spouse, does not exceed the poverty line, as described in section 2014(c)(1) of this title, by more than 65 per centum.

**(4)** In no event shall any individual or group of individuals constitute a household if they reside in an institution or boarding house, or else live with others and pay compensation to the others for meals.

**(5)** For the purposes of this subsection, the following persons shall not be considered to be residents of institutions and shall be considered to be individual households:

**(A)** Residents of federally subsidized housing for the elderly, disabled or blind recipients of benefits under title I, II, X, XIV, or XVI of the Social Security Act.

**(B)** Individuals described in paragraphs (2) through (7) of subsection (j), who are residents in a public or private nonprofit group living arrangement that serves no more than sixteen residents and is certified by the appropriate State agency or agencies under regulations issued under section 1616(e) of the Social Security Act or under standards determined by the Secretary to be comparable to standards implemented by appropriate State agencies under that section.

**(C)** Temporary residents of public or private nonprofit shelters for battered women and children.

**(D)** Residents of public or private nonprofit shelters for individuals who do not reside in permanent dwellings or have no fixed mailing addresses, who are otherwise eligible for benefits.

**(E)** Narcotics addicts or alcoholics, together with their children, who live under the supervision of a private nonprofit institution, or a publicly operated community mental health center, for the purpose of regular participation in a drug or alcoholic treatment program.

**(n)** "Reservation" means the geographically defined area or areas over which a tribal organization exercises governmental jurisdiction.

**(o)** "Retail food store" means--

GOV000228

**(1)** an establishment, house-to-house trade route, or online entity that sells food for home preparation and consumption and--

**(A)** offers for sale, on a continuous basis, a variety of at least 7 foods in each of the 4 categories of staple foods specified in subsection (q)(1), including perishable foods in at least 3 of the categories; or

**(B)** has over 50 percent of the total sales of the establishment or route in staple foods,

as determined by visual inspection, sales records, purchase records, counting of stockkeeping units, or other inventory or accounting recordkeeping methods that are customary or reasonable in the retail food industry;

**(2)** an establishment, organization, program, or group living arrangement referred to in paragraphs (3), (4), (5), (7), (8), and (9) of subsection (k);

**(3)** a store purveying the hunting and fishing equipment described in subsection (k)(6);

**(4)** any private nonprofit cooperative food purchasing venture, including those in which the members pay for food purchased prior to the receipt of such food, or agricultural producers who market agricultural products directly to consumers; and

**(5)** a governmental or private nonprofit food purchasing and delivery service that--

**(A)** purchases food for, and delivers the food to, individuals who are--

**(i)** unable to shop for food; and

**(ii)(I)** not less than 60 years of age; or

**(II)** physically or mentally handicapped or otherwise disabled;

**(B)** clearly notifies the participating household at the time the household places a food order--

**(i)** of any delivery fee associated with the food purchase and delivery provided to the household by the service; and

**(ii)** that a delivery fee cannot be paid with benefits provided under supplemental nutrition assistance program; and

**(C)** sells food purchased for the household at the price paid by the service for the food and without any additional cost markup.

GOV000229

**(p)** "Secretary" means the Secretary of Agriculture.

**(q)(1)** Except as provided in paragraph (2), "staple foods" means foods in the following categories:

    **(A)** Meat, poultry, or fish.

    **(B)** Bread or cereals.

    **(C)** Vegetables or fruits.

    **(D)** Dairy products.

**(2)** "Staple foods" do not include accessory food items, such as coffee, tea, cocoa, carbonated and uncarbonated drinks, candy, condiments, and spices.

**(r)** "State" means the fifty States, the District of Columbia, Guam, the Virgin Islands of the United States, and the reservations of an Indian tribe whose tribal organization meets the requirements of this chapter for participation as a State agency.

**(s)** "State agency" means (1) the agency of State government, including the local offices thereof, which has the responsibility for the administration of the federally aided public assistance programs within such State, and in those States where such assistance programs are operated on a decentralized basis, the term shall include the counterpart local agencies administering such programs, and (2) the tribal organization of an Indian tribe determined by the Secretary to be capable of effectively administering a food distribution program under section 2013(b) of this title or a supplemental nutrition assistance program under section 2020(d) of this title.

**(t)** "Supplemental nutrition assistance program" means the program operated pursuant to this chapter.

**(u) Thrifty food plan**

    **(1) In general**

The term "thrifty food plan" means the diet required to feed a family of 4 persons consisting of a man and a woman ages 20 through 50, a child ages 6 through 8, and a child ages 9 through 11 using the items and quantities of food described in the report of the Department of Agriculture entitled "Thrifty Food Plan, 2021", and each successor report updated pursuant to this subsection, subject to the conditions that--

    **(A)** the relevant market baskets of the thrifty food plan shall only be changed pursuant to paragraph (4);

GOV000230

**(B)** the cost of the thrifty food plan shall be the basis for uniform allotments for all households, regardless of the actual composition of the household; and

**(C)** the cost of the thrifty food plan may only be adjusted in accordance with this subsection.

**(2) Household adjustments**

The Secretary shall make household adjustments using the following ratios of household size as a percentage of the maximum 4-person allotment:

**(A)** For a 1-person household, 30 percent.

**(B)** For a 2-person household, 55 percent.

**(C)** For a 3-person household, 79 percent.

**(D)** For a 4-person household, 100 percent.

**(E)** For a 5-person household, 119 percent.

**(F)** For a 6-person household, 143 percent.

**(G)** For a 7-person household, 158 percent.

**(H)** For an 8-person household, 180 percent.

**(I)** For a household of 9 persons or more, an additional 22 percent per person, which additional percentage shall not total more than 200 percent.

**(3) Allowable cost adjustments**

The Secretary shall--

**(A)** make cost adjustments in the thrifty food plan for Hawaii and the urban and rural parts of Alaska to reflect the cost of food in Hawaii and urban and rural Alaska;

**(B)** make cost adjustments in the separate thrifty food plans for Guam and the Virgin Islands of the United States to reflect the cost of food in those States, but not to exceed the cost of food in the 50 States and the District of Columbia; and

GOV000231

**(C)** on October 1, 2025, and on each October 1 thereafter, adjust the cost of the thrifty food plan to reflect changes in the Consumer Price Index for All Urban Consumers, published by the Bureau of Labor Statistics of the Department of Labor, for the most recent 12-month period ending in June.

**(4) Re-evaluation of market baskets**

**(A) Re-evaluation**

Not earlier than October 1, 2027, the Secretary may re-evaluate the market baskets of the thrifty food plan based on current food prices, food composition data, consumption patterns, and dietary guidance.

**(B) Cost neutrality**

The Secretary shall not increase the cost of the thrifty food plan based on a re-evaluation under this paragraph.

**(v)** "Tribal organization" means the recognized governing body of an Indian tribe (including the tribally recognized intertribal organization of such tribes), as the term "Indian tribe" is defined in section 5304 of Title 25, as well as any Indian tribe, band, or community holding a treaty with a State government.

**CREDIT(S)**

(Pub.L. 88-525, § 3, Aug. 31, 1964, 78 Stat. 703; Pub.L. 91-671, § 2, Jan. 11, 1971, 84 Stat. 2048; Pub.L. 92-603, Title IV, § 411(a), (b), Oct. 30, 1972, 86 Stat. 1491; Pub.L. 93-86, § 3(a) to (c), (l), (o), (p), Aug. 10, 1973, 87 Stat. 246, 248, 249; Pub.L. 93-125, § 1(h), Oct. 18, 1973, 87 Stat. 450; Pub.L. 94-339, § 4, July 5, 1976, 90 Stat. 801; Pub.L. 95-113, Title XIII, §§ 1301, 1302(a)(1), Sept. 29, 1977, 91 Stat. 958, 979; Pub.L. 96-58, §§ 3, 7, Aug. 14, 1979, 93 Stat. 390, 392; Pub.L. 96-181, § 15(b), Jan. 2, 1980, 93 Stat. 1316; Pub.L. 96-249, Title I, §§ 101(a), 111, 135, May 26, 1980, 94 Stat. 357, 360, 369; Pub.L. 97-35, Title I, §§ 101 to 103, 108(a), 116(a)(1), Aug. 13, 1981, 95 Stat. 358, 361, 364; Pub.L. 97-98, Title XII, §§ 1302 to 1304, Dec. 22, 1981, 95 Stat. 1282; Pub.L. 97-253, Title I, §§ 142, 143(a), 144, 145(a), (b), Sept. 8, 1982, 96 Stat. 772 to 774; Pub.L. 98-204, § 3, Dec. 2, 1983, 97 Stat. 1385; Pub.L. 99-198, Title XV, §§ 1501(a), 1502 to 1504, Dec. 23, 1985, 99 Stat. 1566; Pub.L. 99-570, Title XI, § 11002(a) to (c), Oct. 27, 1986, 100 Stat. 3207-167, 3207-168; Pub.L. 100-77, Title VIII, §§ 801, 802(a), July 22, 1987, 101 Stat. 533, 534; Pub.L. 100-435, Title I, § 120, Title III, § 350, Sept. 19, 1988, 102 Stat. 1655, 1664; Pub.L. 101-624, Title XVII, §§ 1712, 1713(a), 1747(b), Nov. 28, 1990, 104 Stat. 3783, 3796; Pub.L. 102-83, § 5(c)(2), Aug. 6, 1991, 105 Stat. 406; Pub.L. 102-237, Title IX, §§ 901, 941(1), Dec. 13, 1991, 105 Stat. 1884, 1892; Pub.L. 102-351, § 1, Aug. 26, 1992, 106 Stat. 937; Pub.L. 103-66, Title XIII, §§ 13931, 13932, Aug. 10, 1993, 107 Stat. 676; Pub.L. 103-225, Title I, § 101(b)(1), Title II, § 201, Mar. 25, 1994, 108 Stat. 107, 108; Pub.L. 103-354, Title III, § 303(a), Oct. 13, 1994, 108 Stat. 3239; Pub.L. 104-193, Title VIII, §§ 801 to 805, Aug. 22, 1996, 110 Stat. 2308, 2309; Pub.L. 107-171, Title IV, §§ 4112(b)(1), 4115(b)(1), May 13, 2002, 116 Stat. 312, 315; Pub.L. 108-199, Div. A, Title VII, § 771(a), Jan. 23, 2004, 118 Stat. 40; Pub.L. 110-234, Title IV, §§ 4001(b), 4115(b)(1), May 22, 2008, 122 Stat. 1092, 1105; Pub.L. 110-246, § 4(a), Title IV, §§ 4001(b), 4115(b)(1), June 18, 2008, 122 Stat. 1664, 1853, 1866; Pub.L. 113-79, Title IV, §§ 4001, 4002(a), 4003(a), 4012, 4014(c), 4030(a), Feb. 7, 2014, 128 Stat. 782, 784, 793, 794, 813; Pub.L. 115-334, Title IV, §§ 4001(a), 4002, 4003(c), 4022(1), Dec. 20, 2018, 132 Stat. 4624, 4627, 4653; Pub.L. 119-21, Title I, § 10101(a), July 4, 2025, 139 Stat. 80.)

Notes of Decisions (22)

GOV000232

Case 1:26-cv-00861-ABJ    Document 17-4    Filed 04/03/26    Page 53 of 72

7 U.S.C.A. § 2012, 7 USCA § 2012

Current through P.L. 119-80. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

GOV000233

 KeyCite Yellow Flag

Proposed Legislation

United States Code Annotated
  Title 7. Agriculture (Refs & Annos)
    Chapter 51. Supplemental Nutrition Assistance Program (Refs & Annos)

7 U.S.C.A. § 2026

§ 2026. Research, demonstration, and evaluations

Effective: December 20, 2018

Currentness

**(a) Contracts or grants; issuance of aggregate allotments**

**(1)** The Secretary may enter into contracts with or make grants to public or private organizations or agencies under this section to undertake research that will help improve the administration and effectiveness of the supplemental nutrition assistance program in delivering nutrition-related benefits. The waiver authority of the Secretary under subsection (b) shall extend to all contracts and grants under this section.

**(2)** The Secretary may, on application, permit not more than two State agencies to establish procedures that allow households whose monthly supplemental nutrition assistance program benefits do not exceed $20, at their option, to receive, in lieu of their supplemental nutrition assistance program benefits for the initial period under section 2017 of this title and their regular allotment in following months, and at intervals of up to 3 months thereafter, aggregate allotments not to exceed $60 and covering not more than 3 months' benefits. The allotments shall be provided in accordance with paragraphs (3) and (9) of section 2020(e) of this title (except that no household shall begin to receive combined allotments under this section until it has complied with all applicable verification requirements of section 2020(e)(3) of this title) and (with respect to the first aggregate allotment so issued) within 40 days of the last benefit issuance.

**(b) Pilot projects**

**(1)(A)** The Secretary may conduct on a trial basis, in one or more areas of the United States, pilot or experimental projects designed to test program changes that might increase the efficiency of the supplemental nutrition assistance program and improve the delivery of supplemental nutrition assistance program benefits to eligible households, and may waive any requirement of this chapter to the extent necessary for the project to be conducted.

**(B) Project requirements**

**(i) Program goal**

The Secretary may not conduct a project under subparagraph (A) unless--

GOV000234

Case 1:26-cv-00861-ABJ    Document 17-4    Filed 04/03/26    Page 55 of 72

**(I)** the project is consistent with the goal of the supplemental nutrition assistance program of providing food assistance to raise levels of nutrition among low-income individuals; and

**(II)** the project includes an evaluation to determine the effects of the project.

### (ii) Permissible projects

The Secretary may conduct a project under subparagraph (A) to--

**(I)** improve program administration;

**(II)** increase the self-sufficiency of supplemental nutrition assistance program recipients;

**(III)** test innovative welfare reform strategies; or

**(IV)** allow greater conformity with the rules of other programs than would be allowed but for this paragraph.

### (iii) Restrictions on permissible projects

If the Secretary finds that a project under subparagraph (A) would reduce benefits by more than 20 percent for more than 5 percent of households in the area subject to the project (not including any household whose benefits are reduced due to a failure to comply with work or other conduct requirements), the project--

**(I)** may not include more than 15 percent of the number of households in the State receiving supplemental nutrition assistance program benefits; and

**(II)** shall continue for not more than 5 years after the date of implementation, unless the Secretary approves an extension requested by the State agency at any time.

### (iv) Impermissible projects

The Secretary may not conduct a project under subparagraph (A) that--

**(I)** involves the payment of the value of an allotment in the form of cash or otherwise providing benefits in a form not restricted to the purchase of food, unless the project was approved prior to August 22, 1996;

**(II)** has the effect of substantially transferring funds made available under this chapter to services or benefits provided primarily through another public assistance program, or using the funds for any purpose other than the purchase of food, program administration, or an employment or training program;

GOV000235

**(III)** is inconsistent with--

**(aa)** paragraphs (4) and (5) of section 2012(m) of this title;

**(bb)** the last sentence of section 2014(a) of this title, insofar as a waiver denies assistance to an otherwise eligible household or individual if the household or individual has not failed to comply with any work, behavioral, or other conduct requirement under this or another program;

**(cc)** section 2014(c)(2) of this title;

**(dd)** paragraph (2)(B), (4)(F)(i), or (4)(K) of section 2015(d) of this title;

**(ee)** section 2017(b) of this title;

**(ff)** section 2020(e)(2)(B) of this title;

**(gg)** the time standard under section 2020(e)(3) of this title;

**(hh)** subsection (a), (c), (g), (h)(1)(F), (h)(2), or (h)(3) of section 2025 of this title;

**(ii)** this paragraph; or

**(jj)** subsection (a)(1) or (g)(1) of section 2029 of this title;

**(IV)** modifies the operation of section 2014 of this title so as to have the effect of--

**(aa)** increasing the shelter deduction to households with no out-of-pocket housing costs or housing costs that consume a low percentage of the household's income; or

**(bb)** absolving a State from acting with reasonable promptness on substantial reported changes in income or household size (except that this subclause shall not apply with regard to changes related to supplemental nutrition assistance program deductions);

**(V)** is not limited to a specific time period;

**(VI)** waives a provision of section 2035 of this title; or

GOV000236

**(VII)** waives a provision of section 2016(i) of this title.

#### (v) Additional included projects

A pilot or experimental project may include projects involving the payment of the value of allotments or the average value of allotments by household size in the form of cash to eligible households all of whose members are age sixty-five or over or any of whose members are entitled to supplemental security income benefits under title XVI of the Social Security Act or are receiving assistance under a State program funded under part A of title IV of the Social Security Act (42 U.S.C. 601 et seq.), the use of identification mechanisms that do not invade a household's privacy, and the use of food checks or other voucher-type forms in place of EBT cards.

#### (vi) Cash payment pilot projects

Subject to the availability of appropriations under section 2027(a) of this title, any pilot or experimental project implemented under this paragraph and operating as of October 1, 1981, involving the payment of the value of allotments in the form of cash to eligible households all of whose members are either age sixty-five or over or entitled to supplemental security income benefits under title XVI of the Social Security Act shall be continued if the State so requests.

**(C)(i)** No waiver or demonstration program shall be approved under this chapter after November 28, 1990, unless--

**(I)** any household whose food assistance is issued in a form other than EBT cards has its allotment increased to the extent necessary to compensate for any State or local sales tax that may be collected in all or part of the area covered by the demonstration project, the tax on purchases of food by any such household is waived, or the Secretary determines on the basis of information provided by the State agency that the increase is unnecessary on the basis of the limited nature of the items subject to the State or local sales tax; and

**(II)** the State agency conducting the demonstration project pays the cost of any increased allotments.

**(ii)** Clause (i) shall not apply if a waiver or demonstration project already provides a household with assistance that exceeds that which the household would otherwise be eligible to receive by more than the estimated amount of any sales tax on the purchases of food that would be collected from the household in the project area in which the household resides.

#### (D) Response to waivers

##### (i) Response

Not later than 60 days after the date of receiving a request for a waiver under subparagraph (A), the Secretary shall provide a response that--

**(I)** approves the waiver request;

GOV000237

**(II)** denies the waiver request and describes any modification needed for approval of the waiver request;

**(III)** denies the waiver request and describes the grounds for the denial; or

**(IV)** requests clarification of the waiver request.

**(ii) Failure to respond**

If the Secretary does not provide a response in accordance with clause (i), the waiver shall be considered approved, unless the approval is specifically prohibited by this chapter.

**(iii) Notice of denial**

On denial of a waiver request under clause (i)(III), the Secretary shall provide a copy of the waiver request and a description of the reasons for the denial to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate.

**(2)(A)** The Secretary may conduct demonstration projects to test improved consistency or coordination between the supplemental nutrition assistance program employment and training program and the Job Opportunities and Basic Skills program under title IV of the Social Security Act (42 U.S.C. 601 et seq.).

**(B)** Notwithstanding paragraph (1), the Secretary may, as part of a project authorized under this paragraph, waive requirements under section 2015(d) of this title to permit a State to operate an employment and training program for supplemental nutrition assistance program recipients on the same terms and conditions under which the State operates its Job Opportunities and Basic Skills program for recipients of aid to families with dependent children under part F of title IV of the Social Security Act (42 U.S.C. 681 et seq.). Any work experience program conducted as part of the project shall be conducted in conformity with section 482(f) of such Act (42 U.S.C. 682(f)).

**(C)** A State seeking such a waiver shall provide assurances that the resulting employment and training program shall meet the requirements of subsections (a)(19) and (g) of section 402 of such Act (42 U.S.C. 602) (but not including the provision of transitional benefits under clauses (ii) through (vii) of section 402(g)(1)(A)) and sections 481 through 487 of such Act (42 U.S.C. 681 through 687). Each reference to "aid to families with dependent children" in such sections shall be deemed to be a reference to supplemental nutrition assistance program benefits for purposes of the demonstration project.

**(D)** Notwithstanding the other provisions of this paragraph, participation in an employment and training activity in which supplemental nutrition assistance program benefits are converted to cash shall occur only with the consent of the participant.

**(E)** For the purposes of any project conducted under this paragraph, the provisions of this chapter affecting the rights of recipients may be waived to the extent necessary to conform to the provisions of section 402, and sections 481 through 487, of the Social Security Act.

GOV000238

**(F)** At least 60 days prior to granting final approval of a project under this paragraph, the Secretary shall publish the terms and conditions for any demonstration project conducted under the paragraph for public comment in the Federal Register and shall notify the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate.

**(G)** Waivers may be granted under this paragraph to conduct projects at any one time in a total of up to 60 project areas (or parts of project areas), as such areas are defined in regulations in effect on January 1, 1990.

**(H)** A waiver for a change in program rules may be granted under this paragraph only for a demonstration project that has been approved by the Secretary, that will be evaluated according to criteria prescribed by the Secretary, and that will be in operation for no more than 4 years.

**(I)** The Secretary may not grant a waiver under this paragraph on or after August 22, 1996. Any reference in this paragraph to a provision of title IV of the Social Security Act shall be deemed to be a reference to such provision as in effect on the day before August 22, 1996.

**(c) Evaluation measures; pilot programs for nutritional monitoring**

The Secretary shall develop and implement measures for evaluating, on an annual or more frequent basis, the effectiveness of the supplemental nutrition assistance program in achieving its stated objectives, including, but not limited to, the program's impact upon the nutritional and economic status of participating households, the program's impact upon all sectors of the agricultural economy, including farmers and ranchers, as well as retail food stores, and the program's relative fairness to households of different income levels, different age composition, different size, and different regions of residence. Further, the Secretary shall, by way of making contracts with or grants to public or private organizations or agencies, implement pilot programs to test various means of measuring on a continuing basis the nutritional status of low income people, with special emphasis on people who are eligible for supplemental nutrition assistance, in order to develop minimum common criteria and methods for systematic nutrition monitoring that could be applied on a nationwide basis. The locations of the pilot programs shall be selected to provide a representative geographic and demographic cross-section of political subdivisions that reflect natural usage patterns of health and nutritional services and that contain high proportions of low income people. The Secretary shall report on the progress of these pilot programs on an annual basis commencing on July 1, 1982, to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate, together with such recommendations as the Secretary deems appropriate.

**(d) Employment initiatives program**

**(1) Election to participate**

**(A) In general**

Subject to the other provisions of this subsection, a State may elect to carry out an employment initiatives program under this subsection.

**(B) Requirement**

GOV000239

A State shall be eligible to carry out an employment initiatives program under this subsection only if not less than 50 percent of the households in the State that received supplemental nutrition assistance program benefits during the summer of 1993 also received benefits under a State program funded under part A of title IV of the Social Security Act (42 U.S.C. 601 et seq.) during the summer of 1993.

**(2) Procedure**

**(A) In general**

A State that has elected to carry out an employment initiatives program under paragraph (1) may use amounts equal to the allotments that would otherwise be issued to a household under the supplemental nutrition assistance program, but for the operation of this subsection, to provide cash benefits in lieu of the allotments to the household if the household is eligible under paragraph (3).

**(B) Payment**

The Secretary shall pay to each State that has elected to carry out an employment initiatives program under paragraph (1) an amount equal to the value of the allotment that each household participating in the program in the State would be eligible to receive under this chapter but for the operation of this subsection.

**(C) Other provisions**

For purposes of the supplemental nutrition assistance program (other than this subsection)--

**(i)** cash assistance under this subsection shall be considered to be an allotment; and

**(ii)** each household receiving cash benefits under this subsection shall not receive any other supplemental nutrition assistance program benefits during the period for which the cash assistance is provided.

**(D) Additional payments**

Each State that has elected to carry out an employment initiatives program under paragraph (1) shall--

**(i)** increase the cash benefits provided to each household participating in the program in the State under this subsection to compensate for any State or local sales tax that may be collected on purchases of food by the household, unless the Secretary determines on the basis of information provided by the State that the increase is unnecessary on the basis of the limited nature of the items subject to the State or local sales tax; and

**(ii)** pay the cost of any increase in cash benefits required by clause (i).

**(3) Eligibility**

GOV000240

A household shall be eligible to receive cash benefits under paragraph (2) if an adult member of the household--

**(A)** has worked in unsubsidized employment for not less than the preceding 90 days;

**(B)** has earned not less than $350 per month from the employment referred to in subparagraph (A) for not less than the preceding 90 days;

**(C)(i)** is receiving benefits under a State program funded under part A of title IV of the Social Security Act (42 U.S.C. 601 et seq.); or

**(ii)** was receiving benefits under a State program funded under part A of title IV of the Social Security Act (42 U.S.C. 601 et seq.) at the time the member first received cash benefits under this subsection and is no longer eligible for the State program because of earned income;

**(D)** is continuing to earn not less than $350 per month from the employment referred to in subparagraph (A); and

**(E)** elects to receive cash benefits in lieu of supplemental nutrition assistance program benefits under this subsection.

**(4) Evaluation**

A State that operates a program under this subsection for 2 years shall provide to the Secretary a written evaluation of the impact of cash assistance under this subsection. The State agency, with the concurrence of the Secretary, shall determine the content of the evaluation.

**(e) Study and report to Congressional committees of effect of reduction of benefits**

The Secretary shall conduct a study of the effects of reductions made in benefits provided under this chapter pursuant to part 1 of subtitle A of title I of the Omnibus Budget Reconciliation Act of 1981, the Food Stamp and Commodity Distribution Amendments of 1981, the Food Stamp Act Amendments of 1982, and any other laws enacted by the Ninety-seventh Congress which affect the supplemental nutrition assistance program. The study shall include a study of the effect of retrospective accounting and periodic reporting procedures established under such Acts, including the impact on benefit and administrative costs and on error rates and the degree to which eligible households are denied supplemental nutrition assistance program benefits for failure to file complete periodic reports. The Secretary shall submit to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate an interim report on the results of such study no later than February 1, 1984, and a final report on the results of such study no later than March 1, 1985.

**(f) Demonstration projects for development and use of intelligent benefit cards to pay benefits**

In order to encourage States to plan, design, develop, and implement a system for making supplemental nutrition assistance program benefits available through the use of intelligent benefit cards or other automated or electronic benefit delivery systems, the Secretary may conduct one or more pilot or experimental projects, subject to the restrictions imposed by subsection (b)(1) and section 2016(f)(2) of this title, designed to test whether the use of such cards or systems can enhance the efficiency and

GOV000241

effectiveness of program operations while ensuring that individuals receive correct benefit amounts on a timely basis. Intelligent benefit cards developed under such a demonstration project shall contain information, encoded on a computer chip embedded in a credit card medium, including the eligibility of the individual and the amount of benefits to which such individual is entitled. Any other automated or electronic benefit delivery system developed under such a demonstration project shall be able to use a plastic card to access such information from a data file.

**(g) Study of effectiveness of employment and training programs**

In order to assess the effectiveness of the employment and training programs established under section 2015(d) of this title in placing individuals into the work force and withdrawing such individuals from the supplemental nutrition assistance program, the Secretary is authorized to carry out studies comparing the pre- and post-program labor force participation, wage rates, family income, level of receipt of supplemental nutrition assistance program and other transfer payments, and other relevant information, for samples of participants in such employment and training programs as compared to the appropriate control or comparison groups that did not participate in such programs. Such studies shall, to the maximum extent possible--

**(1)** collect such data for up to 3 years after the individual has completed the employment and training program; and

**(2)** yield results that can be generalized to the national program as a whole.

The results of such studies and reports shall be considered in developing or updating the performance standards required under section 2015 of this title.

**(h) Demonstration projects for vehicle exclusion limits**

The Secretary shall conduct a sufficient number of demonstration projects to evaluate the effects, in both rural and urban areas, of including in financial resources under section 2014(g) of this title the fair market value of licensed vehicles to the extent the value of each vehicle exceeds $4,500, but excluding the value of--

**(1)** any licensed vehicle that is used to produce earned income, necessary for transportation of an elderly or physically disabled household member, or used as the household's home; and

**(2)** one licensed vehicle used to obtain, continue, or seek employment (including travel to and from work), used to pursue employment-related education or training, or used to secure food or the benefits of the supplemental nutrition assistance program.

**(i) Testing resource accumulation**

The Secretary shall conduct, under such terms and conditions as the Secretary shall prescribe, for a period not to exceed 4 years, projects to test allowing not more than 11,000 eligible households, in the aggregate, to accumulate resources up to $10,000 each (which shall be excluded from consideration as a resource) for later expenditure for a purpose directly related to improving the education, training, or employability (including self-employment) of household members, for the purchase of a home for the household, for a change of the household's residence, or for making major repairs to the household's home.

GOV000242

**(j) Demonstration projects directed at benefit trafficking**

The Secretary shall use up to $4,000,000 of the funds provided in advance in appropriations Acts for projects authorized by this section to conduct demonstration projects in which State or local supplemental nutrition assistance program agencies test innovative ideas for working with State or local law enforcement agencies to investigate and prosecute benefit trafficking.

**(k) Pilot projects to evaluate health and nutrition promotion in the supplemental nutrition assistance program**

**(1) In general**

The Secretary shall carry out, under such terms and conditions as the Secretary considers to be appropriate, pilot projects to develop and test methods--

**(A)** of using the supplemental nutrition assistance program to improve the dietary and health status of households eligible for or participating in the supplemental nutrition assistance program; and

**(B)** to reduce overweight, obesity (including childhood obesity), and associated co-morbidities in the United States.

**(2) Grants**

**(A) In general**

In carrying out this subsection, the Secretary may enter into competitively awarded contracts or cooperative agreements with, or provide grants to, public or private organizations or agencies (as defined by the Secretary), for use in accordance with projects that meet the strategy goals of this subsection.

**(B) Application**

To be eligible to receive a contract, cooperative agreement, or grant under this paragraph, an organization shall submit to the Secretary an application at such time, in such manner, and containing such information as the Secretary may require.

**(C) Selection criteria**

Pilot projects shall be evaluated against publicly disseminated criteria that may include--

**(i)** identification of a low-income target audience that corresponds to individuals living in households with incomes at or below 185 percent of the poverty level;

**(ii)** incorporation of a scientifically based strategy that is designed to improve diet quality through more healthful food purchases, preparation, or consumption;

GOV000243

Case 1:26-cv-00861-ABJ     Document 17-4     Filed 04/03/26     Page 64 of 72

**(iii)** a commitment to a pilot project that allows for a rigorous outcome evaluation, including data collection;

**(iv)** strategies to improve the nutritional value of food served during school hours and during after-school hours;

**(v)** innovative ways to provide significant improvement to the health and wellness of children;

**(vi)** other criteria, as determined by the Secretary.

**(D) Use of funds**

Funds provided under this paragraph shall not be used for any project that limits the use of benefits under this chapter.

**(3) Projects**

Pilot projects carried out under paragraph (1) may include projects to determine whether healthier food purchases by and healthier diets among households participating in the supplemental nutrition assistance program result from projects that--

**(A)** increase the supplemental nutrition assistance purchasing power of the participating households by providing increased supplemental nutrition assistance program benefit allotments to the participating households;

**(B)** increase access to farmers [1] markets by participating households through the electronic redemption of supplemental nutrition assistance program benefits at farmers' markets;

**(C)** provide incentives to authorized supplemental nutrition assistance program retailers to increase the availability of healthy foods to participating households;

**(D)** subject authorized supplemental nutrition assistance program retailers to stricter retailer requirements with respect to carrying and stocking healthful foods;

**(E)** provide incentives at the point of purchase to encourage households participating in the supplemental nutrition assistance program to purchase fruits, vegetables, or other healthful foods; or

**(F)** provide to participating households integrated communication and education programs, including the provision of funding for a portion of a school-based nutrition coordinator to implement a broad nutrition action plan and parent nutrition education programs in elementary schools, separately or in combination with pilot projects carried out under subparagraphs (A) through (E).

**(4) Evaluation and reporting**

GOV000244

**(A) Evaluation**

**(i) Independent evaluation**

**(I) In general**

The Secretary shall provide for an independent evaluation of projects selected under this subsection that measures the impact of the pilot program on health and nutrition as described in paragraph (1).

**(II) Requirement**

The independent evaluation under subclause (I) shall use rigorous methodologies, particularly random assignment or other methods that are capable of producing scientifically valid information regarding which activities are effective.

**(ii) Costs**

The Secretary may use funds provided to carry out this section to pay costs associated with monitoring and evaluating each pilot project.

**(B) Reporting**

Not later than 90 days after the last day of fiscal year 2009 and each fiscal year thereafter until the completion of the last evaluation under subparagraph (A), the Secretary shall submit to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate a report that includes a description of--

**(i)** the status of each pilot project;

**(ii)** the results of the evaluation completed during the previous fiscal year; and

**(iii)** to the maximum extent practicable--

**(I)** the impact of the pilot project on appropriate health, nutrition, and associated behavioral outcomes among households participating in the pilot project;

**(II)** baseline information relevant to the stated goals and desired outcomes of the pilot project; and

**(III)** equivalent information about similar or identical measures among control or comparison groups that did not participate in the pilot project.

GOV000245

**(C) Public dissemination**

In addition to the reporting requirements under subparagraph (B), evaluation results shall be shared broadly to inform policy makers, service providers, other partners, and the public in order to promote wide use of successful strategies.

**(5) Funding**

**(A) Authorization of appropriations**

There are authorized to be appropriated such sums as are necessary to carry out this section for each of fiscal years 2008 through 2012.

**(B) Mandatory funding**

Out of any funds made available under section 2027 of this title, on October 1, 2008, the Secretary shall make available $20,000,000 to carry out a project described in paragraph (3)(E), to remain available until expended.

**(l) Cooperation with program research and evaluation**

Subject to the requirements of this chapter, including protections under section 2020(e)(8) of this title, States, State agencies, local agencies, institutions, facilities such as data consortiums, and contractors participating in programs authorized under this chapter shall--

**(1)** cooperate with officials and contractors acting on behalf of the Secretary in the conduct of evaluations and studies under this chapter; and

**(2)** submit information at such time and in such manner as the Secretary may require.

**(m) Evaluation of child support enforcement cooperation requirements**

**(1) In general**

The Secretary, in consultation with the Secretary of Health and Human Services, shall conduct an independent evaluation of a representative sample of States--

**(A)** to assess the implementation and impact of the eligibility requirements described in subsections (l) through (n) of section 2015 of this title in States that have formerly implemented or continue to implement those requirements, and the feasibility of implementing those requirements in other States;

**(B)** to assess the factors that contributed to the decision of States that formerly implemented the eligibility requirements described in each of subsections (l) through (n) of section 2015 of this title to cease such implementation;

GOV000246

**(C)** to review alternatives to the eligibility requirements described in each of subsections (l) through (n) of section 2015 of this title that are used by other States to assist participants in the supplemental nutrition assistance program to make or receive child support payments and the effectiveness of those alternatives; and

**(D)** to evaluate the costs and benefits to households and to State agencies, of requiring State agencies to implement each of the eligibility requirements described in subsections (l) through (n) of section 2015 of this title.

**(2) Evaluation**

The evaluation under paragraph (1) shall include, to the maximum extent practicable, an assessment of--

**(A)** the manner in which applicable State agencies implement and enforce the eligibility requirements described in subparagraph (A) of such paragraph, including--

**(i)** the procedures used by each State to determine cooperation, to sanction participants for failure to cooperate, and to determine good cause for noncooperation under each of subsections (l) through (n) of section 2015 of this title; and

**(ii)** the manner in which each State aligns the procedures for implementing those eligibility requirements with procedures for implementing other Federal programs that require cooperation with child support enforcement, including the program of block grants to States for temporary assistance for needy families established under part A of title IV of the Social Security Act (42 U.S.C. 601 et seq.), the Medicaid program under title XIX of the Social Security Act (42 U.S.C. 1396 et seq.), and programs carried out under the Child Care and Development Block Grant Act of 1990 (42 U.S.C. 9857 et seq.);

**(B)** the Federal, State, and local costs associated with implementing those eligibility requirements, including costs incurred under this chapter and by child support enforcement agencies for personnel, technology upgrades, and other costs;

**(C)** the effect of those eligibility requirements on the establishment of new child support orders, the establishment of paternity, changes in child support payments to custodial households, and changes in arrears owed on child support orders;

**(D)** with respect to the eligibility requirements under each of subsections (l) through (n) of section 2015 of this title--

**(i)** the number of individuals subject to those requirements;

**(ii)** the number of individuals in each State who meet those requirements; and

**(iii)** the number of individuals in each State who fail to meet those requirements;

**(E)** the number of individuals in each State for whom good cause for noncooperation has been found under section 2015(l)(2) of this title;

GOV000247

Case 1:26-cv-00861-ABJ    Document 17-4    Filed 04/03/26    Page 68 of 72

**(F)** the impact of those eligibility requirements on the supplemental nutrition assistance program eligibility, benefit levels, food security, income, and economic stability of--

**(i)** individuals subject to those requirements;

**(ii)** the household members of those individuals, including children; and

**(iii)** households with nontraditional family structures, including a household in which a grandparent is the primary caretaker of a grandchild of the grandparent.

**(3) State agency cooperation**

Each State agency selected under paragraph (1) shall provide information to the Secretary necessary to conduct the evaluation under such paragraph.

**(4) Report**

Not later than 3 years after December 20, 2018, the Secretary shall submit to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate a report describing the findings from the evaluation conducted under paragraph (1).

**(n) Longitudinal data for research**

**(1) In general**

Subject to paragraphs (3) through (5), a State agency may, on approval by the Secretary, establish a longitudinal database that contains information about households and members of households that receive benefits under the supplemental nutrition assistance program in the State.

**(2) Purpose**

Each longitudinal database established under paragraph (1) shall be used solely to conduct research on participation in and the operation of the supplemental nutrition assistance program, including duration of participation in the program.

**(3) Requirements for databases**

Prior to the approval of State agencies to establish longitudinal databases under paragraph (1), the Secretary shall--

**(A)** identify features that shall be standard across States such as database format to facilitate use of longitudinal databases established under paragraph (1) for research purposes;

GOV000248

**(B)** identify features of longitudinal databases established under paragraph (1) that may vary across States;

**(C)** identify a procedure for States operating longitudinal databases under paragraph (1) to use a unique identifier to provide relevant information on household members who receive benefits under the supplemental nutrition assistance program for the purpose of comparing participation data in multiple participating States over time while protecting participant privacy;

**(D)** establish the manner in which data security and privacy protections, as required by Federal law and consistent with other appropriate practices, shall be implemented and maintained;

**(E)** provide direction to State agencies on the responsibilities of and funding arrangements for State agencies and any State contractors (including entities providing technical assistance) relating to the establishment and operation of a longitudinal database;

**(F)** provide a description of the documentation that States shall submit to the Secretary prior to allowing researchers access to a longitudinal database;

**(G)** consult with other Federal research agencies, including the Bureau of the Census;

**(H)** consult with States that have already established databases used for purposes similar to the purposes outlined in this subsection; and

**(I)** identify any other requirements determined appropriate by the Secretary.

### (4) Included data

#### (A) In general

Subject to subparagraph (B), each longitudinal database established under paragraph (1)--

**(i)** shall include monthly information about households and members of households that receive benefits under the supplemental nutrition assistance program in the participating State taken from existing information collected by the State agency including, if available,--

**(I)** demographic characteristics;

**(II)** income and financial resources (as described in section 2014(g) of this title);

**(III)** employment status;

GOV000249

Case 1:26-cv-00861-ABJ    Document 17-4    Filed 04/03/26    Page 70 of 72

**(IV)** household circumstances, such as deductible expenses; and

**(V)** the amount of the monthly allotment received under the supplemental nutrition assistance program; and

**(ii)** may include information from other State data sources such as--

**(I)** earnings and employment data from the State department of labor;

**(II)** health insurance program data; or

**(III)** data from participation in other programs administered by the State.

**(B) Data protection**

Any State that establishes a longitudinal database under paragraph (1) shall, in accordance with all applicable Federal and State privacy standards and requirements--

**(i)** protect the privacy of information about each member of each household that receives benefits under the supplemental nutrition assistance program in such State by ensuring that no personally identifiable information (including social security number, home address, or contact information) is included in the longitudinal database; and

**(ii)** make the data under this paragraph available to researchers and the Secretary.

**(5) Approval**

The Secretary shall approve the establishment of longitudinal databases under paragraph (1) in States that--

**(A)** meet the requirements for databases under paragraph (3) and (4)(B);

**(B)** reflect a range of participant numbers, demographics, operational structures, and geographic regions; and

**(C)** have the capacity to provide on a periodic and ongoing basis household and participant data derived from the eligibility system and other data sources of the State.

**(6) Grants**

**(A) In general**

GOV000250

In carrying out this subsection, the Secretary may provide grants to States that have been approved by the Secretary in accordance with paragraph (5) out of funds made available under paragraph (9).

**(B) Method of awarding grants**

Grants awarded under this paragraph shall be made in such amounts and under such terms and conditions as the Secretary determines necessary to carry out the purposes of this subsection.

**(7) Report**

**(A) In general**

Not later than 4 years after the effective date of this subsection, the Secretary shall submit to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate a report on the feasibility of expanding implementation of longitudinal databases to every State.

**(B) Contents**

The report required under subparagraph (A) shall describe--

**(i)** the cost of expanding implementation of longitudinal databases with consistent data to every State;

**(ii)** the challenges and benefits of using State longitudinal databases with consistent data; and

**(iii)** alternatives to expanding implementation of longitudinal databases with consistent data to every State that may achieve similar research outcomes and the advantages and disadvantages of those alternatives.

**(8) Effect**

Nothing in this subsection shall be construed to prevent or limit the ability of State agencies to establish or continue operating databases used for purposes similar to the purposes outlined in this subsection.

**(9) Funding**

Of the funds made available under section 2027 of this title, the Secretary shall use to carry out this subsection--

**(A)** $20,000,000 for fiscal year 2019 to remain available through fiscal year 2021; and

**(B)** $5,000,000 for fiscal year 2022 and each fiscal year thereafter.

GOV000251

**CREDIT(S)**

(Pub.L. 88-525, § 17, as added Pub.L. 93-86, § 3(n), Aug. 10, 1973, 87 Stat. 248; amended Pub.L. 95-113, Title XIII, § 1301, Sept. 29, 1977, 91 Stat. 977; Pub.L. 95-400, Sept. 30, 1978, 92 Stat. 856; Pub.L. 96-249, Title I, §§ 130 to 132(a), 133, May 26, 1980, 94 Stat. 367, 368; Pub.L. 97-98, Title XIII, §§ 1328 to 1330, Dec. 22, 1981, 95 Stat. 1289, 1290; Pub.L. 97-253, Title I, §§ 152(c), 181, 182, 190(d), Sept. 8, 1982, 96 Stat. 776, 784, 785, 787; Pub.L. 99-114, § 4, Oct. 1, 1985, 99 Stat. 488; Pub.L. 99-157, § 2, Nov. 15, 1985, 99 Stat. 818; Pub.L. 99-182, § 2, Dec. 13, 1985, 99 Stat. 1173; Pub.L. 99-198, Title XV, § 1540, Dec. 23, 1985, 99 Stat. 1588; Pub.L. 100-435, Title V, §§ 504, 505, Sept. 19, 1988, 102 Stat. 1673; Pub.L. 101-624, Title XVII, §§ 1729(b), 1731, 1754 to 1759, Nov. 28, 1990, 104 Stat. 3790, 3798 to 3800, 3802; Pub.L. 102-237, Title IX, § 941(8), Dec. 13, 1991, 105 Stat. 1893; Pub.L. 103-66, Title XIII, § 13925, Aug. 10, 1993, 107 Stat. 675; Pub.L. 103-225, Title II, § 204, Mar. 25, 1994, 108 Stat. 109; Pub.L. 104-127, Title IV, § 401(c), (d), Apr. 4, 1996, 110 Stat. 1026; Pub.L. 104-193, Title I, § 109(d), Title VIII, §§ 815(b)(1), 850 to 852, 854(c)(2), Aug. 22, 1996, 110 Stat. 2169, 2317, 2336, 2342; Pub.L. 105-18, Title VII, [(b)], June 12, 1997, 111 Stat. 216; Pub.L. 105-277, Div. A, § 101(f) [Title VIII, § 405(d)(2)(C), (f)(2)(C)], Oct. 21, 1998, 112 Stat. 2681-337, 2681-418, 2681-429; Pub.L. 107-171, Title IV, §§ 4112(b)(4), 4116(b), 4122(b), 4123(a), May 13, 2002, 116 Stat. 313, 316, 324; Pub.L. 110-234, Title IV, §§ 4001(b), 4002(a)(9), 4115(b)(12), 4141, 4406(a)(5), May 22, 2008, 122 Stat. 1092, 1094, 1108, 1117, 1141; Pub.L. 110-246, § 4(a), Title IV, §§ 4001(b), 4002(a)(9), 4115(b)(12), 4141, 4406(a)(5), June 18, 2008, 122 Stat. 1664, 1853, 1855, 1869, 1879, 1902; Pub.L. 113-79, Title IV, §§ 4022(b)(3), 4023, Feb. 7, 2014, 128 Stat. 808, 809; Pub.L. 113-128, Title V, § 512(l)(3), July 22, 2014, 128 Stat. 1709; Pub.L. 115-334, Title IV, §§ 4005(e), 4014, 4015(a), 4022(7), Dec. 20, 2018, 132 Stat. 4634, 4643, 4653.)

Notes of Decisions (2)

**Footnotes**

1       So in original. Probably should be "farmers' ".

7 U.S.C.A. § 2026, 7 USCA § 2026
Current through P.L. 119-80. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

GOV000252