**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NIEVES ARAGON, *et al.*,<br><br>                                      Plaintiffs,<br><br>v.<br><br>BROOKE ROLLINS, in her official capacity as Secretary of Agriculture, *et al.*,<br><br>                                      Defendants. | No. 1:26-cv-00861-ABJ |

**BRIEF OF THE FOUNDATION FOR GOVERNMENT ACCOUNTABILITY AS AMI-CUS CURIAE IN SUPPORT OF DEFENDANTS**

Jeffrey M. Harris (D.C. Bar #994058)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

*Counsel for Amicus Curiae*

**TABLE OF CONTENTS**

Table of Authorities..................................................................................................................ii

Interest of Amicus Curiae ..................................................................................................... 1

Introduction............................................................................................................................ 1

Argument ............................................................................................................................... 2

    I.     The waivers are substantively and procedurally proper.................................... 3

    II.    Plaintiffs' requested remedies are overbroad. .................................................. 5

    III.    The waivers are a sound exercise of USDA's policy discretion. .................................... 7

          A.    Without the waivers, taxpayer dollars will continue to fund an obesity epidemic.  8

          B.    Taxpayer-funded junk food contributes to our overburdened healthcare system.  11

Conclusion .......................................................................................................................... 12

Corporate Disclosure Statement ....................................................................................... 13

# TABLE OF AUTHORITIES

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ................................................................. 6, 7

*Campaign Legal Ctr. v. FEC*,
    2025 WL 1768099 (D.D.C. June 26) ............................................................. 5

*Fox Television Stations, Inc. v. FCC*,
    280 F.3d 1027 (D.C. Cir. 2002) ................................................................. 6

*Garnett v. Zeilinger*,
    313 F. Supp. 3d 147 (D.D.C. 2018) ............................................................. 7

*In re Core Comm'ns, Inc.*,
    531 F.3d 849 (D.C. Cir. 2008) ................................................................. 7

*Int'l Union, UMW v. Fed. Mine Safety & Health Admin.*,
    920 F.2d 960 (D.C. Cir. 1990) ................................................................. 6

*Kisor v. Wilkie*,
    588 U.S. 558 (2019) ......................................................................... 5

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024) ......................................................................... 5

*Safer Chems., Healthy Fams. v. EPA*,
    791 F. App'x 653 (9th Cir. 2019) ............................................................. 6

*Skidmore v. Swift*,
    323 U.S. 134 (1944) ......................................................................... 5

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    282 F. Supp. 3d 91 (D.D.C. 2017) ............................................................. 6

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
    289 F.3d 89 (D.C. Cir. 2002) ................................................................. 7

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ..................................................................... 3, 5, 6

*WorldCom, Inc. v. FCC*,
    288 F.3d 429 (D.C. Cir. 2002) ................................................................. 7

**Statutes**

7 U.S.C. §2011 ............................................................................... 2, 7

7 U.S.C. §2012(k) ............................................................................... 2

7 U.S.C. §2026 ............................................................................... 2, 4

7 U.S.C. §2026(b)(1)(A) .................................................................... 2, 3, 4

7 U.S.C. §2026(b)(1)(B)(ii) .................................................................... 4

7 U.S.C. §2026(b)(1)(B)(iv) ................................................................... 3

**Regulations**

7 C.F.R. §282.1(b)................................................................................................................ 5

**Other Authorities**

*Cardiovascular diseases affect nearly half of American adults, statistics show*, American Heart
    Ass'n, perma.cc/58JV-BNBC (archived Apr. 5, 2026) ..................................................... 10

CDC, *Childhood Obesity Facts*, perma.cc/B8WY-JP9F (archived Apr. 5, 2026) ......................... 9

CDC, *Consequences of Obesity*, perma.cc/5TBM-Y72V (Dec. 5, 2025).................................... 10

CDC, *Obesity and Overweight*, perma.cc/X4UY-GNXF (archived Apr. 10, 2026) ................. 9, 12

CMS, *NHE fact sheet*, (2024), perma.cc/8KHZ-PL5B (archived Apr. 5, 2026) ........................ 12

Econ. Rsch. Serv., *Supplemental Nutrition Assistance Program (SNAP) – Key statistics and
    research*, perma.cc/7GL2-EM5V (archived Apr. 5, 2026) ......................................... 8

Food and Nutrition Service, *WIC food packages - Regulatory requirements for WIC-eligible
    foods*, U.S. Dep't of Agric., perma.cc/9DQE-XSZ5 (archived Apr. 6, 2026) .................. 10, 11

Foundation for Government Accountability, *Make America Healthy Again:
    Stop Taxpayer-Funded Junk Food*, perma.cc/AZZ5-QKWH
    (Jan. 16, 2025)........................................................................ 1, 8, 9, 10, 11, 12

Foundation for Government Accountability, *Make American Healthy Again: Most States
    Commit to Banning Taxpayer-Funded Junk Food*, perma.cc/TE75-H32R
    (Feb. 23, 2026) ...................................................................................... 8, 11

J. Bain & J. Ingram, *Medicaid expansion: Busting budgets, bankrupting taxpayers, and
    displacing the truly needy*, FGA, perma.cc/J3S5-924M (Oct. 1, 2024) ................................ 11

J. Hastings & J. Shapiro, *How are SNAP benefits spent? Evidence from a retail panel*,
    American Econ. Rev., perma.cc/3H24-57SX (Dec. 2018) ...................................................... 9

J. Liu et al., *Trends in prediabetes among youths in the US from 1999 through 2018*, JAMA
    Network, perma.cc/23EJ-8ES6 (archived Apr. 5, 2026)...................................................... 12

J. Mande & G Flaherty, *Supplemental Nutrition Assistance Program as a health intervention*,
    Current Opinion in Pediatrics, perma.cc/9W3F-3MKF (archived Apr. 6, 2026) ................... 10

M. Rubio, *No More Subsidies for Junk Food*, Wall St. J. (May 7, 2023) ................................ 9, 11

P. Terryberry, *Food stamp program integrity measures will lower costs for states and preserve
    resources for the truly needy*, FGA, perma.cc/3SWK-7E32 (Oct. 3, 2025) ............................ 8

P. Terryberry, *Trump is Right. Food stamps shouldn't pay for soda*, Washington Post,
    perma.cc/TP63-XUU2 (Feb. 23, 2026)........................................................................ 8, 10, 11

S. Macartney & R. Ghertner, *How many people that receive one safety net benefit also receive
    others?*, U.S. Dep't Health and Hum. Serv., perma.cc/8L35-NQVF, (Jan. 20, 2023)............ 11

U.S. Dep't of Agric., Food & Nutrition Serv., *Colorado SNAP Food Restriction Waiver*,
    perma.cc/SD9A-XQQ9 (archived Apr. 7, 2026)........................................................................ 4

UCLA, *New Research Shows Direct Link Between Soda and Obesity*, perma.cc/7ZCM-87TD (archived Apr. 5, 2026) ................................................................................................... 8, 9

USDA, *Foods Typically Purchased By Supplemental Nutrition Assistance Program (SNAP) Households*, perma.cc/PB4W-3LCD (archived Apr. 5, 2026) ................................................ 8, 9

**INTEREST OF AMICUS CURIAE[1]**

The Foundation for Government Accountability is a nonpartisan, nonprofit organization that helps millions achieve the American dream by improving welfare, work, and healthcare policy on the state and federal level. Launched in 2011, FGA has helped achieve over 1000 reforms impacting federal and state policies, with most of those reforms aimed at moving individuals off of welfare. FGA supports its mission by conducting quality and innovative research, deploying outreach and education initiatives, and equipping policymakers with the information they need to achieve meaningful reforms.

FGA works to eliminate dysfunctional welfare policies that are detrimental to beneficiaries and the public fisc. USDA's waivers here are a shining example of such reform—and FGA has supported such policies for years. *See*, *e.g.*, Foundation for Government Accountability, *Make America Healthy Again: Stop Taxpayer-Funded Junk Food*, perma.cc/AZZ5-QKWH (Jan. 16, 2025). By eliminating sugar-laden drinks and other junk food from SNAP coverage, these waivers will offer recipients of food stamps healthier lifestyles and reduce strain on the already over-burdened federal healthcare apparatus. Because Plaintiffs seek to enjoin and vacate these waivers, this case strikes at the heart of FGA's mission.

**INTRODUCTION**

Congress enacted the Food and Nutrition Act of 2008 with the desire to allow States to experiment with different approaches to administering the Supplemental Nutrition Assistance Program. SNAP is an annual program that aims to promote the health and well-being of low-income households by supplementing their food budgets to the tune of more than $100 billion dollars each

---

[1] No party's counsel authored this brief in whole or in part. And no party, party's counsel, or person (other than amicus or its counsel) contributed money to fund this brief's preparation or submission.

year. *See* 7 U.S.C. §§2011, 2012(k). Under the statute, enrollees may only use SNAP benefits to purchase sustenance that is covered by the definition of "food" in §2012(k).

So that the program might mature to better meet the needs of its beneficiaries, the statute authorizes the Secretary of Agriculture to approve state-run demonstration projects. *See* 7 U.S.C. §2026. In doing so, the Secretary may "waive any requirement" of the program as necessary to test changes that advance certain permissible purposes—including improving administration of the program, increasing the self-sufficiency of recipients, and testing reform strategies. *Id.* §2026(b)(1)(A).

Last year, 22 States submitted waiver requests seeking to launch pilot programs that would narrow the definition of "food" in §2012(k) to exclude certain items lacking nutritional value, such as sugar-sweetened beverages like soda. Each State justified its proposal as a means of improving health outcomes, encouraging more nutritious purchases, and aligning SNAP benefits with public health goals. *See* GOV00496-787. Following review, USDA approved all 22 proposals. Several of these pilot programs began in January 2026, and others are scheduled to follow.

Plaintiffs—five SNAP recipients from five participating States—now challenge those waivers under the Administrative Procedure Act. But their claims fail because USDA acted within its statutory authority, reasonably explained its decisions, and was not required to undertake notice-and-comment procedures. And even assuming the Court finds any APA defect, Plaintiffs' requested remedy—an injunction running against non-party states with distinct waiver programs not before the Court—is substantially overbroad.

## ARGUMENT

Plaintiffs argue, among other things, that they are entitled to sweeping injunctive relief because USDA exceeded its statutory authority by approving the waivers and failed to engage in notice-and-comment rulemaking under 5 U.S.C. §553. Plaintiffs are wrong. The Secretary's

authority to "waive any requirement" under the program covers the waivers at issue here. 7 U.S.C. §2026(b)(1)(A). A requirement of informal rulemaking is absent from the statute's text. And even if there were an APA defect, Plaintiffs' request for universal injunctive relief against all pending waivers—even those that do not impact them or their State—runs headlong into the Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). The waiver programs here are a sound exercise of USDA's policy discretion because they further the statute's goals of providing nutrition to low-income communities while also lifting burdens on our beleaguered healthcare system. This Court should thus deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment.

## I.      The waivers are substantively and procedurally proper.

The waivers fall comfortably within USDA's statutory authority under 7 U.S.C. §2026 and are both substantively and procedurally proper. The statute expressly authorizes the Secretary to conduct "pilot or experimental projects" to "test program changes." 7 U.S.C. §2026(b)(1)(A). Those are broad terms that confer substantial discretion, particularly given Congress's intent to allow States to function as laboratories for policy innovation. And the statute also gives the Secretary authority to "waive any requirement" of the Act to the extent necessary for those projects. *Id.* Congress's use of the word "any" reflects an expansive delegation of authority, allowing USDA to waive requirements broadly—except for a list of specifically enumerated exceptions. 7 U.S.C. §2026(b)(1)(B)(iv). That broad waiver authority extends to the definition of "food." That definition is unquestionably "[a] requirement" under 7 U.S.C. §2026(b)(1)(A) and thus presumptively subject to the Secretary's waiver authority. Nothing in the statute excludes that definition, and the list of exceptions to the Secretary's waiver authority shows that Congress knew how to impose limits when it wished to do so. 7 U.S.C. §2026(b)(1)(B)(iv).

The challenged waivers are also plainly "pilot or experimental" programs designed to "test program changes." 7 U.S.C. §2026(b). They are each time-limited, state-specific demonstrations: the waivers are authorized for a period of only two years, with a limited number of annual extensions available to bring the total duration of the waiver programs up to a maximum of five years. *See* Compl. ¶¶74, 93, 108, 119, 131. Far from indefinite waivers, that modest timeframe underscores the exploratory nature of these programs—placing them in the heartland of §2026(b)'s contemplated "experimental" programs. And different States proposed different approaches to narrowing eligible food categories, further reinforcing their experimental nature. *See id.* ¶¶68-132. These projects are structured to test hypotheses about how changes to eligible purchases affect participant behavior and health outcomes, not to impose permanent policy changes. That experimental design—testing, measuring, and refining—across "one or more areas of the United States" once again fits squarely within the statutory framework. 7 U.S.C. §2026(b)(1)(A).

These waivers also further the additional statutory purposes identified in §2026: (1) improving program administration; (2) increasing the self-sufficiency of SNAP recipients; (3) testing innovative welfare reform strategies; or (4) allowing greater conformity with the rules of other programs. 7 U.S.C. §2026(b)(1)(B)(ii). These waivers fit the bill because they are designed to "improve program administration" by "test[ing]" whether "reform[s]" to eligible purchases better align SNAP with its core goal of improving nutrition among low-income households. 7 U.S.C. §2026(b)(1)(B)(ii). The statute emphasizes raising levels of "nutrition," and the waivers are explicitly aimed at generating evidence about whether restricting certain low-nutritional-value items advances that goal. *See, e.g.*, U.S. Dep't of Agric., Food & Nutrition Serv., *Colorado SNAP Food Restriction Waiver*, perma.cc/SD9A-XQQ9 (archived Apr. 7, 2026). And in any event, this Court

4

should respect USDA's considered judgment in understanding these statutory purposes. *See Skidmore v. Swift*, 323 U.S. 134, 140 (1944).

The waivers are also procedurally proper because USDA was not required to undertake notice-and-comment rulemaking before approving them. USDA's regulations require that notice be published in the Federal Register only when a waiver "will likely have a significant impact on the public." 7 C.F.R. §282.1(b). Because neither the statute nor the regulation defines "significant impact," USDA reasonably interpreted that term to exclude waivers that do not "change SNAP eligibility criteria, allotment levels, or access to staple foods." GOV00190. Applying that interpretation, USDA concluded the waivers had no significant impact and therefore did not trigger the publication requirement. That interpretation is entitled to deference under *Kisor v. Wilkie*, 588 U.S. 558 (2019), which "concerns an agency's interpretation of its own regulations rather than that of a statute," *Campaign Legal Ctr. v. FEC*, 2025 WL 1768099, at *7 (D.D.C. June 26), and thus survives *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

## II.    Plaintiffs' requested remedies are overbroad.

Even if the Court found a defect in USDA's waiver scheme, Plaintiffs' requested remedies are overbroad and inappropriate.

Plaintiffs are five persons residing in five States. Yet they request an injunction running against USDA's waivers in 17 other States to which they have no relation. That request is squarely foreclosed by the Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). Under that decision, "complete relief to the plaintiffs before the court" is the outer limit of the equitable relief that a court can provide. *Id.* at 852. To assess what sort of injunction is necessary to provide "complete relief," a court necessarily focuses on the injury the plaintiffs allege. *Id.* at 851-53. Thus, as the Supreme Court explained, an individual who asserts harm from an agency action receives "complete relief" from an order "prohibiting enforcement" as to that individual; "[e]xtending the

injunction to cover all other similarly situated individuals would not render her relief any more complete." *Id.* at 853

Here, Plaintiffs claim injuries arising from the inability to purchase certain foods with food stamps in the areas where they live. Each of these alleged injuries would be fully remedied by an injunction limited to those individuals. Under that injunction, Plaintiffs would be able to access each of the food items they allege they could access before the waivers. So extending an injunction to all States that have adopted waiver programs "would not render [the Plaintiffs'] relief any more complete." *Id.* Thus, even if the Court finds a legal defect in the waivers, the requested injunction is substantially overbroad. *Id.*

Plaintiffs' request for APA vacatur fairs no better. Vacatur is not granted as a matter of right under the APA. *See Safer Chems., Healthy Fams. v. EPA*, 791 F. App'x 653, 656-57 (9th Cir. 2019). "The decision whether to vacate depends" on two factors: "'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (quoting *Int'l Union, UMW v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 966-67 (D.C. Cir. 1990)). "[I]n circumstances where the first prong of *Allied-Signal* supports remand without vacatur, the second prong 'is only barely relevant.'" *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 108 (D.D.C. 2017) (quoting *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1049 (D.C. Cir. 2002)). Here even if the Court finds some defect with the waivers—which it should not—both factors would favor remand without vacatur.

The first *Allied-Signal* factor—whether the agency may be able to substantiate its decision on remand—is not a high bar. 988 F.2d at 150-51. A court need only determine whether there is

"at least a serious possibility that the [agency] will be able to substantiate its decision on remand." *Id.* If so, then remand without vacatur is appropriate. The D.C. Circuit has emphasized this point. Remand without vacatur is appropriate even if there is only "a 'non-trivial likelihood' that the [agency will] be able to state a valid legal basis for its rules." *In re Core Comm'ns, Inc.*, 531 F.3d 849, 861 (D.C. Cir. 2008) (quoting *WorldCom, Inc. v. FCC*, 288 F.3d 429, 434 (D.C. Cir. 2002)). And the D.C. Circuit has found remand without vacatur appropriate in situations alleging legal defects analogous to those alleged here. *See, e.g.*, *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002).

The second *Allied-Signal* factor considers "the disruptive consequences" of vacating the challenged rule. 988 F.2d at 150. This factor too weighs strongly in favor of remand without vacatur. USDA widely publicized these waivers, and thus both retailers and recipients have been preparing for these changes—and in the case of retailers incurring great expense in doing so. The whiplash that follows vacatur would likely disrupt their operations, not to mention to the pilot programs of States not party to this suit. This Court should uphold USDA's actions in all respects but even if it finds some defect it should reject Plaintiffs' requests for sweeping and unwarranted remedies that would extend far beyond the handful of parties to this case.

### III. The waivers are a sound exercise of USDA's policy discretion.

In 1964, Congress enacted SNAP "to combat hunger and malnutrition by providing assistance to low-income households for purchasing food." *Garnett v. Zeilinger*, 313 F. Supp. 3d 147, 150 (D.D.C. 2018). And the government has invested tremendous resources in "safeguard[ing] the health and well-being of the nation's population by raising levels of nutrition among low-income households." 7 U.S.C. §2011. Indeed, SNAP accounts for more money than any other government food program, and spending on the program has exploded over the last 25 years. *See* P. Terryberry, *Food stamp program integrity measures will lower costs for states and preserve resources for the*

*truly needy*, FGA, perma.cc/3SWK-7E32 (Oct. 3, 2025); Foundation for Government Accountability, *Make American Healthy Again: Most States Commit to Banning Taxpayer-Funded Junk Food*, perma.cc/TE75-H32R (Feb. 23, 2026). Taxpayers now shell out approximately $100 billion per year to provide nutrition for the 42 million people enrolled in food stamps. *See* Econ. Rsch. Serv., *Supplemental Nutrition Assistance Program (SNAP) – Key statistics and research*, perma.cc/7GL2-EM5V (archived Apr. 5, 2026).

But the Supplemental Nutrition Assistance Program has little to do with nutrition in practice. For years now, the program has funneled staggering sums of taxpayer dollars into purchasing foods that lack nutrition and are associated with increasing rates of obesity and cancer. *See* UCLA, *New Research Shows Direct Link Between Soda and Obesity*, perma.cc/7ZCM-87TD (archived Apr. 5, 2026). Indeed, soda and candy account for a substantial portion of food stamp spending. *See* USDA, *Foods Typically Purchased By Supplemental Nutrition Assistance Program (SNAP) Households*, perma.cc/PB4W-3LCD (archived Apr. 5, 2026).

### A. Without the waivers, taxpayer dollars will continue to fund an obesity epidemic.

Taxpayers fund carcinogenic, obesity-causing foods to the tune of tens of billions of dollars every year. The statistics are startling. Nearly a quarter of all money available through food stamps—approximately $25 billion every year—is spent on sugary drinks, candy, or junk snacks. *See* P. Terryberry, *Trump is Right. Food stamps shouldn't pay for soda*, Washington Post, perma.cc/TP63-XUU2 (Feb. 23, 2026). In fact, "[p]urchases of sweetened beverages, desserts, salty snacks, and candy exceed the program's sales of fruits and vegetables *combined* by $9.4 billion a year." *See* Foundation for Government Accountability, *Make America Healthy Again: Stop Taxpayer-Funded Junk Food*, perma.cc/AZZ5-QKWH (Jan. 16, 2025).

8

Soda is a pressure point for the SNAP program. Taxpayers in 2023 were projected to spend more than $60 billion on those sugary drinks over the next decade. *See* M. Rubio, *No More Subsidies for Junk Food*, Wall St. J. (May 7, 2023), archive.ph/a3fQD. Indeed, soda is the single item most often purchased with food stamps. *See* USDA, *Foods Typically Purchased*, *supra*. And even when controlling for income, food stamp recipients consume substantially more sugary drinks than non-enrollees. *See* FGA, *Stop Taxpayer-Funded Junk Food, supra.* Research suggests this may be because food stamp beneficiaries spend food stamp money differently than their own money. *See* J. Hastings & J. Shapiro, *How are SNAP benefits spent? Evidence from a retail panel*, American Econ. Rev., perma.cc/3H24-57SX (Dec. 2018).

Taxpayer-funded junk foods lead to real-world harms. These foods—and sugar-laden drinks in particular—have already been proven to contribute to obesity and its attendant health problems. *See* UCLA, *New Research*, *supra*. Indeed, consuming just one additional sugary drink per day can cause a person to gain 15 pounds in a single year. *See* FGA, *Stop Taxpayer-Funded Junk Food, supra.* This stark statistic is because sugary drinks offer a one-two punch: The drinks themselves pack on calories, but those calories are from simple carbohydrates, which are less filling than calories from nutrient dense, solid foods, and thus these drinks prompt further weight gain. *Id.*

The United States is already in the throes of an obesity epidemic. Nearly 13% of children between the ages of two and five are obese. *See* FGA, *Stop Taxpayer-Funded Junk Food, supra.* Between the ages of two and 19 that figure jumps to 20%. CDC, *Childhood Obesity Facts*, perma.cc/B8WY-JP9F (archived Apr. 5, 2026). And an astonishing 40% of adults are obese. CDC, *Obesity and Overweight*, perma.cc/X4UY-GNXF (archived Apr. 10, 2026). Yet these numbers only

climb among recipients of food stamp. *See* P. Terryberry, *Food stamps shouldn't pay for soda*, *supra*.

But the harms from sugary drinks and junk food do not stop at obesity. On the contrary, obesity has a long list of comorbidities and increases the risk of heart disease, stroke, a variety cancers, osteoarthritis, and type 2 diabetes. CDC, *Consequences of Obesity*, perma.cc/5TBM-Y72V (Dec. 5, 2025). Heart disease, for example, is keeping pace with the obesity statistics and already affects nearly half of American adults. *See Cardiovascular diseases affect nearly half of American adults, statistics show*, American Heart Ass'n, perma.cc/58JV-BNBC (archived Apr. 5, 2026).

There is substantial evidence that food stamps do not improve diet quality. Indeed, even when controlling for income adults on food stamps have a higher rate of obesity than those not on food stamps, and food stamp beneficiaries are more likely to be at very high or extremely high risk of disease. FGA, *Stop Taxpayer-Funded Junk Food, supra.* The effect on children is even more pronounced. Compared to nonbeneficiaries with similar income, kids on food stamps take in 43% more sugary drinks than nonparticipants. *See* J. Mande & G Flaherty, *Supplemental Nutrition Assistance Program as a health intervention*, Current Opinion in Pediatrics, perma.cc/9W3F-3MKF (archived Apr. 6, 2026). And, in turn, these children are more likely to have insufficiently nutritious diets and an elevated risk of disease. FGA, *Stop Taxpayer-Funded Junk Food, supra.*

This problem is uniquely associated with the food stamp program. Consider the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC). This program has noticeably tighter nutrition standards than SNAP. *See* Food and Nutrition Service, *WIC food packages - Regulatory requirements for WIC-eligible foods*, U.S. Dep't of Agric., perma.cc/9DQE-XSZ5 (archived Apr. 6, 2026). Most importantly, soda and candy are not eligible for purchase

through WIC. *Id.* And unsurprisingly, participation in the WIC program is not correlated with elevated risk of disease in children, malnutrition, or any of the other myriad harms that food-stamp-funded sugar brings. FGA, *Stop Taxpayer-Funded Junk Food, supra.* Indeed, beneficiaries of WIC actually saw *positive* effects on the quality of their diet. *Id.*

**B.    Taxpayer-funded junk food contributes to our overburdened healthcare system.**

That billions of taxpayer dollars are spent every year on a program that contributes to making low-income communities less healthy is justification enough for the waiver programs at issue here. But the relief to the United States' overburdened healthcare programs independently justifies the waivers.

There is substantial overlap between recipients of food stamps and beneficiaries of federal healthcare programs. More than three quarters of food-stamp recipients are also enrolled in Medicaid. *See Food stamps shouldn't pay for soda*, *supra*. And among children this number climbs to greater than 80%. *See* FGA, *Stop Taxpayer-Funded Junk Food, supra.* Indeed, a mere 16% of food stamp enrollees do not depend on any other welfare programs. S. Macartney & R. Ghertner, *How many people that receive one safety net benefit also receive others?*, U.S. Dep't Health and Hum. Serv., perma.cc/8L35-NQVF, (Jan. 20, 2023).

That means when taxpayers are done footing the bill for sugary drinks that cause obesity, taxpayers can pick up the tab for the obesity-related treatments as well. That spiral is not sustainable. Obesity and its resulting health complications already cost government healthcare programs more than $60 billion a year. *See* M. Rubio, *No More Subsidies*, *supra.* And that problem is likely to only become more acute. The Medicaid program is collapsing under its own weight. *See* J. Bain & J. Ingram, *Medicaid expansion: Busting budgets, bankrupting taxpayers, and displacing the truly needy*, FGA, perma.cc/7Y3G-G3Y7 (Oct. 1, 2024). Costs are ballooning. Indeed, in 2023

11

alone national health expenditures increased by nearly 8%; and healthcare costs now account for nearly 20% of the nation's Gross Domestic Product. *See* CMS, *NHE fact sheet*, (2024), perma.cc/8KHZ-PL5B (archived Apr. 5, 2026).

These costs are spurred on by America's health crisis. Nearly three quarters of American adults are overweight or obese. CDC, *Obesity and overweight*, *supra*. The rate of prediabetes in American teens has shot up from 11% in 2002 to at least 30% today. *See* J. Liu et al., *Trends in prediabetes among youths in the US from 1999 through 2018*, JAMA Network, perma.cc/23EJ-8ES6 (archived Apr. 5, 2026). And as a result, life expectancy is on a steady decline for Americans across the board. *See* FGA, *Stop Taxpayer-Funded Junk Food, supra.*

But the government can slow this spiral. If people consume more nutritious food and less surgery beverages, their overall health will improve, and they will be less reliant on taxpayer-funded healthcare. Thus the waivers at issue here—restricting the ability of people to spend food stamps on soda and candy—help both to boost public health and curb rising health care costs.

**CONCLUSION**

USDA's waivers are substantively and procedurally proper, and they are a sound exercise of USDA's policy discretion. The Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment.

Dated: April 10, 2026

Respectfully submitted,

*/s/Jeffery M. Harris*
Jeffrey M. Harris (D.C. Bar #994058)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

*Counsel for Amicus Curiae*

12

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Rule 7(o), the Foundation for Government Accountability certifies that it is a Florida nonprofit that has no parent companies, subsidiaries, or affiliates. No publicly traded corporation owns 10% or more of its stock.

13