**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NIEVES ARAGON, MARC CRAIG, NATHAN FLEMING, AMANDA JOHNSON, and SARAH STARKS a/k/a HUNTER STARKS<br><br>Plaintiffs,<br><br>*-against-*<br><br>BROOKE ROLLINS, in her official capacity as Secretary of Agriculture, and<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE<br><br>Defendants. | Case No. 1:26-cv-00861-ABJ |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**[1]

---

[1] Defendants submit two identical briefs at ECF No. 18-1 and ECF No. 19 for their combined Opposition to Plaintiffs' Motion and Cross Motion for Summary Judgment (herein "Def. Br."). Plaintiffs respond to both at once.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT..................................................................................................1

I. INJURY TO SUBSISTENCE BENEFITS MEETS THE INJURY-IN-FACT REQUIREMENT

OF ARTICLE III STANDING.................................................................................................1

    A. SNAP Benefits Are Subsistence Benefits ......................................................................1

    B. Any Reduction of Public Subsistence Benefits Is an Injury.........................................3

    C. Each Plaintiff Has Been, or Soon Will Be, Harmed by the Waivers.............................4

    D. *Weissman* Is Not Applicable to Public Benefits Cases..............................................5

II. THE WAIVERS EXCEED USDA'S STATUTORY AUTHORITY ...........................................6

    A. The Plain Text of the Statute Does Not Support USDA's Approval of the Waivers ...............6

    B. The Waivers Do Not Fit Within the Enumerated Statutory Purposes .....................................7

    C. The Waivers Fail to Provide a Valid Evaluation Framework .................................................11

III. DEFENDANTS' APPROVAL OF THE WAIVERS IS ARBITRARY AND CAPRICIOUS .14

    A. Defendants Failed to Engage in Independent Decision-Making.............................................14

    B. The Administrative Record Does Not Support the Waivers..................................................15

    C. Deficiencies in State Evaluation Plans Confirm Arbitrary Action.......................................23

    D. Defendants Failed to Justify Reversal from Prior Policy.......................................................26

IV. THE WAIVERS REQUIRED NOTICE-AND-COMMENT PROCEDURES........................28

V. THE COURT SHOULD PERMANENTLY ENJOIN THE WAIVERS ..................................32

    A. Plaintiffs Suffer Irreparable Harm and the Balance of Equities Favors Relief.....................33

    B. Vacatur Is the Appropriate Remedy ......................................................................................39

    C. Defendants Waived Opposition to APA Relief.......................................................................42

CONCLUSION.............................................................................................................................42

## TABLE OF AUTHORITIES

**Cases**

*Allied-Signal v. U.S. Nuclear Regulatory Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993)...............................................................................40, 41

*ANR Pipeline Co. v. FERC*,
  71 F.3d 897 (D.C. Cir. 1995)..................................................................................11, 26

*Atkins v. Parker*,
  472 U.S. 115 (1985).......................................................................................................2

*Auer v. Robbins*,
  519 U.S. 452 (1997)......................................................................................................28

*Bliek v. Palmer,*
  916 F. Supp. 1475 (N.D. Iowa 1996), *aff'd*, 102 F.3d 1472 (8th Cir. 1997) .......................2, 3, 35

*Booth v. McManaman*,
  830 F. Supp. 2d 1037 (D. Haw. 2011).......................................................................33

*Bowen v. Georgetown Univ. Hosp.,*
  488 U.S. 204 (1988)......................................................................................................31

*Cabrera v. Mayorkas*,
  792 F. Supp. 3d 91 (D.D.C. 2024) ...........................................................................28

*Cannon v. District of Columbia*,
  717 F.3d 200 (D.C. Cir. 2013)..................................................................................29

*C.G.B. v. Wolf*,
  464 F. Supp. 3d 174 (D.D.C. 2020) .........................................................................39

*Christopher v. SmithKline Beecham Corp.*,
  567 U.S. 142 (2012)....................................................................................................29

*Colorado v. Trump,*
  No. 1:25-cv-03428, 2026 U.S. Dist. LEXIS 57115 (D. Colo. Mar. 16, 2026) ....................30, 32

*Conservation Law Found. v. Roe,*
  422 F. Supp. 3d 12 (D.D.C. 2019) ...........................................................................32

*Creosote Council v. Johnson*,
  555 F. Supp. 2d 36 (D.D.C. 2008)............................................................................39

*Davis v. Proud,*
  2 F. Supp. 3d 460 (E.D.N.Y. 2014) ............................................................................2

*District of Columbia v. Brookstowne Cmty. Dev. Co.*,
   987 A.2d 442 (D.C. 2010).........................................................................................10

*District of Columbia v. U.S. Dep't of Agric.*,
  444 F. Supp. 3d 1 (D.D.C. 2020) .............................................................................8, 33

*Elder v. Gillespie,*
  2021 U.S. Dist. LEXIS 61967, No. 3:19-CV-00155 (E.D. Ark. Mar. 31, 2021),
  *aff'd* 54 F.4th 1055 (8th Cir. 2022) ........................................................................................3

*Environmentel, LLC v. FCC,*
  661 F.3d 80 (D.C. Cir. 2011).................................................................................................30

*Friends of Animals v. Culver,*
  610 F. Supp. 3d 157 (D.D.C. 2022) ........................................................................................6

*Garnett v. Zeilinger,*
  313 F. Supp. 3d 147 (D.D.C. 2018) ................................................................33, 35, 36, 37

*Garnett v. Zeilinger,*
  323 F. Supp. 3d 58 (D.D.C. 2018) ........................................................................................36

*Goldberg v. Kelly*,
  397 U.S. 254, (1970)................................................................................................................3

*Gordon v. Holder*,
  632 F.3d 722 (D.C. Cir. 2011)...............................................................................................36

*Gresham v. Azar,*
  950 F.3d 93 (D.C. Cir. 2020), vacated as moot,
  *Arkansas v. Gresham*, 142 S. Ct. 1665 (2022) ..............................................................10, 13

*Haskins v. Stanton*,
  794 F.2d 1273 (7th Cir. 1986)...............................................................................................33

*Heartland Reg'l Med. Ctr. v. Sebelius*,
  566 F.3d 193 (D.C. Cir. 2009)...............................................................................................40

*In re Core Commc'ns, Inc.*,
  531 F.3d 849 (D.C. Cir. 2008)...............................................................................................40

*Kildare v. Saenz*,
  325 F.3d 1078 (9th Cir. 2003)...............................................................................................35

*Kisor v. Wilkie,*
  588 U.S. 558 (2019)...............................................................................................................28

*Kooritzky v. Reich*,
  17 F.3d 1509 (D.C. Cir. 1994)...............................................................................................32

*League of Women Voters of the U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)...................................................................................................39

*Mathews v. Eldridge,*
  424 U.S. 319 (1976)............................................................................................................2, 35

*Minnesota v. U.S. Dep't of Agric.,*
  No. 25-CV-4767, 2026 U.S. Dist. LEXIS 8851 (D. Minn. Jan. 16, 2026) .........12, 29, 31, 32, 41

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010)...............................................................................................................32

*Morel v. Giuliani*,
  927 F. Supp. 622 (S.D.N.Y. 1995) ....................................................................................3

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)...................................................................................................15, 31

*Nasdaq Stock Mkt. LLC v. SEC*,
  38 F.4th 1126 (D.C. Cir. 2022).......................................................................................10

*Nat'l Ass'n of Reg. Util. Comm'rs v. FCC*,
  737 F.2d 1095 (D.C. Cir. 1984).......................................................................................15

*Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*,
  752 F.3d 999 (D.C. Cir. 2014)........................................................................................30

*Nat'l Park & Conservation Ass'n v. Stanton*,
  54 F. Supp. 2d 7(D.D.C. 1999) ......................................................................................15

*New York v. U.S. Dep't of Homeland Sec.*,
  969 F.3d 42 (2d Cir. 2020) .............................................................................................34

*N. Mariana Islands v. United States*,
  686 F. Supp. 2d 7 (D.D.C. 2009) ...................................................................................39

*Open Cmties. Alliance v. Carson*,
  286 F. Supp. 3d 148 (D.D.C. 2017) ...............................................................................39

*Orangeburg v. FERC*,
  862 F.3d 1071 (D.C. Cir. 2017).........................................................................................6

*Panhandle E. Pipe Line Co. v. FERC*,
  613 F.2d 1120 (D.C. Cir. 1979).......................................................................................30

*Pesce v. Coppinger*,
  355 F. Supp. 3d 35 (D. Mass. 2018) ..............................................................................34

*Philadelphia Welfare Rts. Org. v. O'Bannon*,
  525 F. Supp. 1055 (E.D. Pa. 1981) .............................................................................2, 35

*Rest. Law Ctr. v. U.S. Dep't of Lab.*,
  66 F.4th 593 (5th Cir. 2023)...........................................................................................35

*R.I. State Council of Churches v. Rollins*,
  158 F.4th 304 (1st Cir. 2025) .........................................................................................34

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943)............................................................................................11, 40, 41

*Shook v. District of Columbia Fin. Responsibility & Mgmt. Assistance Auth.*,
  132 F.3d 775 (D.C. Cir. 1998).........................................................................................15

*Smith v. Aroostook Cty.*,
  922 F.3d 41 (1st Cir. 2019) .............................................................................................34

*TRW Inc. v. Andrews*,
  534 U.S. 19 (2001)..........................................................................................................10

*U.S. Telecom Ass'n v. FCC,*
  359 F.3d 554 (D.C. Cir. 2004)................................................................14, 15

*Weissman v. Nat'l R.R. Passenger Corp.,*
  21 F.4th 854 (D.C. Cir. 2021) ........................................................................5

*West v. Bowen*,
  879 F.2d 1122 (3d Cir. 1989) .........................................................................2

*Willis v. Lascaris*,
  499 F. Supp. 749 (N.D.N.Y. 1980)................................................................3

*Williston Basin Interstate Pipeline Co. v. FERC*,
  519 F.3d 497 (D.C. Cir. 2008).....................................................................40

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985)................................................................35, 36

*WorldCom, Inc. v. FCC*,
  288 F.3d 429 (D.C. Cir. 2002).....................................................................40

## Statutes

5 U.S.C. § 706(2)(A).........................................................................................40

5 U.S.C. § 706(2)(C)....................................................................................6, 40

5 U.S.C. § 706(2)(D)..................................................................................28, 40

7 U.S.C. § 2011............................................................................................8, 9

7 U.S.C. § 2014...............................................................................................2

7 U.S.C. § 2017(a) ..........................................................................................2

7 U.S.C. § 2026...............................................................................................6

7 U.S.C. § 2026(b)(1)(A)...............................................................................6, 7

7 U.S.C. § 2026(b)(1)(B)(i)(II).........................................................................13

7 U.S.C. § 2026(b)(1)(B)(ii) ............................................................................8

7 U.S.C. § 2026(b)(1)(B)(ii)(I)-(IV).................................................................8

7 U.S.C. § 2026(b)(1)(B)(ii)(II).......................................................................9

## Regulations

7 C.F.R. § 282.1(b)..........................................................................28, 31, 32, 40, 41

Defendants' response does not justify the legal and factual defects in the challenged approvals. This case asks whether USDA may use limited pilot-project authority to approve sweeping state restrictions on SNAP purchases that redefine "food" based on a generalized policy preference, without meaningfully accounting for the varied medical, nutritional, and practical realities of affected households and retailers. It may not. The challenged waivers do not improve SNAP administration, do not fall within Congress's enumerated purposes, and were approved without the evaluative rigor and procedural safeguards the statute and regulations require. As a result, they burden Plaintiffs' access to subsistence benefits needed to manage health conditions and meet basic daily needs, while generating onerous burdens on retailers that threaten their continued participation in the program. Because the waivers are unlawful in multiple respects, the Court should grant Plaintiffs' motion for summary judgment, deny Defendants' cross-motion, and set aside the challenged approvals.

## I.    INJURY TO SUBSISTENCE BENEFITS MEETS THE INJURY-IN-FACT REQUIREMENT OF ARTICLE III STANDING.

Defendants' approval of the state food-restriction waivers inflicts a concrete and immediate injury by directly limiting Plaintiffs' SNAP benefits. Because SNAP benefits are subsistence benefits, any deprivation of, or restriction on, their use is a cognizable injury. Plaintiffs have shown that harm in individualized terms: they are unable to use their benefits to buy the foods and beverages they or their families need. Defendants' contrary argument, which rests on an inapposite consumer case, fails because that authority does not address public benefits.

### A. SNAP benefits are subsistence benefits.

Plaintiffs have suffered injury in fact because Defendants' approval of the waivers directly restricts access to benefits on which they rely for basic nutrition. Although Defendants repeatedly describe SNAP benefits as merely "supplemental," courts have recognized the practical reality that

1

those benefits are calculated so that a household may "purchase a minimally adequate supply of food." *Bliek v. Palmer*, 916 F. Supp. 1475, 1488 (N.D. Iowa 1996), *aff'd*, 102 F.3d 1472 (8th Cir. 1997) (citing 7 U.S.C. §§ 2014 & 2017(a); *Atkins v. Parker*, 472 U.S. 115, 117–18 (1985), (eligibility calculations); *West v. Bowen*, 879 F.2d 1122, 1124 (3d Cir. 1989)). SNAP benefits "enable persons on the 'margin of subsistence,' . . . to obtain a minimally adequate diet." *Philadelphia Welfare Rts. Org. v. O'Bannon*, 525 F. Supp. 1055, 1058–59 (E.D. Pa. 1981) (citing *Mathews v. Eldridge*, 424 U.S. 319, 340 (1976)).

The declarations submitted by Plaintiffs confirm the subsistence nature of these benefits. Those declarations describe households with no meaningful disposable income to replace items excluded by the waivers. *See* ECF No. 9-5, Johnson Decl. ¶¶ 18–20 ("SNAP is the only money we have to buy groceries . . . If I cannot use SNAP to buy my daughter's food, I will have to run up a credit card balance, sell some of my possessions on eBay, or not to pay one of our bills. I do not know if any of this will be enough to make up for not being able to spend SNAP on my daughter's foods"); ECF No. 9-3, Craig Decl. ¶ 17 ("My SNAP benefits are not enough to buy enough for me to eat each day and stock up on staples like grains so that I can cook more meals"); ECF No. 9-4, Fleming Decl. ¶ 14 ("I cannot afford to buy the energy drinks recommended by my dietician without using SNAP to pay for them"); ECF No. 9-2, Aragon Decl. ¶ 13 ("I have to spend other household funds on the beverages I need. To afford to do this going forward, I will have to spend less money on gas for my car and extracurricular activities for my son"); ECF No. 9-6, Starks Decl. ¶ 15("I don't have extra funds to buy soda without my SNAP benefits").

**B. Any reduction of public subsistence benefits is an injury.**

As explained in Plaintiffs' opening brief, the deprivation of government benefits to which a plaintiff is entitled is a legally cognizable injury sufficient to confer standing. ECF No. 9-1, Pls. Br. at 14-5. That principle applies even when the deprivation is partial rather than total. *See Davis*

*v. Proud*, 2 F. Supp. 3d 460, 485 (E.D.N.Y. 2014) ("The importance of plaintiff's SNAP benefits is high and his interest in having restored the full amount of his SNAP benefits withheld by the State defendant's wrongful implementation . . . is substantial."); *Morel v. Giuliani*, 927 F. Supp. 622, 635 (S.D.N.Y. 1995) ("To indigent persons, the loss of even a portion of subsistence benefits constitutes irreparable injury."); *Willis v. Lascaris*, 499 F. Supp. 749, 756 (N.D.N.Y. 1980) ("[T]here can be no doubt that even the slightest change in a household's food stamp allotment threatens the well-being and the dignity of its members.") (citing *Goldberg v. Kelly*, 397 U.S. 254, 266 (1970)); *Bliek v. Palmer*, 916 F. Supp. at 1488–89 ("[A] miscalculation . . . or any reduction in the food stamps allocated for any other reason . . . can result in a household receiving fewer food stamps than has been determined to be minimally adequate."); *Elder v. Gillespie*, 2021 U.S. Dist. LEXIS 61967, No. 3:19-CV-00155, at *29 (E.D. Ark. March 31, 2021), *aff'd* 54 F.4th 1055 (8th Cir. 2022) (threat of reductions in Medicaid services is injury in fact).

Defendants' contention that the waivers do not reduce a household's monthly SNAP allotment by even one cent misses the point. Def. Br. at 8. By restricting what recipients may purchase with their benefits, the waivers diminish the practical value of those benefits to households that rely on them to meet basic needs. Those households must then either spend scarce cash on excluded items or forgo them altogether. For families living at or near subsistence, restrictions on what recipients may purchase with SNAP benefits inflict a concrete and cognizable injury by forcing them to forgo basic necessities or divert limited funds to cover such items.

**C. Each Plaintiff has been, or soon will be, harmed by the waivers.**

Plaintiffs have already suffered, or imminently will suffer, injury to their SNAP benefits as a result of the waivers. Each challenged waiver restricts Plaintiffs' ability to use those benefits to purchase foods or beverages they or their families need to maintain health and meet basic daily needs. That harm is sufficient to establish standing. Indeed, Defendants do not seriously dispute

that Plaintiffs Johnson, Craig, and Fleming are unable to use SNAP benefits to purchase items they need for their health and welfare. Their loss of access to needed benefits is itself a concrete injury.

Defendants' response to Plaintiff Aragon fares no better. They attempt to dismiss her injury by speculating that she can manage her diabetes with foods other than soda. But the cited materials Defendants purportedly rely on do not even support that claim. Rather, their argument rests on an incomplete draft survey that merely asks whether participants purchased alternatives, such as fruit, instead of soda. Def. Br. at 9, citing ECF No. 17-3 at GOV113 (Colorado draft evaluation survey). That draft survey does not ask which alternatives participants purchased to manage blood sugar, much less whether those alternatives were effective. Nor does Defendants' cited "medical study," ECF No. 17-6 at GOV342, which is not a medical study at all, but rather a statistical simulation, establish that fruit is an adequate substitute for the rapid blood-sugar management Plaintiff Aragon requires. By contrast, Plaintiff Aragon explains in her declaration that her medical team has advised her on how to manage her blood sugar, Aragon Decl. ¶ 7, and that sugary drinks such as soda are the quickest and most effective way for her to raise it, whereas other options such as fruit are far less effective, Aragon Decl. ¶¶ 8, 10. Plaintiff Aragon was diagnosed with type 1 diabetes as a young child and has a lifetime of experience managing her condition in consultation with her medical team. Aragon Decl. ¶ 6. Nothing in the record refutes that evidence. Thus, Plaintiff Aragon is injured when she is unable to use her SNAP benefits in a way that allows her to manage her health safely and effectively.

Defendants likewise trivialize Plaintiff Starks' injuries by recasting them as a matter of taste. They are not. Like the other Plaintiffs, Plaintiff Starks is harmed by the deprivation of a subsistence benefit. As a single parent who works part time and attends school full time, Plaintiff Starks relies on an afternoon source of caffeine that is less excessive than coffee and therefore uses

SNAP benefits to purchase soda. Starks Decl. ¶¶ 9–11, 13. That is a practical and health-related need, not a preference. Defendants also ignore a separate injury reflected in Plaintiff Starks' declaration: because of Colorado's hastily approved waiver, Plaintiff Starks was unable to purchase products, such as flavored water, that should have remained allowable under the waiver. Starks Decl. ¶ 16.[2] Each Plaintiff has a concrete reason for needing to use SNAP benefits to purchase particular items, and the prohibition on those purchases inflicts direct injury. Each Plaintiff therefore has standing to challenge the waiver applicable in their state.

### D. *Weissman* is not applicable to public benefits cases.

Defendants' reliance on *Weissman v. National Railroad Passenger Corp.*, 21 F.4th 854 (D.C. Cir. 2021), is misplaced. Weissman was a consumer case challenging an Amtrak mandatory arbitration clause. *Id.* at 857. Plaintiffs there alleged Amtrak's arbitration policy violated the Petition Clause, Article III, and separation-of-powers principles of the United States Constitution. *Id*. at 856. Defendants attempt to extract from *Weissman* a rule that standing exists only where government action makes a desired product "not readily available" or "unreasonably priced." Def. Br. at 8, (citing *Weissman*, 21 F.4th at 858). But that framing does not fit this case. Plaintiffs are not consumers challenging a market practice; they are public-benefits recipients challenging federal approval of restrictions on the use of subsistence benefits. The standing inquiry must be evaluated in that context, and *Weissman* is inapplicable.[3]

---

[2] As the accompanying declaration of a SNAP-authorized retailer highlights, to avoid onerous compliance burdens and the severe implications of being ejected from the SNAP program upon a second violation, retailers are erring on the side of limiting access to SNAP. *See* Declaration of Elizabeth Hoffer ("Hoffer Decl.") ¶ 13.

[3] Even if *Weissman* controls, Plaintiffs easily meet its standard—the products they need are no longer available to purchase with SNAP benefits, which means they are essentially no longer available for purchase at all. *See supra* I.A. Under this consumer-theory, SNAP recipients are injured by the limitation of their purchasing power, even if there are alternatives they can buy. *Orangeburg v. FERC*, 862 F.3d 1071, 1078 (D.C. Cir. 2017).

## II.    THE WAIVERS EXCEED USDA'S STATUTORY AUTHORITY.

The Administrative Procedure Act ("APA") requires courts to set aside agency action that exceeds statutory authority. 5 U.S.C. § 706(2)(C); *see, e.g.*, *Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 166 (D.D.C. 2022). USDA exceeded the authority granted to it in the Food and Nutrition Act ("FNA" or the "SNAP Act"), and summary judgment should therefore be entered for Plaintiffs on Count 1.

Defendants' statutory-authority argument starts with a straw man.  Defendants contend that Plaintiffs argue any revision to the statutory definition of "food" is categorically beyond the scope of a waiver. Def. Br. at 10–11. But Plaintiffs make no such argument. While revisions to the statutory definition of "food" are more properly made by Congress than through administrative waivers, the Court need not resolve that broader question to grant Plaintiffs the relief they seek. Plaintiffs' argument is both narrower and dispositive: even assuming USDA may waive some statutory requirements "to the extent necessary" under 7 U.S.C. § 2026, that authority extends only to "pilot or experimental projects" that satisfy the statute's affirmative conditions and fit within Congress's enumerated permissible purposes. Waiver of "any requirement" is permitted only for projects "designed to test programs that might increase the efficiency of [SNAP] and improve the delivery of [SNAP] to eligible households[.]" 7 U.S.C. § 2026(b)(1)(A). The waivers challenged here do neither. They do not increase efficiency, do not improve delivery, and do not otherwise qualify as lawful Section 2026 projects. Defendants spend substantial effort defending a broader proposition Plaintiffs have not asked the Court to decide, while sidestepping the actual question.

### A.  The plain text of the statute does not support USDA's approval of the waivers.

The challenged waivers do not qualify as pilot projects under the plain text of Section 2026(b)(1)(A). That provision authorizes pilot or experimental projects only if they are "designed to increase the efficiency" of SNAP or "improve delivery" of SNAP. 7 U.S.C. § 2026(b)(1)(A).

6

By its terms, the statute concerns projects directed to the efficient[4] administration, or improved delivery[5] of SNAP benefits.[6] The waivers at issue do not streamline eligibility determinations, improve issuance, reduce administrative burdens, or otherwise affect how benefits reach recipients; instead, they restrict the items recipients may buy with benefits they already received.

Defendants respond that the waivers are intended to improve the nutritional quality of the program and thereby make the program more effective. That argument fails for at least two reasons. First, the statutory text speaks in terms of efficiency and delivery, not nutrition or policy. Second, Defendants blur the relevant inquiry by conflating the delivery of benefits with restrictions on their use. But a policy governing what recipients may buy after benefits are issued is not a policy about how SNAP is administered or delivered. It is a substantive redefinition of the benefit itself. And Defendants' own implementation underscores the point: the challenged restrictions vary substantially from State to State, rely on inconsistent product definitions, and reflect no coherent effort to improve the mechanisms by which eligible households receive SNAP assistance.

**B.   The waivers do not fit into the four permissible purposes enumerated by Congress.**

As Defendants acknowledge, USDA is "limited in several ways" by Section 2026 when approving pilot projects. Def. Br. at 11. The statute identifies just four permissible purposes for which a waiver may be approved:  to (i) improve program administration, (ii) increase the self-

---

[4] "Efficient" is defined as "capable of producing desired results with little or no waste (as of time or materials)." Efficient, MERRIAM-WEBSTER DICTIONARY (12th ed. 2026). Efficiency is "the quality or degree of being efficient." *Efficiency*, MERRIAM-WEBSTER DICTIONARY (12th ed. 2026).
[5] Under its plain dictionary meaning, delivery is "the act or manner of delivering something: such as . . . the act of taking something to a person or place." Delivery, MERRIAM-WEBSTER DICTIONARY (12th ed. 2026). To improve the act of delivering SNAP benefits to SNAP recipients does not, under the plain meaning, include restriction of products eligible for purchase.
[6] Congress indicated as much when originally enacting the food stamp program nearly 50 years ago. *See, e.g.*, S. REP. NO. 95-418, at 125 (1977) (describing demonstration projects as testing "improvements in the food stamp program" such as "simplification of the application process" and "streamlining recertification procedures").

sufficiency of supplemental nutrition assistance program recipients, (iii) test innovative welfare reform strategies, and (iv) allow greater conformity with the rules of other programs than would be allowed but for this paragraph. 7 U.S.C. § 2026(b)(1)(B)(ii)(I)-(IV). A project must fit within one of those affirmative purposes; it is not enough merely to say that the project is not expressly prohibited. Def. Br. at 12.

Here, the waivers do not fit within any permissible category identified by Congress. The approvals, the state requests, and the Administrative Record attempt to justify the waivers as measures intended to "restore nutritional value," promote "healthy choices," and improve health outcomes. *See* ECF No. 17-2 at GOV003; 009; 015; 031; 040; 054; 063; 069; 078; 080-1; 092; ECF No. 17-7 at GOV591; ECF No. 17-8 at GOV699; 703; 706; 711; 743. However, while those may be legitimate policy aspirations, *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 7 (D.D.C. 2020) (quoting 7 U.S.C. § 2011), they are not among the specific purposes Congress enumerated in Section 2026 for pilot projects.

Defendants' effort to force the waivers into the first category of improving "program administration" fails for two reasons. First, "program administration" concerns the operation and administration of SNAP[7]—it does not authorize the agency to rewrite the substantive scope of benefits Congress itself defined. USDA itself illustrates this point in two waiver denials from 2018. These waivers, which were similarly focused on restricting products like "sugar sweetened beverages," were denied in part because they were likely to increase the "costs of administering the SNAP program for both the State and retail community." ECF No. 9-9, Ex. 15. By contrast, Defendants invoke SNAP's general nutrition-related purpose in 7 U.S.C. § 2011 to stretch "program administration" beyond recognition. Depriving SNAP recipients the ability to access

---

[7] *See supra* n.12 regarding Congress' stated purpose for these pilot projects.

products they need has nothing to do with administering the program more effectively. It concerns the substance of what the benefits cover.

Second, Defendants' argument cannot withstand factual scrutiny. Even assuming that "program administration" can be read to include the nutritional content of the program, the arbitrary and disjointed nature of the waivers belies that justification. If these waivers truly improved administration, one would expect consistency and reduced complexity. The opposite is true. The waivers vary across states and impose substantial burdens on retailers, including item-by-item point-of-sale reprogramming, state-by-state inconsistencies, and acknowledged implementation and enforcement difficulties. *See* Declaration of Elizabeth Hoffer ("Hoffer Decl.") ¶¶ 8–9. Further, the challenged waivers make SNAP benefits more complicated for recipients to use. *See* Craig Decl. ¶¶ 19–23 ("I am finding Iowa's food restriction waiver to be extremely complicated to navigate."); Starks Decl. ¶¶ 16–17 (explaining that they are unable to buy flavored water which should have been allowed under the waiver). These burdens complicate administration; they do not improve it.

Defendants' "self-sufficiency" theory fares no better. The approvals do not explain how the waivers increase self-sufficiency within the meaning of Section 2026(b)(1)(B)(ii)(II). Instead, Defendants speculate that restricting SNAP purchases *may* cause recipients to make healthier food purchases with other sources of income in the future and cite snippets from the Administrative Record as support. Def. Br. at 13 (citing ECF No.17-2 at GOV003 (quoting the first page of the demonstration project template)), ECF No. 17-5 at GOV259 (quoting a portion of a USA Today opinion piece written by Secretary Rollins and Secretary Kennedy addressing new Dietary Guidelines for Americans); ECF No. 17-2 at GOV066 (pointing to Tennessee's Waiver Request which claims limiting purchases of certain products "aligns SNAP benefits with public health

9

goals")). In reality the waivers force recipients with limited means to forgo necessary items or spend scarce cash, when available, on items they previously could purchase with SNAP. *See* Johnson Decl. ¶¶ 18–20; Craig Decl. ¶ 33; Fleming Decl. ¶¶ 14–15; Aragon Decl. ¶¶ 10, 13; Starks Decl. ¶ 14. That diversion of household resources decreases, rather than increases, self-sufficiency.

Defendants' invocation of "innovative welfare reform strategies" is equally unpersuasive. Novelty is not enough. If a project qualified as an "innovative welfare reform strateg[y]" merely because it had not been tried before, then virtually any substantive reshaping of the program could be justified under that label. That would be inconsistent with the structure of Section 2026, which limits the range of permissible pilot projects. *See Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1137 (D.C. Cir. 2022) (citing *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (("[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.")); *see also District of Columbia v. Brookstowne Cmty. Dev. Co.*, 987 A.2d 442, 447–48 (D.C. 2010) (referencing the statutory construction canon *expressio unius est exclusio alterius* which explains "when a list is enumerated it may be presumed to be exhaustive unless otherwise provided"). Defendants also do not grapple with Plaintiffs' authority on this point. As *Gresham* explained, agencies are bound "not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *Gresham v. Azar*, 950 F.3d 93, 101 (D.C. Cir. 2020), vacated as moot, *Arkansas v. Gresham*, 142 S. Ct. 1665 (2022). Nothing in the approvals or applications explains how these waivers amount to welfare reform strategies, as opposed to straightforward nutrition restrictions untethered to the purposes Congress actually enumerated for pilot projects.

The Administrative Record likewise does not appear to ground the approvals in any of the enumerated purposes. Defendants' belated attempt to retrofit the waivers into those categories is

nothing more than unpersuasive post hoc rationalizations. *See ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943) (indicating that courts should look "only to the reasons given by the agency" when determining "whether an agency has provided a reasoned explanation for departing from precedent or treating similar situations differently"). Section 2026 does not grant USDA open-ended authority to approve any waiver it believes may be beneficial in some general sense.

C. **The waivers do not accomplish the stated objective of "increasing nutrition" or provide an evaluation method to demonstrate the effects of the waiver.**

Even if the Court were to conclude that "increasing nutrition" could, in some circumstances, fall within Section 2026's permissible purposes, these waivers still fail because they are not structured as genuine pilot projects capable of testing that hypothesis. The restrictions rely on broad, inconsistent, and often arbitrary product definitions that are not coherently tied to nutritional value. If the goal were truly to test whether excluding certain items improves nutrition, one would expect reasoned and comparable restrictions. Instead, the states have adopted materially different approaches. Iowa ties eligibility to state tax treatment and store type; Tennessee relies on ingredient-order rules while allowing beverages with artificial sweeteners; West Virginia bans soda but not candy or energy drinks; Nebraska bans all energy drinks. ECF No. 17-2 at GOV026; 063; 079-80; 050-1. Moreover, none of the waivers include appropriate evaluative criteria. Rather, they provide vague promises to implement some form of evaluative methodology later. These are not carefully designed nutrition experiments. They are blunt restrictions using crude proxies that vary by state and bear no obvious, consistent relationship to actual nutritional value. In 2018, USDA itself denied very similar waiver requests from Maine and Nevada because they did not include the "[a]bility to delineate nutritional benefits for allowable and excluded foods." ECF No. 9-9, Exs. 14-15. In 2024, USDA denied another waiver request from Iowa to ban "cultivated-

11

protein food products" because it did not "provide information on how the project would raise levels of nutrition."[8] Even though the challenged waivers are plagued with identical deficiencies, USDA provided no explanation for its decision to depart from those precedents.

Moreover, Defendants do not meaningfully contend with Plaintiffs' argument that the waivers fail to include evaluative criteria and methodologies capable of measuring the effects of the waivers. This alone is a sufficient basis to invalidate them. As discussed more fully below in Section II.C, the waivers, at best, included preliminary evaluative frameworks for determining whether the waivers achieved their stated purposes. ECF No. 17-2 at GOV010–11; 053; 028–29; 086–88. At worst, the waivers merely contemplate that the States will provide a finalized evaluation plan later. *See, e.g.*, ECF No. 17-2 at GOV067 ("The State will develop retailer and customer experience surveys to collect data on food purchasing habits, non-SNAP spending, and qualitative data."). Neither approach complies with the FNA. As *Minnesota v. U.S. Dep't of Agric.* held, the absence of an adequate evaluation method "alone is enough to set aside" a Section 2026 demonstration project. No. 25-CV-4767, 2026 U.S. Dist. LEXIS 8851, at *29–30 (D. Minn. Jan. 16, 2026). Defendants do not meaningfully distinguish that holding, nor do they address the related principle in *Gresham* that an agency must comply with the means Congress prescribed. 950 F.3d 93 at 101.

Defendants attempt to reduce the statutory requirement to the word "evaluation," as though any placeholder will suffice. But the statute requires more than a promise to evaluate later. Section

---

[8] Ex-3, Letter from Catherine Buhrig, Assoc. Adm'r, Supplemental Nutrition Assistance Program, Food & Nutrition Serv., U.S. Dep't of Agric., to Stacie Gordon, Bureau Chief, Div. of Cmty. Access & Eligibility, Iowa Dep't of Health & Human Servs. (July 12, 2024) https://aglaw.psu.edu/wp-content/uploads/2025/01/29-Letter-Iowa-SNAP-Denial-7.12.24.pdf.

2026 specifically requires the inclusion of an "evaluation to determine the effects of the project."[9] 7 U.S.C. § 2026(b)(1)(B)(i)(I(b). The record indicates that USDA approved these waivers before it reviewed any final evaluation plan capable of measuring success or failure in a meaningful way. *Compare* ECF No. 17-2 at GOV010-11 (Colorado's proposed evaluation), *with* ECF No. 17-3 at GOV109-10 (final evaluation identical to that proposed in waiver). *But see* ECF No. 17-7 at GOV499-501 (questions from FNS without response from the State); ECF No. 17-7 at GOV591 ("Please define 'changes in health behaviors' and how it will be measured" and "there is no control group not subject to the restriction."); ECF No. 17-2 at GOV031 (approval dated May 22, 2025, without evidence that questions had been substantively answered). That defect is especially significant here because the States' proposed methods often focus on shopping behavior, even though the Administrative Record itself acknowledges that such data does not demonstrate health outcomes, while Defendants justify the waivers in terms of nutrition and health. In sum, the approvals do not test that premise or reliably show whether the waivers serve any lawful objective.

The waivers likewise do not consider the consequences of the restrictions on recipients who require excluded items for medical, disability-related, or other health reasons. Plaintiffs have already shown why that matters here: for some recipients, the excluded items are medically or functionally necessary foods and beverages. Aragon Decl. ¶¶ 6-8; Craig Decl. ¶¶ 9-10; Fleming Decl. ¶¶ 6-9; Johnson Decl. ¶¶ 7, 9; Starks Decl. ¶¶ 12-4. Defendants do not rebut that point. The absence of any consideration of individual health and nutrition needs further undermines

---

[9] The waivers approved by Defendants plainly did not include any "evaluation" to "determine" the "effects" of the waivers. *See* Determine, MERRIAM-WEBSTER DICTIONARY (12th ed. 2026) ("[T]o officially decide (something) especially because of evidence or facts."); Effect, MERRIAM-WEBSTER DICTIONARY (12th ed. 2026) ("[S]omething that inevitably follows an antecedent (such as a cause or agent) : result, outcome."); Evaluation, MERRIAM-WEBSTER DICTIONARY (12th ed. 2026) ("[D]etermination of the value, nature, character, or quality of something or someone.").

13

Defendants' claim that the waivers are genuinely designed to improve nutrition rather than simply impose categorical exclusions untethered to the real circumstances of SNAP recipients.

In short, these waivers are not lawful Section 2026 pilot projects. They do not fit the statute's enumerated purposes, they, in fact, undermine those purposes and lack the evaluation methods Congress requires. USDA therefore exceeded its statutory authority in approving them.

## III.    DEFENDANTS' APPROVAL OF EACH OF THE STATES' WAIVERS IS ARBITRARY AND CAPRICIOUS.

Defendants acted arbitrarily and capriciously in approving the waivers for three related but distinct reasons. First, Defendants did not engage in independent, reasoned decision-making. Second, the Administrative Record does not support the approvals. Third, Defendants reversed longstanding agency policy without acknowledging or justifying that reversal.

### A.    Defendants have not engaged in any independent decision-making and, therefore, their actions were arbitrary and capricious.

Agencies may seek advice and recommendations from outside parties, but they must make the final decision themselves. *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 568 (D.C. Cir. 2004) ("[A] federal agency may turn to an outside entity for advice and policy recommendations, provided the agency makes the final decisions itself," and "[a]n agency may not . . . merely 'rubber-stamp' decisions made by others . . . nor will vague or inadequate assertions of final reviewing authority save an unlawful subdelegation.") (internal citations omitted). "Subdelegations to outside parties are assumed to be improper absent an affirmative showing of congressional authorization." *Id.* at 565 (citing *Shook v. District of Columbia Fin. Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775, 783–84 & n.6 (D.C. Cir. 1998); *Nat'l Ass'n of Reg. Util. Comm'rs v. FCC*, 737 F.2d 1095, 1143–44 & n.41 (D.C. Cir. 1984); and *Nat'l Park & Conservation Ass'n v. Stanton*, 54 F. Supp. 2d 7, 18–20 (D.D.C. 1999). *U.S. Telecom Ass'n* is especially instructive because it makes

clear that subdelegation to a state entity does not relieve the federal agency of its obligation to exercise independent judgment. 359 F.3d at 566. Here, Defendants effectively admit that they relied on the States' reasoning wholesale. Def. Br. at 16 ("Where, *as here*, an agency adopts a State's reasoned decisionmaking as its own . . . ." (emphasis added)). Such rubber-stamping is not entitled to deference and is arbitrary and capricious.[10]

### B. The Administrative Record does not support the food restriction waivers.

Even if Defendants had independently evaluated each State's waiver, the approvals would still be arbitrary and capricious because the Administrative Record does not support them. Agency action is arbitrary and capricious when the agency fails to consider important aspects of the problem or offers explanations that run counter to the evidence before it. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). That is what happened here. After representing to the Court that the Administrative Record would be sparse, Mar. 20, 2026 Hr'g. Tr. 17:9–11 ("I don't anticipate the administrative record will be much broader than the exhibits they've already attached to their TRO.") Defendants submitted a nearly 800-page record that, although substantial in appearance, is rather insubstantial in substance. Much of the record consists of statutory and regulatory materials,[11] documents concerning waivers not at issue in this case,[12]

---

[10] *Quackenbush* and *Younger* do not help Defendants. Those cases describe abstention principles grounded in comity and federalism; they do not concern APA review of final federal agency action or authorize a federal agency to substitute a State's policy judgment for its own reasoned decision making. *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 723 (1996); *Younger v. Harris*, 401 U.S. 37, 44 (1971). The issue here is not whether the Court should refrain from interfering with state functions, but whether USDA lawfully exercised its own authority under Section 2026 and the APA.

[11] ECF No. 17-4 at GOV196–252.

[12] ECF No. 17-7 at GOV503–13.

"press releases,"[13] redacted documents,[14] and duplicative materials.[15] Once those materials are properly set aside, what remains is a notably thin record that fails to show reasoned consideration of the waiver requests.

Indeed, the record does not demonstrate that USDA meaningfully examined whether the States' proposals were supported by evidence, whether the waivers satisfied the governing statutory requirements, or whether the approvals would create the practical and legal problems Plaintiffs identified. Nor does the record contain any coherent explanation from Defendants showing how USDA weighed those issues before granting approval. Instead, the record reflects adoption of the requests without the kind of independent, reasoned analysis the APA requires.

Defendants contend that each waiver's revised definition of "food" could plausibly permit "the State to more effectively and efficiently achieve SNAP's purpose of improving nutritional outcomes for SNAP recipients." Def. Br. at 16. This contention is based on little more than conclusory assertions by the States themselves.[16] Additionally, that argument is plainly refuted by the Administrative Record. USDA clearly approved the waivers without requiring any meaningful evaluative criteria capable of determining whether the restrictions would improve health outcomes.

---

[13] ECF No. 17-5 at GOV254–87.

[14] ECF No. 17-7 at GOV498, 514, 516–20, 638; ECF No. 17-8 at GOV640–43, 693, 695, 716, 718–19, 787.

[15] *See, e.g.*, ECF No. 17-7 at GOV 601–06; ECF No. 17-8 at GOV650–74, 696–700, 706–15, 761–74.

[16] Colorado asserted that "[s]upporting the health of Coloradans is of paramount importance." ECF No. 17-2 at GOV009. Iowa stated that it sought to "refocus the SNAP program on its designed intent, 'to promote the general welfare and safeguard the health and wellbeing' by encouraging SNAP participants to purchase healthier foods by modifying the definition of 'food and food products.'" ECF No. 17-2 at GOV028. Nebraska said it sought to "improve the health of low-income SNAP recipients and increase responsible spending of federal SNAP dollars." ECF No. 17-2 at GOV052. Tennessee represented that its project would "encourage nutritious choices that improve health outcomes for SNAP participants." ECF No. 17-2 at GOV066. And West Virginia asserted that restricting soda purchases could reduce diet-related disease and generate long-term healthcare savings. ECF No. 17-2 at GOV081.

16

If the agency seriously intended to test whether these restrictions would improve nutrition or health, it should have required a methodology for measuring whether those outcomes will change as a result of the waivers. It did not.

That omission is especially revealing given Defendants' own position on standing. Defendants argue that recipients can simply use other funds to purchase the restricted items. If that is so, then the premise of the waivers—that restricting SNAP purchases will improve health outcomes—becomes even more speculative, because the purchasing behavior the waivers are supposedly designed to change may not change at all.[17] In that circumstance, the predictable result is not improved health, but greater hardship for recipients who rely on SNAP to meet basic food needs and must now divert scarce non-SNAP funds to purchase items they previously could lawfully obtain with their benefits.

USDA's failure to require any meaningful evaluation is even more telling because the agency had previously rejected similar waiver requests on the ground, among others, that they failed to demonstrate likely health benefits. *See, e.g.* ECF No. 9-9, Exs. 14-15. Yet Defendants offer no reasoned explanation for why USDA reached a different conclusion here, nor do they explain why the agency abandoned the need for a meaningful evaluative framework. That unexplained shift further underscores the arbitrary and capricious nature of the approvals.

Moreover, rather than evaluating health outcomes to measure the success of the waiver, the states are instead looking at trends in food purchases. ECF No. 17-3 at GOV109-14; 119-21; 132-35; 166; 178-80. Those trends say nothing about health outcomes standing alone. And, in fact,

---

[17] In fact, as discussed below, the Administrative Record acknowledges this very issue. ECF No. 17-8 at GOV743.

Food and Nutrition Service ("FNS")[18] discouraged states from attempting to evaluate health outcomes because they acknowledge that if SNAP recipients simply use their scarce non-SNAP resources to purchase prohibited items, health outcomes won't change. For example, in response to West Virginia's proposal to "monitor trends in the diagnosis and treatment of conditions closely associated with high consumption of sugar-sweetened beverages," FNS responded, "This is great, but changing health outcomes is a long term goal. Will WV try to get data from retailers to see if SNAP households purchases change in [sic] after the pilot is implemented? Since households would still be able to purchase soda with cash or other resources it would be optimal to see if purchases changes as a first step before assessing health outcomes. If purchases don't change, then one wouldn't expect to see a change in diagnoses." ECF No. 17-8 at GOV743; *see also* "Terms and Conditions" attached to waiver approvals ECF No. 17-2 at GOV020, 046, 059, 073, and 096-97 (stating that surveys must collect information about participant shopping and purchasing behaviors, nothing about health).

These admissions expose the weakness of Defendants' asserted justification for the waivers. The States themselves acknowledge that improved health outcomes are, at best, long-term goals that cannot be meaningfully measured through a short-term pilot. But even setting that aside, the Administrative Record contains no serious effort to establish that restricting purchases of certain items will lead to improved health outcomes. Nor does it reflect any attempt to address the obvious methodological difficulty of testing that proposition. Demonstrating a causal relationship between changes in purchasing behavior and changes in health outcomes is a complex undertaking

---

[18] FNS is the sub-agency within the USDA that administers SNAP and related federal nutrition programs.

18

that requires careful experimental design, reliable data, and meaningful evaluation criteria. The lack of any such analysis in the record underscores the arbitrary nature of USDA's approvals.

Moreover, Defendants argue that "[t]he applications were well reasoned and drew upon scientific evidence from accredited sources like the Center[s] for Disease Control and Prevention and American Diabetes Association." Def. Br. at 16, (citing ECF No. 17-6 GOV288-495). This mischaracterizes the waiver requests. The Colorado and Tennessee waivers fail to reference evidence of any kind when justifying their waiver requests. ECF No. 17-2 at GOV009 (Colorado); GOV066 (Tennessee). Iowa's waiver includes one citation to a page on the CDC's website titled "Fast Facts: Sugar-Sweetened Beverage Consumption" to support the statement that sugar-sweetened beverages "are associated with weight gain, obesity, type 2 diabetes, heart disease, kidney diseases, non-alcoholic liver disease, tooth decay and cavities, and gout." ECF No. 17-2 at GOV0028. This citation does not mention SNAP participation whatsoever. *Id*. (citing ECF No. 17-6 at GOV352). And notably, Iowa fails to justify how this statement relates to its proposed restriction on any food or beverage deemed taxable under Iowa state sales-tax law, ECF No. 1 ¶¶ 80, 83, 93; Ex. 2, which includes numerous categories of food and beverages that cannot be characterized as sugar-sweetened beverages. Nor does Iowa cite studies showing that restricting all foods and beverages taxable under Iowa law would improve health outcomes.

Nebraska's and West Virginia's waiver requests supply the remaining eleven studies—the balance of the purported "scientific evidence" on which Defendants rely to justify all of the challenged waivers. ECF No. 17-6 GOV288–495. But those materials do not meaningfully support the agency's approvals. Rather, two are general fact sheets about obesity in the United States, which do not attribute any outcome to the consumption of any particular food or beverage, or

19

connect obesity to the SNAP program.[19] Three more discuss other health conditions without tethering those outcomes to the consumption of any specific food or beverages, or connecting them to the SNAP program.[20] Another source concerns soda consumption among youth in West Virginia, but still does not evaluate SNAP restrictions or whether excluding soda from SNAP purchases improves health outcomes.[21] Of the sources that mention SNAP, one is a Cato Institute blog post on downsizing the federal government; hardly a scientific or academic source.

While Nebraska states that "[m]ultiple studies have shown that SNAP participation is associated with increased obesity risk," ECF No. 17-2 at GOV051, it cites to only one study that investigated "whether mental health was a mediator in the association between obesity . . . and participation in [SNAP]" to support that statement. ECF No. 17-6 at GOV370. If anything, this study underscores the complexity of associating poor health outcomes with SNAP participation, as it was premised on whether SNAP participation could negatively affect mental health, leading

---

[19] ECF No. 17-2 at GOV080 (West Virginia Waiver Request), (citing GOV289, *Adult Obesity Prevalence Maps*, CDC (Dec. 3, 2025)); GOV051 (Nebraska Waiver Request), (citing GOV320, *Childhood Obesity Facts*, CDC (Apr. 2, 2024)). Two others are state-specific obesity materials for Nebraska and West Virginia, but again do not analyze SNAP purchase restrictions or the effects of excluding particular products from SNAP eligibility. GOV051 (Nebraska Waiver Request), (citing GOV368, *Obesity Fact Sheet, Nebraska*); GOV080 (West Virginia Waiver Request), (citing GOV380, *Trust for America's Health, The State of Obesity 2024: Better Policies for a Healthy America*).

[20] These include a study concerning coronary artery risk in Appalachian communities, GOV080 (West Virginia Waiver Request), (citing GOV308, Eloise Elliott et al., *The Coronary Artery Risk Detection in Appalachian Communities (CARDIAC) Project: An 18 Year Review*, 13 *Current Pediatric Reviews* 265 (2017)), and two diabetes-related sources cited by Nebraska, GOV051 (Nebraska Waiver Request), (citing GOV322, Emily D. Parker et al., *Economic Costs of Diabetes in the U.S. in 2022*, 47 *Diabetes Care* 26 (2024); and GOV357, *The American Diabetes Association Urges Congress to Make Diabetes a Priority*, American Diabetes Association).

[21] ECF No. 17-2 at GOV081, (West Virginia's Waiver Request), citing ECF No. 17-5 at GOV297, Soda Consumption – Youth in West Virginia, America's Health Rankings United Health Foundation).

to obesity through disrupted eating patterns and/or reduced physical activity. ECF No. 17-6 at GOV370. Notably, none of the states justify their waivers on mental health grounds.

In the end, only one study in the entire 787-page Administrative Record meaningfully addresses the central premise of these waivers, and that study appears in West Virginia's waiver request. ECF No. 17-2 at GOV080, (citing ECF No. 17-6 at GOV340, Sanjay Basu et al., *Ending SNAP Subsidies for Sugar-Sweetened Beverages Could Reduce Obesity and Type 2 Diabetes*, 33(6) *Health Aff. (Millwood)* 1032 (2014)). But that study also does not provide the support Defendants need. It is more than a decade old and relies on a simulation model to estimate how a change in SNAP policy might affect health outcomes. The authors expressly acknowledge the limitations of that approach, including that "no model can capture all aspects of reality or predict the future." ECF No. 17-6 at GOV343–44. Yet, Defendants moved directly from scattered background materials and a single modeling study to ad hoc approval of sweeping food-restriction waivers across a large number of states. That is not reasoned decision making grounded in substantial support; it is speculation dressed up as experimentation.

Further, in response to Plaintiffs' argument that the USDA failed to consider the implications of the waivers on SNAP recipients with unique health needs, Defendants point to the above-mentioned "studies," stating that "the Administrative Record is rife with studies and discussion of the poor nutritional outcomes experienced by SNAP recipients." Def. Br. at 17, (citing ECF No. 17-6 at GOV288-495. This statement is demonstrably false. None of the documents in the Administrative Record cited by Defendants address whether restricting access to SNAP recipients with unique medical needs—such as Plaintiffs—could compromise their health and reduce overall health outcomes in a given state given the number of recipients with such needs.

In short, USDA failed to consider sound nutritional science and the consequences of the waivers for individuals with unique medical and dietary needs.

Moreover, USDA's failure to evaluate—much less address—the burdens these waivers impose on SNAP retailers is an independent reason the approvals were arbitrary and capricious. Plaintiffs have pointed to those burdens not as a collateral concern, but as evidence that the waivers are likely to drive retailers out of the program, whether voluntarily because compliance becomes too costly or involuntarily because vague standards create an unacceptable risk of enforcement. Defendants' brief does not address that problem.

That omission is especially striking because both the Administrative Record and retailer declaration testimony confirm that the waivers impose substantial implementation and compliance burdens. West Virginia acknowledged that "the cost of changing systems and upgrading to comply with this waiver will be shifted to SNAP retailers operating within WV," and agency materials likewise recognize that retailers would "bear the brunt of this effort." ECF No. 17-2 at GOV083; ECF No. 17-8 at GOV720. Iowa similarly acknowledged that compliance would be especially difficult for smaller retailers ECF No. 17-7 at GOV590, and Colorado's waiver was approved even though the record does not show any meaningful response to how retailers would actually implement the policy. Testimony from a SNAP-authorized retailer underscores those exact concerns. Elizabeth Hoffer, Vice President of Weigel Stores Inc. ("Weigel's"), explains that Tennessee's waiver would replace the current streamlined nationwide system with an item-by-item compliance regime that is "expensive, time-consuming, and lacks reliable guidelines," requiring continual review of thousands of SKUs, coordination with wholesalers, and revisions to software and point-of-sale systems. She further explains that the State has provided "no clear guidance or direction on implementation," creating uncertainty, inconsistency, and a serious risk that retailers

22

will restrict products defensively to avoid losing SNAP authorization. Hoffer Decl. ¶¶ 7–14. And she states that the burden may become so severe that it outweighs the benefit of remaining a SNAP retailer at all. *Id.* at ¶ 15.

Defendants' disregard of these burdens further confirms the arbitrariness of the approvals. USDA cannot plausibly claim that these waivers will improve program efficiency or administration while ignoring record evidence that they impose major operational costs, ongoing compliance burdens, and serious risks of retailer attrition. Yet, that is exactly what Defendants did, both in approving the waivers and in defending them now.

## C. Deficiencies in state evaluation plans confirm the arbitrary nature of Defendants' approvals.

An examination of how the various waiver applications treated the need for an evaluation plan reinforces the conclusion that the approval of the waivers was arbitrary and capricious.

**Colorado**: Colorado proposed an "outcome study" based on participant questions about shopping and consumption behavior. ECF No. 17-2 at GOV010. Its materials also referenced possible evaluations of health impacts, sweetened-beverage purchases, hot-food purchases, and feedback from SNAP communities. ECF No. 17-7 at GOV499. FNS questioned whether Colorado could lawfully collect health data. It also questioned how Colorado would obtain reliable purchase data, including whether purchases were made with SNAP benefits or other payment methods. ECF No.17-7 at GOV501. Colorado does not appear to have answered those questions, yet USDA approved the waiver on August 4, 2025. ECF No. 17-2 at GOV015. The undated evaluation in the record simply mirrors the original waiver submission and does not address those unresolved issues. ECF No. 17-3 at GOV109–14.

**Iowa**: The record includes a contract with Altarum Institute to develop Iowa's evaluation and study design, but that contract was not signed until September 2025—four months after USDA

approved the waiver. ECF No. 17-7 at GOV521–22. Iowa's undated "SNAP Waiver – Evaluation Plan" is marked "draft" and is plainly incomplete. ECF No. 17-3 at GOV119–21. It lists a "Research Question" as Question 1 and a "Project Overview" as Question 2, but provides no actual detail for Question 2 or for how Iowa and national SNAP participants would be identified, contacted, and surveyed. *Id.* No final evaluation plan appears in the record, even though the waiver took effect on January 1, 2026.

**Nebraska**: On April 18, 2025, Nebraska told FNS it was "still working to identify" components of its survey and evaluation. ECF No. 17-8 at GOV691. The "NE Healthy SNAP Evaluation Plan," dated November 2025, appears to be a draft. That draft does not even contain a completed plan: the "Theory of Change" and "Logic Model" figures are blank. No final evaluation plan appears in the Administrative Record, even though the waiver took effect on January 1, 2026.

**Tennessee**: Tennessee's waiver application states that the State "will develop retailer and customer experience surveys to collect data on food purchasing habits, non-SNAP spending, and qualitative data." ECF No. 17-2 at GOV067. But the rest of the record indicates that Tennessee had done little more than express an intention to create an evaluation plan. USDA, nonetheless, approved the waiver on September 29, 2025, and the record contains no later material showing that Tennessee ever developed a meaningful evaluation framework.

**West Virginia**: West Virginia's application proposed an evaluation that included health outcomes. But in comments dated May 15, 2025, FNS discouraged that approach, explaining that changing health outcomes is a long-term goal, so it instead urged the State to measure soda consumption. ECF No. 17-8 at GOV743. Consistent with that guidance, West Virginia's November 2025 Evaluation Plan does not include any measure of health outcomes.

24

The record also demonstrates the arbitrary nature of Defendants' decision making in more specific ways. For example, in reviewing Iowa's waiver, FNS requested "health data specific to Iowa." ECF No. 17-7 at GOV593. It did not make the same request of Colorado or Tennessee, even though those states likewise failed to include comparable data in their submissions. And there is no indication that Iowa ever provided the requested data before its waiver was approved. The same inconsistency appears in FNS's treatment of evaluation design. In communications with Iowa and Nebraska, FNS raised concerns about the absence of a control group—a basic feature of any evaluation intended to generate meaningful comparative data. ECF No. 17-7 at GOV591; ECF No. 17-8 at GOV691. But in its communications with Colorado, Tennessee, and West Virginia, FNS did not raise that issue at all, despite the same apparent deficiency. There is simply no record-based explanation for the varying ways each State drew its food restrictions. Defendants argue that Congress viewed pilot programs with differing state approaches as desirable as a policy matter. Def. Br. at 17. But that misses the point. The problem is not merely that the waivers vary from State to State; it is that each waiver redraws the statutory definition of "food" in a different and unsupported way, such that the restrictions "lack[] anything resembling a sound nutritional basis for these changes." Pls. Br. at 22. The record confirms that these distinctions rest on no discernible nutritional principle and reflect a chaotic, unreasoned approach.

Finally, the Administrative Record includes evidence that cuts against the waivers' basic premise that restricting benefits will improve health outcomes. A 2024 report in the record recommends "Decreas[ing] Food and Nutrition Insecurity While Improving Nutritional Quality of Available Foods" by "*Enhanc[ing] SNAP Benefits*." ECF No. 17-6 at GOV449 (emphasis added). It further urges Congress to "oppose any legislative or regulatory efforts that would effectively limit SNAP eligibility or that would diminish or create any other barriers to participating." ECF

25

No. 17-6 at GOV449. By narrowing what recipients may purchase with SNAP benefits and thereby creating additional barriers to effective participation, the challenged waivers run directly counter to that guidance.

### D. Defendants have failed to acknowledge or justify the reversal from prior policy to not approve food restriction waivers.

Defendants' effort to sidestep their complete reversal from prior policy, without offering any justification, further confirms that their position is arbitrary and capricious. Agency action is arbitrary and capricious when it "departs from established precedent without a reasoned explanation." *ANR Pipeline Co.*, 71 F.3d at 901. This applies here.

For years, USDA maintained a consistent policy against approving food-restriction waivers of the kind at issue in this case. In 2007, USDA issued guidance titled "Implications of Restricting the Use of Food Stamp Benefits."[22] That guidance criticized the suggestion "that food stamp recipients should be prohibited from using their benefits to buy foods with limited nutritional value," and concluded that "there are serious problems with the rationale, feasibility and potential effectiveness of this proposal." *Id.* at 1. USDA identified several "serious concerns" with such proposals, including that there are no clear standards for defining foods as good or bad, healthy or unhealthy; that food restrictions would create major implementation challenges and increase program complexity and cost; that restrictions might not change participants' purchasing behavior; and that there was no evidence that food stamp benefits themselves caused poor food choices or negative dietary outcomes such as obesity. *Id.*

Before 2025, USDA consistently denied state efforts to restrict the foods that SNAP participants could purchase on the grounds at issue here. In 2004, USDA denied Minnesota's

---

[22] *See, e.g.*, *Implications of Restricting the Use of Food Stamp Benefits*, U.S. DEP'T OF AGRIC., FOOD & NUTRITION SERV. at 1–2 (Mar. 1, 2007), https://fns-prod.azureedge.us/sites/default/files/FSPFoodRestrictions.pdf.

request to "modify eligible foods under SNAP" by prohibiting the purchase of candy and soft drinks.[23] In 2010, USDA denied New York City's request to exclude sugar-sweetened beverages.[24] In 2018, USDA denied Maine's request to exclude sugar-sweetened beverages and candy. ECF No. 9-9, Exs. 13-14. That same year, USDA denied Nevada's request to restrict sugar-sweetened beverages. ECF No. 9-9, Ex. 15. And as recently as 2024, USDA denied Iowa's request to exclude "cultivated-protein food products" from SNAP eligibility.[25]

Ignoring that history, Defendants approved twenty-two state food-restriction waiver requests, including the five challenged here. But neither the approvals themselves nor Defendants' brief offer any explanation for that reversal. Defendants do not meaningfully address the longstanding agency position reflected in the 2007 guidance. They do not explain why the concerns USDA previously identified no longer apply. And they do not explain why requests the agency had repeatedly rejected for years are now suddenly permissible. Instead, Defendants dismiss the issue in a single conclusory sentence unsupported by facts or authority. *See* Def. Br. at 20.

That is not reasoned decision making. An agency that chooses to change course must acknowledge the change and give a reasoned explanation for it. Defendants did neither. Their unexplained reversal from prior policy is further evidence that USDA approved these waivers

---

[23] Ex-1, Letter from Ollice C. Holden, Regional Administrator, Supplemental Nutrition Assistance Program, Food & Nutrition Serv., U.S. Dep't of Agric. to Maria Gomez, Assistance Commissioner, Economic and Community Support Strategies, Minnesota Dep't of Human Services (May 4, 2004), https://www.scribd.com/document/335678672/USDA-s-2004-letter-rejecting-Minnesota-s-proposed-changes-to-food-stamps (last accessed Apr. 15, 2026).

[24] Ex- 2, Letter from Jessica Shahin, Associate Administrator, Supplemental Nutrition Assistance Program to Elizabeth Berlin, Executive Deputy Comm'r, New York State Office of Temporary and Disability Assistance (August 19, 2011).

[25] Ex-3, Letter from Catherine Buhrig, Assoc. Adm'r, Supplemental Nutrition Assistance Program, Food & Nutrition Serv., U.S. Dep't of Agric., to Stacie Gordon, Bureau Chief, Div. of Cmty. Access & Eligibility, Iowa Dep't of Health & Human Servs. (July 12, 2024), https://aglaw.psu.edu/wp-content/uploads/2025/01/29-Letter-Iowa-SNAP-Denial-7.12.24.pdf (last accessed Apr. 15, 2026).

without the reasoned analysis the APA requires. For that reason alone the approvals must be set aside.

## IV. THE WAIVERS WERE REQUIRED TO UNDERGO NOTICE-AND-COMMENT BEFORE IMPLEMENTATION.

The waivers were required to undergo notice and comment before implementation, and USDA's failure to provide that process constitutes an independent APA violation. 5 U.S.C. § 706(2)(D); *Cabrera v. Mayorkas*, 792 F. Supp. 3d 91, 102 (D.D.C. 2024).

Defendants' interpretation of 7 C.F.R. § 282.1(b) and the term "significant impact" is not entitled to any deference. First, Defendants' reliance on *Auer* deference is unavailing. Def. Br. at 21 (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)). Even if *Auer* deference survived *Loper Bright*,[26] *Kisor v. Wilkie*, 588 U.S. 558 (2019) sharply limits when such deference may apply. For Defendants to be entitled to *Auer* deference, the Court must find that the term "significant impact" is "genuinely ambiguous" after "exhaust[ing] all the 'traditional tools' of construction" and after carefully considering "the text, structure, history, and purpose of [the] regulation, in all the ways it would if it had no agency to fall back on." *Id.* at 575. Moreover, even if genuinely ambiguous, deference may be "'unwarranted' . . . when a court concludes that an interpretation does not reflect an agency's authoritative, expertise-based, 'fair[, or] considered judgment.'" That is, "a court should decline to defer to a merely 'convenient litigating position' or '*post hoc* rationalizatio[n] advanced' to 'defend past agency action against attack.'" *Id.* at 579 (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155-6 (2012)). Here, as discussed below, the term

---

[26] *See, e.g.*, Matthew P. Allen, *A Matter of Deference*, AM. BAR ASS'N (Mar. 3, 2025), https://www.americanbar.org/groups/litigation/resources/newsletters/securities/a-matter-of-deference-auer-chevron/ (last accessed Apr. 15, 2026); Henry Dai, *Loper Bright Means Auer's Demise, Too*, NEW CIV. LIBERTIES ALL. (Sept. 5, 2025), https://nclalegal.org/loper-bright-means-auers-demise-too (last accessed Apr. 15, 2026).

28

"significant impact" is not genuinely ambiguous, and even if it was, Defendants' position does not reflect the agency's authoritative, expertise-based judgment.

There is no genuine ambiguity that the waivers apply statewide and affect *every* SNAP recipient[27] and *every* authorized SNAP retailer[28] in each State. Under those circumstances, it is not plausible to characterize these projects as having no "significant impact on the public." As in *Minnesota*, the waivers affect hundreds of thousands of participants, thousands of retailers, and threaten to impede the use of SNAP benefits on a statewide basis. *Minnesota* held that a demonstration project that would "require Minnesota to violate USDA regulations [to implement], and threatens to impede the SNAP benefits of all Minnesotans" has a "significant impact on the public." *Minnesota*, No. 25-cv-04767, 2026 U.S. Dist. LEXIS 8851, at *33.

The closest USDA comes to exercising any judgment on this issue is a December 30, 2025 informational memo that belatedly asserts the General Notice Rule does not apply, without any meaningful analysis of the waivers' impact on recipients and retailers, based on an unduly narrow view of "significant impact" limited to eligibility, allotment levels, and access to staple foods. GOV000190-1. Defendants' assertion that their belated and cursory "significant impact" analysis deserves deference is, therefore, meritless. This conclusion is reinforced by USDA's failure to

---

[27] Nebraska has 138,013 SNAP recipients, West Virginia has 255,901, Iowa has 252,435, Colorado as 590,753, and Tennessee has 629,537. *SNAP Data Tables*, USDA FOOD & NUTRITION SERV., https://www.fns.usda.gov/pd/supplemental-nutrition-assistance-program-snap (linking to SNAP participant data as of Mar. 13, 2026, https://fns-prod.azureedge.us/sites/default/files/resource-files/snap-persons-3.pdf) (last accessed Apr. 15, 2026). Plaintiffs ask the Court to take judicial notice of the facts contained within the USDA's own website as it is a government website. *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013).

[28] Nebraska has 1,435 authorized SNAP retailers, West Virginia has 2,167, Iowa has 3,071, Colorado has 3,207, and Tennessee has 6,836. *SNAP Retailer Management Year End Summary FY 2024*, USDA FOOD & NUTRITION SERV., https://www.fns.usda.gov/data-research/data-visualization/snap-retailer-management-dashboard-fy24 (last accessed Apr. 15, 2026).; Plaintiffs ask the Court to take judicial notice of the facts contained within the USDA's own website as it is a government report. *Cannon*, 717 F.3d at 205 n.2.

seriously address the factors courts evaluate to determine whether a Section 2026 project is likely to have a significant impact on the public, such as the number of people affected, the project's duration, and the strain on state resources. For example, in *Colorado v. Trump*, the court held that USDA's claim that the project "would not likely 'have a significant impact on the public'" was "simply not credible." No. 1:25-cv-03428, 2026 U.S. Dist. LEXIS 57115, at *40 (D. Colo. Mar. 16, 2026). The court emphasized that more than 100,000 households in five of the State's 64 counties would be affected and stated that the State's resources would be strained. *Id.* at *15, 17. It also found USDA's position "directly at odds with the agency's assertions that the project's purpose is to uncover substantial benefits fraud," reasoning that "[i]f the project is significant enough to expose widespread fraud, and important enough to enforce with sanctions, it is necessarily significant enough to require notice to stakeholders and the public." *Id.* at *17. The court therefore concluded that USDA's contrary position "reflects not a reasoned determination, but an attempt to evade its notice-and-comment obligations altogether." *Id.*

For these reasons, USDA's interpretation that these waivers will not have a significant impact on the public does not reflect the agency's authoritative, expertise-based judgment.  It is "'axiomatic' . . . that an agency is bound by its own regulations." *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quoting *Panhandle E. Pipe Line Co. v. FERC*, 613 F.2d 1120, 1135 (D.C. Cir. 1979) (holding that an agency does not have authority to "play fast and loose with its own regulations")). Agency action that fails to "comply with those regulations" should be set aside as arbitrary and capricious. *Id.* (quoting *Environmentel, LLC v. FCC*, 661 F.3d 80, 85 (D.C. Cir. 2011)). Nor is deference  owed to post hoc rationalizations or to agency reasoning that lacks a contemporaneous, reasoned explanation. *Bowen v. Georgetown Univ.*

*Hosp.*, 488 U.S. 204, 212 (1988); *Minnesota*, No. 25-cv-04767, 2026 U.S. Dist. LEXIS 8851, at *45 (citing *Motor Vehicle Mfrs.*, 463 U.S. at 43).

Those principles apply here. "Significant impact" should be given its ordinary meaning, not artificially narrowed to projects that affect only "SNAP eligibility, allotment levels, or access to staple foods." *See* Def. Br. at 21. It is not plausible to say a project lacks significant public impact when it affects statewide SNAP participants and retailers, imposes substantial implementation costs, threatens retailer participation, and is defended as advancing broad goals like "improving nutrition," all while attaching harsh penalties for even inadvertent noncompliance.

USDA also failed to follow the required procedure. Under the regulation's 30-day requirement, the agency had to determine before the Federal Register deadline whether each waiver was likely to have a significant impact on the public. Its later justification for nonpublication was an impermissible post hoc rationalization and therefore contrary to the APA.[29]

Defendants are also wrong that 7 C.F.R. § 282.1(b) does not require notice and comment. The regulation is plain and clearly calls for comments:

> If significant comments are received in response to this General Notice, the Department will take such action as may be appropriate prior to implementing the project. If the operational procedures contained in the General Notice described above are significantly changed because of comments, an amended General Notice will be published in the Federal Register at least 30 days prior to the initiation of the demonstration project, except where good cause exists supporting a shorter effective date. . . The amended General Notice will also explain the basis and purpose of the change.

7 C.F.R. § 282.1(b). The regulation not only requires notice and an opportunity for comment but also directs the agency to consider those comments and, if it makes changes in response, to publish

---

[29] Tennessee's waiver is set to take effect on July 31, 2026, which means USDA must publish notice and allow for comment by July 1, 2026, if it intends to comply with its own regulation. Failure to do so would constitute the same APA violation again.

31

an additional General Notice in the Federal Register. This notice-and-comment requirement has been confirmed by courts. *See Colorado*, No. 1:25-cv-03428, 2026 U.S. Dist. LEXIS 57115, at *39 (concluding that 7 C.F.R. § 282.1(b) "require[s] USDA to follow notice-and-comment procedures for any project that 'will likely have a significant impact on the public'"); *Minnesota*, No. 25-cv-04767, 2026 U.S. Dist. LEXIS 8851, at *28.

USDA's failure to provide a formal notice and comment period is not harmless. *Minnesota*, No. 25-cv-04767, 2026 U.S. Dist. LEXIS 8851, at *33 ("Again, that regulation is not mere box-checking" but "ensures that . . .the [USDA] hears from those affected by the proposed Section 2026 project and considers whether to 'adjust or abandon [its] proposals in light of public comments or internal agency reconsideration'") (quoting *Kooritzky v. Reich*, 17 F.3d 1509, 1513 (D.C. Cir. 1994) and citing 7 C.F.R. § 282.1(b)). Plaintiffs and affected retailers would have commented on the impact the waivers have had, or will have, on them, other SNAP recipients, and SNAP-participating retailers. Johnson Decl. ¶ 21; Starks Decl. ¶¶ 18–19; Craig Decl. ¶ 36; Aragon Decl. ¶ 14; Fleming Decl. ¶ 18; Hoffer Decl. ¶ 16.

## V.    THE COURT SHOULD PERMANENTLY ENJOIN THE CHALLENGED WAIVERS.

To obtain a permanent injunction, Plaintiffs must show: "(1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Conservation Law Found. v. Roe*, 422 F. Supp. 3d 12, 31 (D.D.C. 2019) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (internal quotation marks omitted)). Plaintiffs satisfy each requirement. The record shows ongoing irreparable harm to Plaintiffs' health, nutrition, and household finances; damages cannot remedy

32

those injuries; and the balance of equities and public interest favor restoring the longstanding federal SNAP framework and halting unlawful agency action.

### A. Plaintiffs suffer irreparable injury and the balance of equities compels a permanent injunction.

Defendants do not seriously rebut Plaintiffs' showing that they face two principal forms of irreparable injury: (1) the waivers deny them access to the full SNAP benefits to which they are lawfully entitled, thereby harming their nutrition, health, and medical stability, and (2) they force Plaintiffs to use scarce household funds, where available, to purchase restricted foods and beverages, resulting in nonrecoverable economic loss. Pls. Br. at 27–31. Defendants' attempt to characterize the waivers as a "mere limitation" on how SNAP benefits may be used, Def. Br. at 24, misstates both the record and the law. Plaintiffs submitted declarations establishing that the waivers prevent them from using SNAP benefits to purchase foods and beverages they need to manage diabetes, chronic kidney disease, severe allergies, and ARFID—and, in some instances, to eat at all. See Johnson Decl. ¶¶ 9–19; Craig Decl. ¶¶ 23–35; Fleming Decl. ¶¶ 12–15; Aragon Decl. ¶¶ 11–13; Starks Decl. ¶¶ 14–17. Plaintiffs are legally entitled to use their SNAP benefits to purchase foods now barred by these unlawful waivers. *See supra* Sections II–IV. Courts routinely recognize that deprivation of food and other basic necessities—the precise harm established here—constitutes irreparable injury. *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d at 43; *Garnett v. Zeilinger*, 313 F. Supp. 3d 147, 157 (D.D.C. 2018); *Haskins v. Stanton*, 794 F.2d 1273, 1276–77 (7thCir. 1986); *Booth v. McManaman*, 830 F. Supp. 2d 1037, 1043 (D. Haw. 2011).

That conclusion is even stronger here because Plaintiffs' dietary needs are medical and practical necessities, not matters of preference. *Garnett*, 313 F. Supp. 3d at 157 (recognizing that the risk of hunger " is "particularly true for recipients with dietary restrictions, for whom finding food can be particularly burdensome"). Plaintiff Johnson's daughter depends on several restricted

items as her "safe foods" that her physician has encouraged her to eat because, without them, she may not eat at all. Johnson Decl. ¶¶ 9–15, 17. Plaintiff Aragon relies on small sugary beverages such as soda as the quickest and most reliable way to raise dangerously low blood sugar while working. Aragon Decl. ¶¶ 7–12. Plaintiff Fleming's dietitian recommended low- or no-sugar energy drinks as his only safe source of caffeine to enable him to attend medical appointments. Fleming Decl. ¶¶ 9–16. Plaintiff Craig's health deteriorated because the waiver pushes him toward higher-sugar, higher-sodium foods and away from beverages that help him stay hydrated. Craig Decl. ¶¶ 23–35. And Plaintiff Starks has no extra funds to purchase restricted beverages and already experienced an erroneous point-of-sale denial. Starks Decl. ¶¶ 14–17.

Defendants likewise do not respond to Plaintiffs' showing that the waivers' vague and inconsistent rules inflict irreparable harm. Plaintiffs have shown that confusing product definitions, retailer-by-retailer variation, and mistaken denials deter lawful use of SNAP benefits and expose recipients to the loss of benefits through no fault of their own. *See* Craig Decl. ¶ 28; Starks Decl. ¶¶ 16–17. A "chilling effect" on the use of public benefits is itself irreparable harm.[30] *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020). So, too, is interference with medically necessary treatment. *Smith v. Aroostook Cty.*, 922 F.3d 41, 42 (1st Cir. 2019); *Pesce v. Coppinger*, 355 F. Supp. 3d 35, 48 (D. Mass. 2018). And where, as here, lost meals and hunger predictably threaten health, the injury is immediate and irreparable. *R.I. State Council of Churches v. Rollins*, 158 F.4th 304, 316 (1st Cir. 2025). Defendants do not meaningfully engage with any of those points.

---

[30] The "chilling effect" on SNAP recipients' benefit use is compounded by the fact that retailers, seeking to avoid enforcement consequences, are erring on the side of caution and rejecting SNAP purchases that may, in fact, be allowable. *See* Hoffer Decl. ¶ 13 ("Weigel's is forced to err on the side of restricting products to avoid inadvertent violations.").

Plaintiffs also established nonrecoverable economic harm. Because the APA does not provide money damages, every dollar Plaintiffs are forced to divert from gas, rent, utilities, car insurance, and other household necessities to purchase restricted foods and beverages is gone for good. *See* Craig Decl. ¶ 33; Fleming Decl. ¶¶ 15–16; Aragon Decl. ¶ 13. That, too, is irreparable harm. *Garnett*, 313 F. Supp. 3d at 157; *Kildare v. Saenz*, 325 F.3d 1078, 1083 (9th Cir. 2003); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *Rest. Law Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023).

Defendants' dismissive suggestion that "if [Plaintiffs] desire options that are not SNAP eligible, they may use other funds to purchase those," Def. Br. at 24, ignores the practical reality of Plaintiffs' lives as established in the record. Defendants' refrain that SNAP is only "supplemental" is no answer in the face of consistent court determinations that SNAP is a subsistence benefit. *See, e.g.*, *Bliek v. Palmer*, 916 F. Supp. at 1488; *Philadelphia Welfare*, 525 F. Supp. at 1058 (citing *Mathews*, 42 U.S. at 340). The record establishes that SNAP is the primary, and often sole, means by which Plaintiffs obtain food, and that there are no spare funds waiting in the wings. *See* Johnson Decl. ¶ 18; Craig Decl. ¶¶ 8, 17; Fleming Decl. ¶ 4. Forcing Plaintiffs to reallocate scant household funds to purchase medically necessary foods and beverages that are restricted under the waivers is irreparable harm. *Garnett*, 313 F. Supp. 3d at 157 (finding irreparable harm to SNAP recipients who lost benefits, and for whom obtaining food "comes at the cost of paying for other necessary survival expenses, such as rent, electric bills, or phone bills").

Rather than engage with the record or the governing case law on irreparable harm, Defendants dismiss Plaintiffs' injuries as "minimal[]" asserting that Plaintiffs are only "minimally harmed by the limits on which food options are eligible." Def. Br. at 24. That characterization cannot be reconciled with the record. As established in the Plaintiffs' declarations—which

Defendants fail to meaningfully address—the food-restriction waivers do not impose trivial inconveniences.[31] Rather, they prevent Plaintiffs from purchasing foods and beverages that they need to manage chronic health conditions, maintain adequate nutrition, and avoid diverting scarce household funds from other essentials. This harm is ongoing each day that the waivers remain in effect, which supports the need for injunctive relief.[32]

Defendants' silence on Plaintiffs' cited authorities is telling. Beyond reciting the general standard from *Wisconsin Gas*, Defendants do not cite, much less attempt to distinguish, the cases Plaintiffs cite that recognize hunger, interference with medical care, deterrence from using public benefits, and nonrecoverable subsistence losses as irreparable harm.[33]

Legal remedies at law are inadequate for the same reasons that Plaintiffs' injuries are irreparable. The APA does not include a damages provision to compensate Plaintiffs for food they

---

[31] Defendants' discussion of Plaintiffs Aragon and Starks is especially revealing. As to Plaintiff Aragon, Defendants point out that she sometimes uses juice boxes and speculates that fruit or other foods may also raise blood sugar. ECF No. 19 at 24. But Defendants do not dispute her testimony that small, sugary beverages are the quickest and most reliable means of managing her diabetes, or that the waiver makes it more difficult for her to purchase those drinks because she is prevented from purchasing many of the most effective beverages she uses. Aragon Decl. ¶¶ 8–13. As to Plaintiff Starks, Defendants dismiss their injury as a preference for beverages "more suitable to their tastes." Def. Br. at 24. That characterization ignores Plaintiffs Starks's declaration that they do not have additional funds to purchase restricted beverages and that they have already experienced point-of-sale denials for an allowable beverage because the waiver is so confusing for both recipients and retailers. Starks Decl. ¶¶ 15–17. Defendants thus do not rebut Plaintiffs' irreparable harm showing; they simply attempt to minimize it.

[32] In this Circuit, delay alone does not defeat injunctive relief in any event. *See Gordon v. Holder*, 632 F.3d 722, 724–25 (D.C. Cir. 2011) ("[A] delay in filing is not a proper basis for denial of a preliminary injunction.").

[33] Defendants cite *Garnett v. Zeilinger*, 323 F. Supp. 3d 58 (D.D.C. 2018) to argue that the Court's injury inquiry for standing is different than its irreparable injury determination. So stipulated. To argue irreparable harm, however, Plaintiffs cited *Garnett v. Zeilinger*, 313 F. Supp. 3d 147, 157 (D.D.C. 2018)—a different decision in the same case. In the *Garnett* decision cited by Plaintiffs, the court held that "forgoing food or other necessities" is irreparable harm. *Id*. at 157. Defendants do not distinguish this case from the *Garnett* decision on irreparable harm, or any other case that Plaintiffs cite on irreparable harm.

could not purchase with their benefits, money diverted from basic household needs, or health deterioration caused by the waivers. Missed meals cannot be repaid after the fact. Medical destabilization cannot be fully undone. And household funds spent on previously covered food are gone permanently. *See supra* at Section I.A-B. Because the injuries here are ongoing, immediate, and not compensable through money damages, equitable relief is necessary.

The balance of hardships and the public interest both favor an injunction. Plaintiffs face hunger, worsening health, disruption of medically necessary diets, confusion at the point of sale, and unrecoverable economic loss. By contrast, Defendants identify only the asserted inconvenience of enjoining waivers that USDA chose to approve and implement despite the legal and practical problems those waivers created. Defendants argue that an injunction would cause "whiplash" because retailers and recipients have already begun preparing for the waivers and incurring costs to implement them. Def. Br. at 24–25. But that argument has it backwards. There is no public interest in perpetuating unlawful agency action, and Defendants cannot create an equitable defense by pointing to implementation burdens that flow from its own decisions. Plaintiffs seek to restore the uniform federal SNAP rules that governed for decades before USDA approved these waivers. An injunction would not create a new regime; it would halt a confusing patchwork of state-by-state restrictions while the Court grants relief on the merits.

That is especially true because retailers face ongoing burdens. The waivers require retailers to reprogram point-of-sale systems, interpret and apply unclear product definitions, absorb ongoing compliance costs, and operate under the threat of serious enforcement consequences, including disqualification from SNAP for repeated errors. *See* Hoffer Decl. ¶ 9 ("Because we update our SKUs weekly, compliance will require a continual and massive operational effort, including reviewing inventories, coordinating with wholesalers, and revising software and point-

37

of-sale systems."); *id.* at ¶ 10 ("The State has provided no clear guidance or direction on implementation. When asked for help, the State's response was simply that retailers 'will figure it out.'); *id.* at ¶¶ 11–14 (explaining that uncertainty created by the Tennessee waiver burdens store clerks who must "police" customer purchasers, forces Weigel's to over restrict products to avoid inadvertent violations, and fosters unfair competitive advantages among competitor retailers); ECF No. 1 ¶¶ 177–87. Those burdens are not a reason to keep the waivers in place; they are a reason to enjoin them. Defendants' sunk-cost argument misses the mark because these costs are not sunk. In reality, they are ongoing and potentially prohibitive. Hoffer Decl. ¶ 15 ("Ultimately, the work and expense required to comply may be so prohibitive that it outweighs the benefit of remaining a SNAP-participating retailer, which would severely harm food access for the Tennessee communities we serve."). Retailers are better served by an injunction restoring a single, uniform rule than by continued exposure to mounting compliance costs, checkout confusion, and harsh penalties under a patchwork regime. *See Id.* at ¶¶ 8–9 (describing current standardized nationwide practice of SNAP coding and explaining that "compliance will require a continual and massive operational effort").

The authorities Plaintiffs cited—and that Defendants virtually ignore—confirm the point. Defendants cannot claim cognizable harm from an injunction that halts unlawful agency action, and the public interest is served when agencies are required to comply with the APA and the statutory limits on their authority. *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020); *Open Cmties. Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017); *Creosote Council v. Johnson*, 555 F. Supp. 2d 36, 40 (D.D.C. 2008); *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009). *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12, 19-20 (D.C. Cir. 2016), likewise undercuts Defendants' "whiplash" theory: there is generally no public interest in

38

the continuation of unlawful agency action, and an agency may not rely on disruption or confusion of its own making to avoid injunctive relief.

Finally, an injunction limited to the named Plaintiffs cannot provide complete relief. The challenged waivers apply categorically and statewide to all SNAP recipients and to each authorized retailer in that waiver State. The waivers are implemented through retailer point-of-sale systems at the product-code level and contain no mechanism for individualized exemptions. A plaintiff-specific injunction would therefore require retailers to process the named Plaintiffs' SNAP transactions differently from all other SNAP transactions in the same stores under the same waiver. That would not be administrable and would only increase the onerous costs of the program for retailers, while resulting in confusion, errors, and wrongful denials. The only workable way to provide complete relief is to enjoin enforcement of the waivers themselves.

### B. Vacatur is an appropriate remedy.

Defendants' fallback request for remand without vacatur should be denied. This is not a case involving a minor explanatory gap[34] that USDA may readily cure on remand. Defendants expressly say USDA is "capable of elaborating upon the bases of its decisions" and should be

---

[34] Defendants' remand-without-vacatur authorities do not fit this case. Those decisions involved agency actions suffering from remediable explanatory defects where the court could reasonably conclude the agency might supply a lawful rationale on remand without reopening the substance of the decision. *See, e.g.*, *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009); *Williston Basin Interstate Pipeline Co. v. FERC*, 519 F.3d 497, 504 (D.C. Cir. 2008); *In re Core Commc'ns, Inc.*, 531 F.3d 849, 861 (D.C. Cir. 2008); *WorldCom, Inc. v. FCC*, 288 F.3d 429, 434 (D.C. Cir. 2002). Here, by contrast, Plaintiffs challenge defects that go to the lawfulness of the approvals themselves: USDA exceeded the limits Congress placed on Section 2026 waivers, approved projects without the evaluation the statute requires, and bypassed the pre-implementation public process required by 7 C.F.R. § 282.1(b). Defendants' request for "another opportunity" to "elaborat[e] upon the bases of [USDA's] decisions" is therefore not a request to clarify a valid action, but to preserve unlawful waivers while the agency attempts to supply a better rationale after the fact. ECF No. 18-1 at 26–27; *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943).

given "another opportunity" to do so if the Court finds the approvals inadequately supported. Def. Br. at 27. That is a request for a do-over in so many words. But under the APA, courts "shall" hold unlawful and set aside agency action that is arbitrary, capricious, contrary to law, or taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C)-(D). Where an agency has exceeded its authority and bypassed required procedure, the proper remedy is vacatur, not preservation of unlawful action while the agency tries again.

The first *Allied-Signal* factor—the seriousness of the rule's deficiencies—strongly favors vacatur. *Allied-Signal v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). Defendants do not identify a discrete technical omission that can be clarified without revisiting the approvals themselves. Instead, they ask to preserve the waivers while USDA improves its rationale after the fact. That is especially inappropriate here because the defects Plaintiffs identify are not merely explanatory: USDA exceeded the limits Congress placed on Section 2026 waivers, approved projects without the evaluation the statute requires, and bypassed the pre-implementation process required by 7 C.F.R. § 282.1(b). To the extent the Administrative Record fails to supply a clear contemporaneous basis for the approvals, that only confirms the problem; remand without vacatur is not a vehicle to let the agency supply a better rationale later. *See Chenery*, 318 U.S. at 87–88.

The same is true of the procedural defect. Defendants argue that USDA did not have to provide notice and comment, and that any failure to comply with 7 C.F.R. § 282.1(b) was harmless because the waivers were publicized elsewhere. But publicity is not procedure. As Plaintiffs have explained, the regulation exists to ensure that when USDA undertakes a demonstration project with a significant impact on the public, the agency hears from affected recipients, retailers, and other stakeholders before implementation, and considers whether to adjust or abandon the proposal in

40

light of that input. *See Minnesota*, No. 25-cv-04767, 2026 U.S. Dist. LEXIS 8851, at \*33–34. USDA's failure to follow that required process is not a mere explanatory defect; it is part of what makes the approvals unlawful. That defect cannot be cured by leaving the waivers in place while USDA reconstructs the decision-making it should have already undertaken.

The second *Allied-Signal* factor also favors vacatur. *Allied-Signal*, 988 F.2d at 150–51 (describing the second factor as "the disruptive consequences of an interim change that may itself be changed"). Defendants' disruption argument reduces to sunk costs: states, retailers, and recipients have already invested time and money in implementing these waivers. But sunk costs do not justify preserving unlawful agency action, and the real disruption comes from the waivers themselves. Retailers have already incurred significant compliance costs, those burdens will continue while the waivers remain in effect, and Defendants identify no concrete reliance interest sufficient to justify maintaining them. *See supra* Section V.A. Vacatur would end those ongoing harms; remand without vacatur would prolong them.

Finally, equitable considerations weigh decisively against remand without vacatur because no later explanation will change the central reality that these waivers are already harming people with specific dietary, medical, and household needs now. Defendants' proposed remedy would force recipients and retailers to continue living under unlawful restrictions while USDA attempts to improve the paper trail. If the Court concludes that USDA exceeded its authority, acted arbitrarily and capriciously, or failed to observe procedure required by law, the waivers should be set aside and vacated.

### C. USDA waived opposition to Plaintiffs' request for APA relief.

Defendants forfeited any developed opposition to Plaintiffs' request for declaratory and set-aside relief under the APA. Plaintiffs sought the APA's ordinary remedy: an order declaring

41

USDA's approval of the food-restriction waivers unlawful and setting them aside as contrary to the Food and Nutrition Act, arbitrary and capricious, and procedurally unlawful. Pls. Br. at 16-25. Although Defendants acknowledge that Plaintiffs seek injunctive and declaratory relief under the APA, ECF No. 19 at 6, they never argue declaratory relief is unavailable, address § 706's command that unlawful final agency action be set aside, or explain why these waivers should remain in force if USDA acted unlawfully.

Instead, Defendants argue only that no injunction should issue and, failing that, seek remand without vacatur. Def. Br. at 23, 25–27. That is not a meaningful response to Plaintiffs' request for APA merits relief, which is especially appropriate here because the waiver approvals are final, operative agency actions already restricting SNAP purchases and suffering from defects that go to their core validity: USDA exceeded its statutory authority, acted arbitrarily and capriciously, and failed to follow required notice-and-comment procedure. Pls. Br. at 16–25. The Court should therefore declare the approvals unlawful and set them aside, not leave them in place while USDA attempts to justify them later, and treat any opposition to that relief as forfeited.

## CONCLUSION

For the foregoing reasons, the Court should declare the challenged food restriction waivers unlawful, permanently enjoin their enforcement, grant Plaintiffs' motion for summary judgment, and deny Defendants' cross-motion for summary judgment.


Date: April 15, 2026
New York, New York

Respectfully submitted,

 /s/ *Meegan Hollywood*
Meegan F. Hollywood (NY0206)
Jeffrey I. Shinder (*pro hac vice*)
Ellison A. Snider (*pro hac vice*)

Shinder Cantor Lerner LLP
14 Pennsylvania Plaza, 19th Floor
New York, NY 10122
(646) 960-8601
meegan@scl-llp.com
jeffrey@scl-llp.com
esnider@scl-llp.com

Lindsay R. Maher (*pro hac vice*)
Shinder Cantor Lerner LLP
600 14th St. NW, 5th Floor
Washington, D.C. 20005
lmaher@scl-llp.com

Katharine Deabler-Meadows (*pro hac vice*)
Ciara Wren Malone (*pro hac vice*)
National Center for Law and Economic
Justice
50 Broadway, Suite 1500
New York, NY 10004
(212) 633-6967
deabler@nclej.org
malone@nclej.org

43