**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NIEVES ARAGON, *et al.*,<br><br>              Plaintiffs,<br><br>     v.<br><br>BROOKE ROLLINS, in her official capacity as Secretary of Agriculture, *et al.*,<br><br>              Defendants. | Case No.  1:26-cv-00861-ABJ |

**DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO
<u>DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

ARGUMENT....................................................................................................................... 2

    I.      Plaintiffs Lack Standing By Failing to Demonstrate Any Injury Under *Weissman*.  2

    II.    Each of Plaintiffs' Claims Still Fail on The Merits, Thus Defendants Are Entitled to Summary Judgment. ...................................................................................... 6

        A.    The Waivers Are Consistent with USDA's Statutory Authority to Conduct Demonstration Projects. ............................................................................. 6

        B.    The Waivers Are Supported by the Administrative Record and Are Not Arbitrary and Capricious.......................................................................... 10

        C.    The Waivers Were Not Required to Undergo Notice and Comment. .......... 21

    III.    Plaintiffs Are Not Entitled to Any Relief. ................................................... 23

CONCLUSION.................................................................................................................. 25

ii

**INTRODUCTION**

The demonstration projects USDA approved in Colorado, Iowa, Nebraska, Tennessee, and West Virginia are all reasonably designed to pilot different approaches testing out the hypothesis that limitations on certain, low-nutrition foods' eligibility for purchase with SNAP benefits might lead to improved nutritional levels amongst SNAP recipients. The Administrative Record demonstrates that USDA, through its sub-agency the Food and Nutrition Service ("FNS"), worked hand-in-hand with the State applicants to develop sound implementation strategies capable of meaningful evaluation. While USDA developed a collegial and cooperative relationship with the States as it provided them with technical assistance to sharpen their applications, smooth out their implementation strategies, and make their evaluations more rigorous, USDA never abdicated its ultimate approval authority or subdelegated any of its power to the States.

The demonstration projects are well within USDA's statutory authority, as it is clear they have the potential to improve SNAP's efficiency at achieving its mission of improving recipients' levels of nutrition for a constant level of benefits (or, said differently, to get more nutritional "bang" for the same "buck"). Moreover, they are designed to improve program administration, increase recipients' self-sufficiency, and test innovative welfare reform strategies. USDA reached determinations that were supported by the information before the agency—that SNAP recipients face worse health outcomes and higher rates of obesity; that it was plausible to improve recipients' nutrition levels through these pilots; that short-term pilots could reveal meaningful insights about long term goals; and that challenges faced by retailers and people with unique health needs could be accounted for by sound strategies and other means. And notwithstanding USDA's reasonable conclusion that the projects would not have significant impacts on SNAP eligibility, allotment, or

1

access to staple foods—thus formal notice was not required—the agency widely publicized the pilot programs elsewhere and Plaintiffs do not dispute they had actual knowledge of them.

For these reasons, and those explained below and in Defendants' opening brief, summary judgment should be granted for Defendants on all counts. If the Court concludes otherwise, it must limit any relief to the narrowest grounds necessary to provide complete relief to each Plaintiff with standing—and each Plaintiff's standing is in question, as none of their benefits have been reduced at all. The only proper remedy in these circumstances would be remand to the agency without vacatur to further explain its reasoning.

## ARGUMENT

### I.   PLAINTIFFS LACK STANDING BY FAILING TO DEMONSTRATE ANY INJURY UNDER *WEISSMAN*.

This case concerns demonstration projects that limit in certain respects what may be purchased with SNAP benefits. It is undisputed that the demonstration projects do "not change SNAP eligibility criteria, allotment levels or access to staple foods." GOV000190 (Administrative Record, ECF No. 17). Thus, the correct standard to evaluate Plaintiffs' standing comes from *Weissman v. Nat'l R.R. Passenger Corp.*, 21 F.4th 854 (D.C. Cir. 2021), a case about government actions that limit a consumer's choices—not *Garnett*, a case concerning SNAP recipients who were not receiving the benefits to which they were entitled, as Plaintiffs advocated for in their original motion. *See* Pls.' Mot., ECF No. 9-1 at 15 (citing *Garnett v. Zeilinger*, 323 F. Supp. 3d 58, 66 (D.D.C. 2018) (*Garnett III*)).

Each of the cases Plaintiffs cite in their latest opposition, *see* Pls.' Br., ECF No. 24 at 1–5, also concern either eligibility or allotment, not limitations on choices. *See Bliek v. Palmer*, 916 F. Supp. 1475 (N.D. Iowa 1996) (allotment); *Atkins v. Parker*, 472 U.S. 115 (1985) (eligibility); *West v. Bowen*, 879 F.2d 1122, 1124 (3d Cir. 1989) (eligibility); *Philadelphia Welfare Rts. Org. v.*

*O'Bannon*, 525 F. Supp. 1055, 1058–59 (E.D. Pa. 1981) (eligibility and allotment); *Davis v. Proud*, 2 F. Supp. 3d 460, 485 (E.D.N.Y. 2014) (allotment). Those cases are inapposite here, where there has been no change to Plaintiffs' eligibility or allotment.

Plaintiffs do not dispute Defendants' assertion that the waivers do not reduce a household's monthly SNAP allotment by even one cent, *see* Defs.' Br., ECF No. 18-1 at 8, but rather claim that it "misses the point." Pls.' Br. at 3. Because the "practical value," of the benefit has changed, Plaintiffs argue that the standard for an outright "deprivation" of SNAP benefits should apply. *Id.* at 2–3. As Defendants explained in their opening brief, however, "the proposition that *any* limitation on a person's range of choices constitutes injury-in-fact is a dubious one." Defs.' Br. at 8. Indeed, in *Weissman*, the plaintiffs asserted a change in the value of the product they were seeking to purchase—in that they could not now decline arbitration. *Weissmann*, 21 F.4th at 859. That was not enough to satisfy Article III's injury-in-fact requirement. Plaintiffs have not experienced the outright deprivation of SNAP benefits that the *Garnett* plaintiffs did, and they are not entitled to the same presumption of injury. *Weissman* is more apposite on the question of whether a governmental limitation on purchasing options constitutes an injury-in-fact.[1]

*Weissman* "analyzed the injury-in-fact requirement by considering whether government action had meaningfully abridged a concrete interest of the plaintiff in accessing the desired product." 21 F.4th at 858. The test for meaningful abridgement accounts for situations like the instant one where plaintiffs allege a change to the "practical value" of the consumer's bargain. *Weissman* suggested two ways that a court can identify whether a government action has meaningfully abridged a plaintiff's concrete interest: first, if it makes the plaintiff's desired

---

[1] While *Garnett* concerned SNAP recipients more specifically than consumers, this question of "who" is ultimately less important to the injury-in-fact inquiry than the question of "what" the injury is that Plaintiffs are actually alleging.

product, as defined by its core features, not readily available, and second, if it renders the product unreasonably priced. *See id.* The pilot programs have not changed either the supply of the food items Plaintiffs desire nor the price, therefore no injury has occurred.

Plaintiffs argue, *see* Pls.' Br. at 5 n.3, that the limitations imposed by the pilots have the effect of limiting each recipient's access to the desired products, therefore the food items are not "readily available" or "[]reasonably priced" relative *to them*. *Weissman*, 21 F. 4th at 858. But as Defendants previously explained, the test is not a relative one focused upon each individual consumer—it is focused upon the "product, as defined by its core features." *Id.* The products have not changed; not in price, not in availability. For this reason, none of the Plaintiffs can establish they have suffered any actual injury.

In another case concerning governmental limitations on consumer choice, *Coalition for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275 (D.C. Cir. 2012) (*Mercury-Free*), plaintiffs alleged "FDA's approval of thimerosal-*preserved* vaccines has made it more difficult and costly for Coalition members to find and obtain thimerosal-*free* vaccines." *Id.* at 1281. The Court held there was no injury-in-fact because "FDA's approval of thimerosal-preserved vaccines [did not] prevent[] [plaintiffs] from purchasing thimerosal-free vaccines altogether. Rather, plaintiffs concede that mercury-free versions are available." *Id.* Like the *Mercury-Free* plaintiffs, plaintiffs here allege that USDA's approval of the State waivers prohibiting the purchase of sugary beverages and other less nutritious food items with SNAP benefits has made it more difficult and costly for them to obtain the products they desire. *See* Pls.' Br. at 3. But also like the *Mercury-Free* plaintiffs, Plaintiffs here acknowledge that they continue to have the option to purchase those products with other funds. *Id.* ("households must . . . spend scarce cash on excluded items. . ..."). For this reason, *Orangeburg v. FERC*, which held that "the lost opportunity to purchase a desired

4

product is a cognizable injury," does not help Plaintiffs argument, *see* Pls.' Br. at 5 n.3, because Plaintiffs here still have the same opportunity as everyone else to purchase the items they desire. *Orangeburg v. FERC,* 862 F.3d 1071, 1078 (D.C. Cir. 2017). The Government has not limited the price or availability of the products Plaintiffs desire, therefore they fail to state a cognizable injury.

Even supposing *Garnett* is the right standard, Plaintiffs' standing would still be in doubt. Again, that case concerned outright deprivations of SNAP benefits; the most favorable case for "deprivation" that Plaintiffs can make is that they have been deprived of access to sugary beverages and other ineligible products. But these are not the types of necessary food items, or "staple foods," as USDA puts it, GOV000190, that the program is built around. Or, in the language of *Weissman*, such food is not the "core feature" of SNAP. Thus, Plaintiffs are not facing circumstances like the *Garnett* plaintiffs who were "unable to obtain enough food for themselves and their families, requiring them to skip meals and go hungry." *Garnett II*, 313 F.Supp. 3d. at 157.[2]

The difference from *Garnett* is particularly salient with respect to Plaintiffs Aragon and Starks. If any Plaintiff lacks standing, Plaintiffs cannot seek relief from the demonstration project in that individual's home State. *See* Defs.' Br. at 7. Plaintiffs accuse Defendants of "speculating that [Aragon] can manage her diabetes with foods other than soda." Pls.' Br. at 4. But it is not speculation at all—it is Plaintiff Aragon's own words: "I often use juice boxes . . . to manage my blood sugar." Aragon Decl. ¶ 8, ECF No. 9-2. Colorado's pilot targets sodas, not juice boxes, and specifically allows beverages with greater than fifty percent fruit juice by volume. GOV000005.

---

[2] While Plaintiffs Craig and Johnson do discuss not obtaining enough food, this is not clearly traceable to the waiver decisions rather than their independent economic circumstances predating the waiver decisions and their attempts—understandable as they may be—to use a supplemental benefit to cover their entire food needs. *See* Craig Decl. ¶ 29, ECF No. 9-3 ("[e]ven before the food restrictions went into effect, I was only eating once a day."); Johnson Decl. ¶18, ECF No. 9-5 ("SNAP is the only money we have to buy groceries."). Again, the total value of food they can purchase using their SNAP benefits remains unchanged. GOV000190.

Indeed, getting recipients to move away from sodas to healthier alternatives like juice boxes is the goal of the pilot programs, and Plaintiff Aragon demonstrates precisely why the hypothesis is well-founded. Since Plaintiff Aragon admits she can find alternatives to manage her blood sugar under the pilot programs, it is clear that she is not facing any actual or imminent injury under any standard, whether it is *Weissman* or *Garnett*.

Plaintiffs also unpersuasively attempt to reframe Plaintiff Starks' injuries as a medical issue rather than one of personal taste. Being "a single parent who works part time and attends school full time" is not a medical condition, however—and desiring "an afternoon source of caffeine that is less excessive than coffee" is not a medical treatment. Pls.' Br. at 4. This is a night and day difference from the type of deprivation experienced by the *Garnett* plaintiffs. And as for her "separate injury" of errantly being denied the option to purchase flavored water with her SNAP benefits, *id*. at 5, this one-off mistake at the point of sale is not traceable to Defendants and is so minor an inconvenience that it is doubtful it is a cognizable Article III injury at all. *See Mercury-Free*, 671 F.3d at 1282 ("the unavailability of [the product] at a few individual outlets does not come close to establishing [injury]").

None of the Plaintiffs has standing, as none has demonstrated an injury resulting from a change in their desired product's price or availability. At a minimum, however, Plaintiffs Aragon and Starks lack standing, and Plaintiffs cannot obtain relief against the waivers granted to Colorado and West Virginia.

II.    **EACH OF PLAINTIFFS' CLAIMS STILL FAIL ON THE MERITS, THUS DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT.**

A. **The Waivers Are Consistent with USDA's Statutory Authority to Conduct Demonstration Projects.**

6

USDA's decision to grant each State's waiver application comported with its authority under the FNA. Plaintiffs' arguments about 7 U.S.C. § 2026(b)(1)(A)—which authorizes pilot projects—and 7 U.S.C. § 2026(b)(1)(B)—which lists permissible pilot project purposes—fail to demonstrate otherwise.[3]

### i.    7 U.S.C. § 2026(b)(1)(A)

USDA is authorized to conduct pilot projects that are "designed to test program changes that might increase the efficiency of [SNAP] and improve the delivery of [SNAP] benefits to eligible households[.]" 7 U.S.C. § 2026(b)(1)(A). This is an undemanding standard affording USDA a great deal of discretion; it only requires that a pilot "might" increase SNAP efficiency or improve benefits delivery. *Id.* Nonetheless, Plaintiffs argue that Defendants have exceeded this authority by conducting a pilot concerning "nutrition [and] policy." Pls.' Br. at 7. These goals are not in tension with efficiency, however; to the contrary, they are synergetic.

Plaintiffs' self-selected definition defines "[e]fficient" as "capable of producing desired results with little or no waste (as of time or materials)." Pls.' Br. at 7 n.4. Thus, to determine whether the pilots seek to improve efficiency, one must necessarily determine what the "desired results" are. Per Congress, those results are better nutrition: The FNA strives "to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011. The waivers fit comfortably within the goal of raising

---

[3] Plaintiffs also assert that Defendants have exceeded their statutory authority because the planned evaluations are allegedly so deficient that they fail to meet the statutory requirement that "the project includes an evaluation to determine the effects of the project." 7 U.S.C. § 2026(b)(1)(B)(i)(II). As there is no genuine dispute that the projects include plans for an evaluation, and Plaintiffs' arguments are grounded in the sufficiency of those evaluations, *see* Pls.' Br. at 11–13, Defendants will address this issue in the arbitrary and capricious section, *infra* Section II.B.iii. To the extent the Court considers this to be a statutory authority issue, however, Defendants rely upon the arguments asserted in Defs.' Br. at 14–15.

levels of nutrition among low-income households. *See* GOV000028 ("SNAP is inefficient at delivering on purpose of 'promoting general welfare and safeguarding health and well-being' and 'alleviating malnutrition' because the program does not regulate the types of items that can be purchased with SNAP benefits." (quoting 7 C.F.R. § 271.1(a))). The statute's requirement that program changes "*might* increase the efficiency of [SNAP]" indicates that a demonstration project is acceptable if it proposes a way of better raising nutrition levels with the same amount of time or material inputs. *Id*. § 2026(b)(1)(A) (emphasis added). In other words, if USDA can achieve better health outcomes while awarding the same benefit amount, that would be "efficient." Thus, the second part of the definition of "efficient," that there be "little or no waste," is also met by the pilot projects' intentions (which need only show they "might" achieve the goal). Accordingly, USDA has acted within its statutory authority under 7 U.S.C. § 2026(b)(1)(A).

### ii.    7 U.S.C. § 2026(b)(1)(B)

USDA may conduct demonstration projects that "(I) improve program administration; (II) increase the self-sufficiency of [SNAP] recipients; [or] (III) test innovative welfare reform strategies." 7 U.S.C § 2026(b)(1)(B)(ii). The approved waivers achieve all three of these purposes. *See* Defs.' Br. at 12. Plaintiffs' dispute this by applying a cramped reading of 7 U.S.C § 2026(b)(1)(B)(ii) to argue USDA lacks the authority necessary to approve the waivers.

***First***, the approved waivers help improve program administration. As Defendants previously explained, the words "program" and "administration" are capacious. *See* Defs.' Br. at 13 n.1. Plaintiffs suggest Defendants exceeded their authority by considering "the substance of what the benefits cover," Pls.' Br. at 9. But there is no reason that a demonstration project cannot or should not concern "substance" under the FNA's first permissible purpose of improving program administration, particularly when Congress specified that the purpose of the program is

8

to "rais[e] levels of nutrition among low-income households." 7 U.S.C. § 2011.  Plaintiffs argue that Defendants' reliance upon the congressional declaration of policy found in § 2011 to guide the reading of § 2026 "stretch[es] 'program administration' beyond recognition."  Pls.' Br. at 8. But it is a perfectly rational reading—and indeed the best reading—of the phrase "improve program administration" to include changes that help the program better achieve its objectives. Again, if the agency can achieve better health outcomes for the same input costs, that is an efficient use of available resources *and* a use that is consistent with Congress's goal.

*Second*, the waivers advance the permissible purpose of increasing recipients' self-sufficiency.  USDA seeks to help recipients make nutritious decisions not only with SNAP benefits but with other sources of funding they have or may someday have.  *See* GOV000259 ("Moms and dads from across the country have told us they want sound, simple and clear nutrition advice so they know the best food to put on the dinner table."); GOV000066 ("This demonstration project is a public health strategy intended to support informed purchasing choices for all participants.").

Plaintiffs object that "Defendants speculate that restricting SNAP purchases *may* cause recipients to make healthier food purchases with other sources of income in the future."  Pls.' Br. at 9.  Their pessimistic framing aside, all this shows is that the agency has a hypothesis about how to improve recipients' self-sufficiency at making sound nutritional choices, and it seeks to test that hypothesis through "pilot or experimental projects" conducted "on a trial basis"—precisely what 7 U.S.C. § 2026(b)(1)(A) envisions.  Section 2026 authorizes the testing of a hypothesis and does not prejudge the results of the experiment.  Plaintiffs attempt to convert their policy disagreements with the agency into statutory authority arguments.  *See* Pls.' Br. at 9–10.  They believe self-sufficiency is better served in a different way.  *See id*.  They are entitled to that opinion, but that

9

does not change the agency's statutory authority to test out whether its preferred way "might" succeed.  7 U.S.C. § 2026(b)(1)(A).

*Third*, the waivers seek to advance the permissible purpose of testing innovative welfare reform strategies. USDA approved these waivers as "novel demonstration project[s]" to "test innovative approaches to support healthy choices, and healthy outcomes." GOV000015.  Plaintiffs argue that "[n]ovelty is not enough," without ever offering a view of what would be enough.  Pls.' Br. at 10.  They argue that Defendants' understanding of "innovative welfare reform strategies" is so broad that it risks being superfluous.  *See id*.  Without offering any limiting principle of their own, however, there is no way for the Court to evaluate whether the waivers fall inside or outside of Plaintiffs' understanding of 7 U.S.C § 2026(b)(1)(B)(ii)(III).  But even accepting Plaintiffs' view that the words "welfare reform strategies" require something more than novelty, Defendants have shown that.  The SNAP program is a "welfare" program. 7 C.F.R. § 271.1 ("SNAP is designed to promote the general welfare"). Modifying which foods can be purchased with SNAP benefits is a "reform strategy" aimed at better achieving the program's goal of raising recipients' levels of nutrition.  7 U.S.C. § 2011.

The waivers, which only must satisfy one of the permissible purposes in 7 U.S.C § 2026, satisfy three of them.  Thus, USDA has the statutory authority to approve each waiver and conduct the associated demonstration projects.[4]

### B. The Waivers Are Supported by the Administrative Record and Are Not Arbitrary and Capricious.

As the Administrative Record shows, Defendants' waiver approvals were well-reasoned exercises of the agency's authority designed to test the States' theories of change and meaningfully

---

[4] Plaintiffs' argument that Defendants' statutory authority arguments are post-hoc ignores that the Administrative Record specifically includes the authorities the agency relied upon. GOV000235.

evaluate each pilot's impact.  While the approvals and implementation involved close cooperation with the States, USDA never subdelegated its ultimate reviewing authority to them.

### i.    USDA Did Not Subdelegate Its Authority.

Plaintiffs' first argument—that Defendants abdicated decisionmaking authority to the States when they approved their applications—is incorrect.  As a threshold matter, it makes little sense to suggest USDA abdicated or delegated its reviewing authority by affirmatively approving the waivers when the alternative that Congress designed results in the *automatic* approval of States' applications if they have been pending with USDA for more than 60 days. *See* 7 U.S.C.  § 2026(b)(1)(D)(ii).

Regardless, USDA closely consulted with the States on developing their applications and subsequently adopted the reasoning in those applications in the agency's final approval of them; that is not the same as delegating all discretionary authority to the States.  As the Administrative Record shows, USDA did not simply rubber stamp the States' applications, as Plaintiffs suggest. *See* GOV000496–787.  Instead, the agency engaged in weeks—in some instances, months—of technical assistance to the States. *See id*.  This was an iterative process by which USDA identified areas for improvement it saw in the States' initial applications and worked with the States to address them. *See id*.; *infra* 15-17.

This is in stark contrast to *U.S. Telecom Association v. Federal Communications Commission*, which Plaintiffs argue controls here.  359 F.3d 554 (D.C. Cir. 2004).  There, Congress directed the FCC to determine "which [existing telecommunication carriers'] network elements shall be made available to [competitor carriers] on an unbundled basis" to avoid impairing competitor carriers. *Id*. at 565.  After the FCC made "a nationwide finding that [all competitor carriers] are impaired without unbundled access," it authorized States to make and apply their own

11

independent determinations that might contradict the FCC's.  *Id*. at 564.  The D.C. Circuit found that "subdelegations," like this one, "to outside parties are assumed to be improper." *Id*. at 565.

Unlike in *U.S. Telecom*—where the FCC did not dispute the existence of the subdelegation but instead argued it was lawful—no subdelegation has occurred here.  Plaintiffs twist Defendants' request for deference to the Federal-State partnership's decisionmaking under federalism principles to suggest Defendants have conceded that a subdelegation to the States has occurred. *See* Pls.' Br. at 15.  That is simply not the case.  The States behaved as applicants, and USDA behaved as a reviewer; USDA offered technical assistance on how to improve the applications and exercised ultimate approval authority.   GOV000496-787 (Technical Assistance to States); GOV000015–22 (Colorado Approval); GOV000031–39 (Iowa); GOV000054–61 (Nebraska); GOV000069–76 (Tennessee); GOV000092–99 (West Virginia).

Even if this applicant-reviewer model can be conceived of as a delegation—which would pose problematic implications for countless administrative schemes designed by Congress— "[d]elegations by federal agencies to [outside] parties are … valid so long as the federal agency or official retains final reviewing authority."  *Nat'l Park & Conservation Ass'n v. Stanton*, 54 F. Supp. 2d 7, 19 (D.D.C. 1999).  Plaintiffs' do not seriously dispute Defendants' ultimate reviewing authority but quote *U.S. Telecom*'s statement that "vague or inadequate assertions of final reviewing authority [will not] save an unlawful subdelegation."  Pls.' Br. at 14.   The Administrative Record here demonstrates that the final reviewing authority was actually exercised and done in an adequate, hands-on fashion.  GOV000496-787.

### ii.    The Administrative Record Supports the Waiver Decisions.

The Administrative Record documents the process each State's application underwent between submission and final approval.  The substantive discussions contained in it, whether in

the States' applications, in the intergovernmental communications, or in the peer-reviewed studies, justify the ultimate decision made by USDA to authorize the waivers piloting innovative strategies to improve levels of nutrition amongst SNAP recipients.  Plaintiffs highlight what they believe to be several shortcomings, but none succeeds at making the decisions arbitrary and capricious.[5]

First, Plaintiffs argue it was unreasonable for the agency to conclude that SNAP recipients experience worse nutritional health outcomes and are at higher risk of obesity-related illnesses. *See* Pls.' Br. at 20.  This conclusion is supported by ample record evidence.  *See* GOV000340, 370, 386.  Nevertheless, Plaintiffs criticize a study USDA relied upon discussing the mental health links to SNAP recipients' higher rates of obesity as somehow irrelevant to the conclusion, *see* Pls.' Br. at 20, even though the first sentence of that study states: "Participation in the Supplemental Nutrition Assistance Program (SNAP) has been associated with obesity."  GOV000370.  That sentence cites two other studies finding the same.  *Id*.  That is not the only study in the Administrative Record supporting the agency's conclusion, however; another study stated SNAP recipients "experience higher rates of obesity and type 2 diabetes than higher-income groups." GOV000340.  And The 2024 State of Obesity report recommends "[i]mproving diet quality in SNAP through voluntary pilot programs, and supporting programs that promote and incentivize healthy eating[.]"  GOV000386.  The agency did not act arbitrarily and capriciously in concluding SNAP recipients are at higher risk of obesity and related illnesses based upon the record evidence.

---

[5] It is worth noting at the outset that there is a misfit between the governing law and the factual circumstances in this case.  The APA's inquiry into whether an agency's decision was supported by evidence does not neatly map onto a decision like USDA's to authorize the gathering and study of potentially supportive evidence.  To say, as Plaintiffs do, that "the States' proposals were [not] supported by evidence," Pls.' Br. at 16, counterintuitively implies that to justify gathering evidence "on a trial basis," 7 U.S.C. § 2026(b)(1)(A), the agency must already have the evidence.  This Catch-22 should be avoided, as it would discourage experimentation and information gathering that Congress has already determined to be valuable.

Second, Plaintiffs argue that it was unreasonable to conclude that the States' proposals could plausibly more effectively and efficiently achieve SNAP's purpose of improving nutritional outcomes for SNAP recipients. *See* Pls.' Br. at 16–17. USDA's and the States' hypotheses on improving nutritional outcomes are highly plausible, however. *See* GOV000100–180 (States' plans). The theory that limiting SNAP eligible purchases to food items with higher nutritional value will result in better health outcomes for recipients because recipients will opt for more nutritious options both when using SNAP benefits and possibly when using other funds is logically sound, *see id.*, and supported by a scientific simulation model the agency relied upon, *see* GOV000340–350. Plaintiffs critique the simulation because it was conducted in 2014 and it acknowledges its own limitations, as every quality scientific study does. *See* Pls.' Br. at 21. These criticisms fail to undercut the study's value in contributing to USDA's decision to pilot programs that the study strongly suggests could improve nutritional outcomes for SNAP recipients. Nor do Plaintiffs supply a reason to think the outcome would be meaningfully different in 2026. *See id*. Plaintiffs' other criticisms amount to counterhypotheses that may also be plausible, *see, e.g.*, Pls.' Br. at 17 ("the purchasing behavior the waivers are supposedly designed to change may not change at all.")—the value of a pilot program, however, is to test those hypotheses. USDA's hypothesis cannot be assailed as arbitrary and capricious just because experimentation might not bear it out. That is how the scientific method works, after all, which is why Congress recognized the reality that demonstration projects only "might" achieve the goals of increasing efficiency or improving delivery of SNAP. 7 U.S.C. § 2026(b)(1)(A).

Third, Plaintiffs argue it was arbitrary and capricious for USDA to set long-term goals of improving health outcomes in short-term pilot programs. *See* Pls.' Br. at 17–18. But short-term pilots can yield valuable insights and projections about long-term goals, even if they cannot

14

conclusively prove they will be achieved.  Nebraska's Theory of Change, a "logic model . . . create[ing] a clear roadmap for defining what success means and how it will be measured," GOV000132, is instructive on this point:

> **Problem Statement**: Studies have shown that SNAP participation is associated with increased obesity risk [*sic*] and that low-income adults and children have higher obesity rates compared to other Americans.
>
> ***So***, Nebraska's Department of Health and Human Services implemented a SNAP demonstration waiver to restrict the purchase of SSBs and energy drinks from eligible SNAP purchases.
>
> ***To*** reduce the consumption of SSBs and energy drinks among SNAP recipients to encourage healthier consumption habits and dietary behaviors that lead to improved health outcomes.
>
> ***So that*** Nebraska can reduce obesity and chronic disease rates among SNAP recipients and improve overall health in the state.

GOV000146.

USDA recognized that the pilots' short-term goal in the ***to*** statement was more readily measurable than the longer-term goal in the ***so that*** statement, so it advised States like West Virginia to amend their evaluations to primarily focus upon evaluating purchasing behaviors rather than health data.  GOV000743.  The agency reasonably concluded that leading indicators like purchasing behaviors had more practical value than lagging indicators like health data in the context of this pilot program.  *See id*.  Note, however, that USDA did not instruct West Virginia to *stop* collecting health data, it simply told it to also collect purchasing data, and the State responded, "the State will provide an evaluation plan that tracks both health outcomes and shopping behaviors throughout the project."  *Id*.  This was a sound and reasonable adjustment ensuring more useful information was collected, not to mention further proof that USDA did not simply delegate away its reviewing authority to the States or act as a rubberstamp.  Plaintiffs argue "[purchasing] trends say nothing about health outcomes standing alone."  Pls.' Br. at 17.  But they

15

are not standing alone—they stand in connection with the reasonable finding just discussed that SNAP recipients' poor levels of nutrition lead to obesity and obesity-related health issues.

Fourth, Plaintiffs argue that Defendants did not satisfactorily consider those with unique health needs. *See id*. at 21–22. However, USDA reasonably concluded that "SNAP benefits are supplemental, calculated to cover only 70 percent of the household's monthly food budget. SNAP households will remain free to use cash to purchase SNAP restricted items." GOV000190. Thus, people with unique needs such as Plaintiffs remain free to purchase SNAP restricted items with other funds while shifting SNAP benefits to other purchases. Plaintiffs argue that this is insufficient because SNAP is a subsistence benefit, helping recipients achieve a minimum living standard. *See* Pls.' Br. at 35. But SNAP was never meant to cover the entirety of a recipient's food costs—the program has always envisioned recipients will need to find other sources of funding to purchase other necessary food items for which SNAP cannot cover the full balance. And, again, the pilot programs do not change the monetary value of the relevant benefits.

Fifth, Plaintiffs argue that Defendants failed to consider retailers' interests. Setting aside the fact that Plaintiffs are not retailers and their standing to assert this issue is highly questionable, *see Int'l Ass'n of Machinists & Aerospace Workers v. Fed. Election Comm'n*, 678 F.2d 1092, 1099 (D.C. Cir.), *aff'd,* 459 U.S. 983 (1982) ("a plaintiff generally may assert only his own legal interests, and may not raise those of third parties")—USDA extensively considered retailers' interests. Plaintiffs attempt to dispute this in two ways. First, they attach a declaration to their opposition from a non-party retailer, ECF No 24-1, and rely upon the assertions made therein. *See* Pls.' Br. at 22–23. The Court should afford no attention or credit to these assertions, however, because review of final agency action in an APA case is limited to the administrative record and reasons relied upon by the agency—not the post-decision testimony by non-parties. *See Esch v.*

16

*Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (it is a "familiar rule that judicial review of agency action is normally to be confined to the administrative record. That principle exerts its maximum force when the substantive soundness of the agency's decision is under scrutiny[.]").

Second, Plaintiffs attempt to use USDA's observations of the potential challenges retailers might face as evidence the waiver approvals were arbitrary and capricious. *See* Pls.' Br. at 22. They were anything but. Plaintiffs ignore that after observing the potential challenges retailers might face, USDA and the States discussed how they would strategize to mitigate these challenges. *See* GOV00083 ("the State will provide clear guidance and technical specifications to retailers and work with the West Virginia Retailers Association and other stakeholders to support compliance. … Temporary allowances may be considered on a case-by-case basis for retailers actively working toward compliance[.]"); GOV000720 (call notes stating "[we are] [c]ognizant the retailers will bear the brunt of this effort. [We will] [d]o our best to help them through this process and implementation. … "[We are] [d]eveloping educational materials for retailers and clients [as] part of the effort … [We are] [w]orking through our feedback and will share responses and provide more details."); GOV000590 ("We anticipate all retailers will be able to make the required [POS system] updates. However we do understand this may be a heavier lift for some smaller retailers . . . [but] the [S]tate will work with Iowa Grocery Industry Association and other retailers without [POS systems]" to smooth the rollout.). Furthermore, while Plaintiffs argue Colorado did not respond to USDA's questions about retailers, Pls.' Br. at 22, USDA held 20 phone calls with Colorado subsequent to its waiver request in which the discussions reflected in the Administrative Record were cooperatively and strategically resolved. *See* Declaration of Casey McConnell ("McConnell Decl.") ¶¶ 7–8.

The Administrative Record shows that USDA and the States considered all important facets of the pilot programs and carefully considered how to resolve challenges that might arise. Plaintiffs' criticisms amount to disagreements with USDA's policy judgments, but APA review is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*State Farm*).

### iii.    The Evaluation Plans Are Reasonable and Sufficient.

USDA and the State applicants have worked closely and diligently to develop and implement their evaluation plans for the demonstration projects. *See* GOV100-180 (State Plans); GOV000496-787 (Technical Assistance to States). Plaintiffs criticize the evaluation plans for not being complete at the moment the waivers were approved, *see* Pls.' Br. at 23–24, but there is no authority requiring that. All that the FNA requires is there to be an evaluation for each project to determine its effects. 7 U.S.C. § 2026(b)(1)(B)(i)(II). There is. And all the APA requires is that the evaluations are well-reasoned. 5 U.S.C. § 706(2)(A). They are. There is no option to add procedural requirements Plaintiffs think are desirable. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 524 (1978) ("[R]eviewing courts are generally not free to impose [procedural requirements]").

Each State's application included a high-level plan for evaluation, GOV000010–11 (Colorado); GOV000028–29 (Iowa); GOV000053 (Nebraska); GOV000066–67 (Tennessee); GOV000086–88 (West Virginia), and USDA committed in each approval letter to "carefully review the results of the Project, based on the evaluation data provided by the State and other available information." GOV000015–22 (Colorado); GOV000031–39 (Iowa); GOV000054–61 (Nebraska); GOV000069–76 (Tennessee); GOV000092–99 (West Virginia). Moreover, the terms and conditions of each approval included the following language:

18

- The State will provide a finalized evaluation plan defining Project health outcomes and behaviors tracked throughout the Project.
  - The evaluation plan must detail how the State will mitigate SNAP client reporting bias for any Project data collection methods.
  - The evaluation plan will define Project success (i.e., reduction of diseases/illnesses, changes in behaviors, increase nutrition knowledge).
  - The evaluation plan must describe in detail all data points and metrics that the State will be collecting, aside from those listed in these terms and conditions, and how they will be analyzed.

*Id.* In order to monitor the States' evaluation obligations, USDA also included a term stating, "The State will provide FNS with quarterly reports using the evaluation reporting template FNS will provide to the State in WIMS [an online tracking system] based upon finalized data collection points, defined key metrics, and data analysis." *Id.* And as an added enforcement mechanism to ensure States comply with the evaluation requirements, the terms and conditions also state:

> Continued approval of the Project is contingent upon the results of the ongoing Project evaluation. This Project may be extended in yearly increments for an additional 3 years, for a total of 5 years, provided that the State and FNS agree upon additional evaluative measures prior to renewal so that FNS can continue to assess this demonstration Project's impact.

*Id.*

The terms also note that USDA "is available and willing to provide technical assistance on all components of the Project, including but not limited to . . . evaluation strategies[.]" *Id.* Each State took USDA up on its offer of technical assistance. *See* GOV000496-787. Plaintiffs' cherry pick comments from USDA technical assistance staff reviewing State evaluation plans and flagging issues they spotted as if they are smoking guns betraying the arbitrariness of the evaluations. *See, e.g.*, Pls.' Br. at 23 (the agency "questioned whether Colorado could lawfully collect health data. It also questioned how Colorado would obtain reliable purchase data[.]"); *id.* at 24 (the agency "explain[ed] that changing health outcomes is a long-term goal, so it instead urged the State to measure soda consumption"). In reality, these comments reflect a reasonable,

19

ongoing discourse between the agency and States to develop the soundest evaluation strategy. Indeed, if there were *not* these kinds of comments, it would lead one to wonder whether the evaluations were reviewed with a critical eye.  While the agency did not keep notes of every single one of the dozens of phone calls it had with States to discuss the evaluative frameworks and other issues, the call notes that are available demonstrate that the agency diligently resolved any issues that came up, and that issues USDA raised were not just ignored by the States, as Plaintiffs suggest. *See* GOV000720–722; McConnell Decl. ¶ 8 ("States generally responded to our technical assistance comments via these phone calls as opposed to responding in writing. These calls resolved many of the issues that Plaintiffs flag in the administrative record as having never received a response from the States.").

### iv.    The Agency Was Not Required to Consider Past Decisions About Different Applications.

Defendants were not required to reexamine past decisions about different demonstration project applications from different States arising under different circumstances and making different proposals.   It is arbitrary and capricious when an agency "reverses an earlier determination but does not provide a reasoned explanation for doing so."  *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 535 (2009) (Kennedy J., concurring in part and concurring in the judgment).   Here, however, there was no "earlier determination"—this was the first time the agency determined to approve the unique waiver applications submitted by each State.

To be sure, the approvals reflect different policy preferences than the agency held when it denied previous States' demonstration project applications under past administrations.  *See* Pls.' Br. at 26–27.  However, there is "no basis in the [APA] or in our opinions for a requirement that all agency change be subjected to more searching review."  *Fox Television Stations,* 556 U.S. at 514 (2009). The Supreme Court has "'neither held nor implied that every agency action

20

representing a policy change must be justified by reasons more substantial than those required to adopt a policy in [the] first instance.'" *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1037 (D.C. Cir. 2012) (quoting *Fox Television Stations*, 556 U.S. at 514).  Indeed, "[a]n agency's view of what is in the public interest may change, either with or without a change in circumstances." *State Farm*, 463 U.S. at 57.  The agency's policy view may be different than it once was, but that does not mean the approvals were required to "be justified by reasons more substantial" than those already discussed *supra* Section II.B.ii.   *Nat'l Ass'n of Home Builders*, 682 F.3d at 1037.

### C.  The Waivers Were Not Required to Undergo Notice and Comment.

The waivers were not required to undergo notice and comment under 7 C.F.R. § 282.1(b). First, this regulation is not a notice-and-comment requirement but simply a notice requirement. Second, it only requires notice when a demonstration project is likely to have a significant impact, and USDA properly determined these projects were not.  Third, even if the Court concludes publication in the *Federal Register* was required, it should find that the agency's not doing so constitutes harmless error because it widely publicized its decision elsewhere.

The structure and text of the regulation demonstrate that it is only a notice requirement, not a notice-and-comment requirement.  The title of 7 C.F.R. § 282.1(b) is simply "Notices."  In other parts of the regulation where USDA determined a more robust notice-and-comment process was required, however, it said so explicitly.  For example, 7 C.F.R. § 273.25(e) is titled "Opportunity for public comment," and reads, "States must provide an opportunity for public input on proposed S-SNAP plans . . . through a public comment period, public hearings, or meetings with groups representing participants' interest."  This is markedly different than § 282.1(b), which does not use mandatory language requiring the solicitation of comments.  Instead § 282.1(b) merely notes that USDA may end up receiving comments in response to the notice, and if the agency happens to

21

find these comments are significant, it should address them how it deems fit. *Id*. § 282.1(b) ("If significant comments are received in response to this General Notice, the Department will take such action as may be appropriate prior to implementing the project.").

The regulation only requires notice, and it only requires it when the agency determines that a demonstration project "will likely have a significant impact on the public." *Id*. The agency's interpretation of the term "significant impact" is entitled to deference under *Auer v. Robbins* because it is reasonable and aligns with historical practice. 519 U.S. 452 (1997). The term is not accompanied in the regulatory text by any standards to discern between pilots that are significant and those that are not; thus, it is "genuinely ambiguous" how a Court should draw that line. *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019).

The agency found that the waivers did not pose significant impacts, and thus were not required to be published, because they did not concern "SNAP eligibility criteria, allotment levels or access to staple foods." GOV000190. This makes sense—the significant aspects of the SNAP program are whether someone is eligible for it, 7 U.S.C §§ 2014, 2015; their total benefit calculation, *id*. § 2017; and their ability to buy nutritious food, *id*. §§ 2011, 2016. Moreover, it accords with historical practice by the agency. The agency did not publish a notice with respect to other waiver programs it previously approved in these States, including Colorado and Iowa's Standard Medical Deduction demonstration projects implemented in 2017 and 2020, Colorado's Job Retention Services Extension demonstration project in 2024, and Tennessee's Elderly Simplified Application Project in 2025, even though those also impacted a large portion of SNAP recipients in those States. *See* McConnell Decl. ¶ 9. Even if Plaintiffs' approach focusing on the number of people impacted is also reasonable, Pls.' Br. at 29, it does not demonstrate USDA's approach is "plainly erroneous." *Auer*, 519 U.S. at 461.

22

In any event, in addition to determining there was no significant impact, the agency also explained that the projects were being widely publicized elsewhere; thus, even if the Court concludes publication in the *Federal Register* was necessary, it should find that the decision not to publish was harmless error. *See AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 88 (D.D.C. 2007); *Food & Drug Admin. v. Wages & White Lion Invs., LLC.*, 604 U.S. 542, 590 (2025). The decision not to publish was accompanied by an explanation of other publicity taking place:

- Prior to waiver implementation, State agencies have been engaging intensively with SNAP retailers to coordinate implementation and incorporate retailer feedback.
- State agencies are also providing notification and informational materials about the changes to SNAP households and other stakeholders and have developed websites to inform the public about the changes. All States have issued press releases regarding the waivers and media coverage has been extensive both locally and nationally.
- FNS has also created a webpage which posts all approved Food Restriction Waivers publicly, summarizes restricted foods, and provides implementation dates.
- Prior to waiver implementation, FNS plans to issue State-specific notices to retailers that serve SNAP participants of States implementing Food Restriction Waivers.

GOV000190. Furthermore, the Administrative Record includes press releases directly from USDA publicizing the demonstration projects. *See* GOV000267–287. Direct engagement with retailers and recipients, press releases reported on by familiar media outlets rather than the obscure *Federal Register*, and a public page on USDA's own website are all adequate if not superior means of spreading the word about the demonstration projects. And again, even in their latest opposition, Plaintiffs do not dispute that they had actual notice of the demonstration projects.

### III.    PLAINTIFFS ARE NOT ENTITLED TO ANY RELIEF.

Any relief in this case is unjustified, therefore Defendants unambiguously and categorically opposed (and continue to oppose) Plaintiffs' entire request for relief. Plaintiffs attempt to spike the football and say, "Defendants forfeited any developed opposition to Plaintiffs' request for declaratory and set-aside relief under the APA." Pls.' Br. at 41. That is a curious reading of

23

Defendant's straightforward argument that even if the Court determines to grant relief, "[t]he [o]nly [p]roper [r]emedy [i]s [r]emand [w]ithout [v]acatur." Defs.' Br. at 25. The word "only" in that sentence means to the exclusion of all other forms of relief.

Injunctive relief remains particularly improper. *See id*. at 23–25. Plaintiffs primarily contest this by elaborating upon all of the "irreparable harms" they allege stem from the demonstration projects. Pls.' Br. at 33–39. However, all of these alleged harms boil down to Plaintiffs' ability to access certain drinks and foods. *See id*. The *Supplemental* Nutrition Assistance Program may be a "subsistence benefit," *id*. at 35—but it is only designed to *support* recipients' subsistence, not wholly account for it. The agency properly concluded that SNAP is calculated to cover "only 70 percent of the household's monthly food budget," GOV000190, and it was proper to subsequently infer that recipients who have unique needs would shift the other 30 percent of their food budget to purchase items SNAP no longer covers. Plaintiffs think SNAP *should* cover 100 percent of their food costs, and that its failure to do so constitutes an irreparable injury in its own right; but that is a concern for Congress, not USDA or this Court.

USDA's substantive and procedural decisions relating to its approval of each State's application to conduct innovative demonstration projects were authorized by statute. Moreover, the reasoning that supported them was adequate. That being said, if the Court identifies that there was an explanatory gap in any of the areas Plaintiffs identified— the finding that SNAP recipients experience worse health outcomes; the plausibility of achieving better nutritional outcomes; the determination to set long term goals in a short term pilot (in addition to short term goals); the consideration of unique health needs; or the consideration of retailer interests—then the appropriate remedy is remand to the agency to further explain its rationale.

24

Remand without vacatur is particularly appropriate when, as here, there is a likelihood that the agency can explain itself on remand. *See Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993). Even if the Court concludes that the agency could have better explained itself, any deficiencies here are not so serious as to justify vacating the agency's actions. *See id.* All the Court must determine is whether it is "conceivable" or if there is "at least a serious possibility that the Commission will be able to substantiate its decision on remand." *Id.* Defendants are confident that the Administrative Record demonstrates that the agency has done so; however, at the very least, it demonstrates that it is surely capable of doing so. Furthermore, the "disruptive consequences" of having retailers in five states suddenly change their internal procedures, after months of preparation, are significant. *Id.*

At a minimum, in deciding whether and how to fashion any relief, the instruction from *Trump v. CASA, Inc.*, 606 U.S. 831 (2025)—that relief must be fashioned in the most limited manner possible to afford complete relief to each plaintiff with standing—requires careful consideration of the bounds of any relief. The Court need not universally vacate or enjoin actions by USDA and the five sovereign States in order to resolve the issues presented by five individual Plaintiffs. *See United States v. Texas*, 599 U.S. 670, 703 (2023) (Gorsuch, J. concurring) (courts must "ask[] whether party-specific relief can adequately protect the plaintiff's interests. If so, an appellate court should not hesitate to hold that broader relief is an abuse of discretion.").

## CONCLUSION

For the above reasons, summary judgment should be granted in favor of Defendants, as Plaintiffs do not have standing, and in any event, each of their claims fail on the merits. Alternatively, should the Court find for Plaintiffs, relief should be limited to remand to the agency without vacatur.

Date:  April 22, 2026                    Respectfully submitted,


BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director
Civil Division, Federal Programs Branch

*/s/ Eitan R. Sirkovich*
EITAN R. SIRKOVICH
(D.C. Bar No. 90030102)
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC  20005
Tel. (202) 353-5525
Eitan.r.sirkovich@usdoj.gov

*Attorneys for Defendants*

26