**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NIEVES ARAGON, ET AL., <br><br> **Plaintiffs,** <br><br> v. <br><br> BROOK ROLLINS, IN HER OFFICIAL CAPACITY AS SECRETARY OF AGRICULTURE, ET AL. <br><br> **Defendants.** | Case No. **1:26-cv-00861-ABJ** |

**BRIEF OF THE STATES OF NEBRASKA, IOWA, TENNESSEE, AND WEST VIRGINIA AS AMICI CURIAE IN SUPPORT OF DEFENDANTS**

MICHAEL T. HILGERS
Attorney General of Nebraska

Nebraska Department of Justice
1445 K Street, Room 2115
Lincoln, Nebraska 68508
Tel.: (402) 471-2683
Fax: (402) 471-3297

CODY S. BARNETT
Solicitor General
Cody.Barnett@nebraska.gov

LINCOLN J. KORELL
Assistant Solicitor General

Counsel for State of Nebraska

TABLE OF CONTENTS

Page

Table of Authorities ............................................................................................................. ii

Interest of Amici Curiae ...................................................................................................... 1

Introduction .......................................................................................................................... 1

Argument ............................................................................................................................... 2

    I.    The Pilot Project Statute Should Be Interpreted In Favor of
        Federal–State Cooperation. ...................................................................................... 3

    II.   The Pilot Projects Advance SNAP's Goal by Removing Junk Foods
        that Undermine It. ..................................................................................................... 6

Conclusion ........................................................................................................................... 12

TABLE OF AUTHORITIES

Page(s)

**Cases**

*City of New York v. United States,*
179 F.3d 29 (2d Cir. 1999) ................................................................................ 6

*District of Columbia v. USDA,*
444 F. Supp. 3d 1 (D.D.C. 2020) ................................................................ 4, 12

*Gregory v. Ashcroft,*
501 U.S. 452 (1991) .......................................................................................... 5

*Gresham v. Azar,*
950 F.3d 93 (D.C. Cir. 2020) .......................................................................... 12

*Judulang v. Holder,*
565 U.S. 42 (2011) .......................................................................................... 12

*New State Ice Co. v. Liebmann,*
285 U.S. 262 (1932) .......................................................................................... 3

*Union Brokerage Co. v. Jensen,*
322 U.S. 202 (1944) .......................................................................................... 6

*United States v. Lopez,*
514 U.S. 549 (1995) .......................................................................................... 4

*Will v. Mich. Dep't of State Police,*
491 U.S. 58 (1989) ............................................................................................ 5

**Statutes**

5 U.S.C. § 706(2)(A)–(D) ...................................................................................... 11

7 U.S.C.
§ 2020 ................................................................................................................ 4
§ 2026(b)(1)(A) ................................................................................... 2, 4, 6, 11
§ 2026(b)(1)(B) ..................................................................................... 2, 4, 6, 7

**Other Authorities**

Aubrey Winger et al., *The Implications of Federal SNAP Spending Cuts on Individuals with Medicaid, Medicare, and Other Health Coverage*, KFF (June 26, 2025) ................................................................... 9

Boon Peng NG et al., *Medical Expenditures Associated with Diabetes Among Adult Medicaid Enrollees in Eight States* (Sept. 27, 2018) ....................... 9

*Get the Facts: Added Sugars,* Ctrs. for Disease Control & Prevention (Jan. 5, 2024) ......................................................................................... 7, 8

Kevin Williamson, *The White Ghetto*, Nat'l Review (Dec. 16, 2013) ................................................................... 10

Markos Makiso Urogo et al., *Comprehensive review of carbonated soft drink consumption rates and their public health importance*, Nat'l Libr. of Med. (Jan. 10, 2026) ....................................................................... 8

Nahla Khamis Ibrahim & Rahila Iftikhar, *Energy Drinks: Getting wings but at what health cost?* 30 Pak. J. Med. Sci. 1415 (Apr. 6, 2014) ........................................................................................... 10

Sachin A. Shah et al., *Impact of High Volume Energy Drink Consumption on Electrocardiographic and Blood Pressure Parameters*, 8 J. Am. Heart Ass'n (May 29, 2019) ................................................ 10

Sarah Casagrande et al., *Health Insurance and Diabetes*, Nat'l Inst. of Diabetes & Digestive & Kidney Diseases (Dec. 20, 2023) ...................................... 9

Stephane Green & Raquel Hernadez, *Energy Drinks and Kids: What You Need to Know*, John Hopkins Medicine (June 4, 2024) ................................. 10

Steven Garasky et al., *Foods Typically Purchased by Supplemental Nutrition Assistance (SNAP) Households* 18, USDA (Nov. 2016) ........................ 8

*The Burdens of Diabetes in Iowa*, Am. Diabetes Ass'n (Feb. 2025) ............................................................................................ 9

*The Burdens of Diabetes in Nebraska*, Am. Diabetes Ass'n (Aug. 2025) ......................................................................................... 8, 9

*The Burdens of Diabetes in Tennessee*, Am. Diabetes Ass'n (Feb. 2025) ............................................................................................ 9

**Other Authorities—continued**

*The Burdens of Diabetes in West Virginia*, Am. Diabetes Ass'n
　　(March 2025)................................................................................................. 9

*The Buzz on Energy Drinks*, Ctrs. for Disease Control & Prevention
　　(July 22, 2024) ............................................................................................. 10

## INTEREST OF AMICI CURIAE

The States of Nebraska, Iowa, Tennessee, and West Virginia ("Amici States") respectfully submit this brief as amici curiae in support of Defendants. Amici States applied for and were granted waivers for the pilot projects at issue here. Plaintiffs ask this Court to set aside those waivers based on a restrictive and narrow interpretation of the pilot project statute—an interpretation that looks right past the federalist principles Congress built into the Supplemental Nutrition Assistance Program ("SNAP").

Congress gave the Secretary of Agriculture express authority to work with States to test different SNAP implementation policies for the purposes of advancing SNAP's overall mission. Amici State's pilot projects do exactly that. They ensure that those in need have ready access to *nutrition*—not just food. The nutritional needs of SNAP beneficiaries are ill-served by foods that do more harm than good. Our States and our people have already borne enough of the health costs from these junk foods. The subject waivers, which empower Amici States to exclude the most sugary and processed culprits from SNAP's ambit, are an important step forward in promoting a healthy and nutritionally rich diet for all our people.

## INTRODUCTION

SNAP's mission is simple—to improve the nutrition of low-income individuals. To advance this mission, Congress built on the keystone of American government— federalism. Congress entrusted States to deliver SNAP benefits to low-income individuals. Congress also expressly authorized the Secretary of Agriculture to collaborate with States to test innovative implementation strategies. For good reason.

States are well-situated to evaluate how SNAP is improving their citizens' nutrition. And States offer the Secretary laboratories of experimentation to test the effectiveness of proposed reforms.

The Secretary took Congress up on that authority and has approved pilot projects in each of the Amici States. These programs aim to advance SNAP's mission—they seek to improve nutritional outcomes for low-income households by excluding from SNAP junk foods that do more nutritional harm than good. Yet Plaintiffs seek to scrap these pilot projects, arguing that excising junk food from the SNAP menu in our States somehow does not advance SNAP's goal of augmenting nutritional outcomes for low-income individuals.

This Court should respect Congress's vision of a federal–state partnership and decline Plaintiffs' invitation to construe the pertinent statutes in a manner that would severely limit both collaboration and innovation.

## ARGUMENT

SNAP aims to "provid[e] food assistance to raise levels of nutrition among low-income individuals." 7 U.S.C § 2026(b)(1)(B)(i)(I). To further that goal, Congress empowered the Secretary to tap into States as laboratories of experimentation and conduct pilot projects in States "designed to test program changes" to improve SNAP's efficiency and delivery. 7 U.S.C. § 2026(b)(1)(A). Not wanting to unnecessarily stifle innovation, Congress gave the Secretary wide latitude in conducting these pilot projects.

The pilot projects challenged here are exactly what Congress envisioned. Amici States, who are on the frontlines of administering SNAP benefits, have seen both

SNAP's promise and its shortcomings. And Amici Stats have observed that some food products—particularly sugary drinks, processed sweets (e.g., candy), and energy drinks—frustrate SNAP's primary goal. Subsidizing such products does not raise nutrition among our low-income citizens—it harms them. Not only do these products contribute to negative health outcomes, but they also crowd out healthier alternatives.

In response, Amici States applied for, and the Secretary granted, waivers to create pilot projects to test whether eliminating these products from SNAP will more efficiently raise nutrition levels for low-income families by promoting healthier, more nutritious choices.

This Court should not shut down these joint federal–state efforts by adopting Plaintiffs' exceedingly narrow interpretation of the pilot project statute. Instead, the Court should (1) vindicate Congress's desire that the Secretary partner with States as laboratories of SNAP policy experimentation, and (2) give due respect to the States' hypothesis that subsidizing junk foods undermines the goal of SNAP, weakens the efficiency and effectiveness of SNAP, and ultimately *de*creases the self-sufficiency of SNAP beneficiaries.

## I.    The Pilot Project Statute Should Be Interpreted In Favor of Federal–State Cooperation.

Justice Brandeis famously observed that "[it] is one of the happy incidents of the federal system" that states can "serve as a laboratory[] and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). Indeed, when States

3

are given leeway to "perform their role as laboratories for experimentation," they work "to devise various solutions where the best solution is far from clear." *United States v. Lopez,* 514 U.S. 549, 581 (1995) (Kennedy, J., concurring).

Congress sought to leverage state experimentation when it created SNAP's pilot project program. "States … play a significant role in administering SNAP." *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 7 (D.D.C. 2020). States are responsible "for certifying applicant households" and "'issuing' [SNAP] benefits." *Id.* (quoting 7 U.S.C. § 2020). In doing so, States are well positioned to evaluate SNAP's strengths and weaknesses. They are especially well positioned to ascertain the nutritional needs of their citizens and evaluate whether SNAP is effectively addressing those needs. So Congress built into SNAP a path for the Secretary to leverage the States' knowledge and their role as laboratories of democracy.

The Secretary is expressly permitted to conduct, in any State, "pilot or experimental projects designed to test program changes that *might* increase the efficiency of [SNAP] and improve the delivery of [SNAP] benefits to eligible households." 7 U.S.C. § 2026(b)(1)(A) (emphasis added). The Secretary can waive "*any* [SNAP] requirement" for a pilot project. *Id.* (emphasis added). The project must be consistent with the goal of SNAP and include an evaluation to determine its impact. *Id.* § 2026(b)(1)(B)(i). An eligible project must also fit in one of four broad categories: It must seek to (1) "improve program administration," (2) "increase the self-sufficiency of [SNAP] recipients," (3) "test innovative welfare reform strategies," or (4) "allow greater conformity with the rules of other" SNAP programs. *Id.* § 2026(b)(1)(B)(ii).

4

The Secretary's authority is broad. She can conduct any "experimental" project that "might" increase efficiency or delivery of SNAP benefits, and in doing so, she can waive "any" SNAP requirement. These projects can fit into any one of four categories centered on broad objectives such as "program administration," "self-sufficiency of SNAP recipients," and "reform strategies." These categories cast a wide net. And the undeniable aim of the statute is to leverage our federalist system to serve the end goals of SNAP, which is exactly what the States' pilot projects do. They seek to reform SNAP by excluding food products that undermine SNAP's goal and reduce the self-sufficiency of its beneficiaries. *See* pp. 7–11, *infra*.

Despite this, Plaintiffs seek a restrictive interpretation of the pilot project statute that would severely limit States' ability to launch experimental programs to advance SNAP's overarching goal. This Court should not oblige. Instead, it should interpret the pilot statutes to support federal–state cooperation and innovation.

Indeed, a respect for federalism and intersovereign cooperation is built into our interpretive jurisprudence. Because "States retain substantial sovereign powers under our constitutional scheme," courts do not interpret statutes to "upset the usual constitutional balance of federal and state powers" unless Congress has made its intent to do so "unmistakably clear." *Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991) (last quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989)). If statutes are to be interpreted to preserve state power when Congress fails to clearly indicate otherwise, there can be little doubt that statutes which *expressly authorize* federal–state collaboration should be interpreted to promote such collaboration. Our "system of dual sovereignties cannot work without informed, extensive, and cooperative

interaction of a voluntary nature between sovereign systems for the mutual benefit of each system." *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999). Thus, "[w]here the Government has provided for collaboration the courts should not find conflict." *Union Brokerage Co. v. Jensen*, 322 U.S. 202, 209 (1944). Likewise, this Court should reject Plaintiffs' invitation to kill innovative federal–state collaborations by strictly construing a statute designed to promote *exactly that*.

## II.     The Pilot Projects Advance SNAP's Goal by Removing Junk Foods that Undermine It.

To ensure federal–state collaborations are aimed in the right direction, Congress placed guardrails on pilot projects. The projects should be "designed to test program changes that might increase the efficiency of [SNAP] and the delivery of [SNAP] benefits to eligible households." 7 U.S.C § 2026(b)(1)(A). They must be consistent with SNAP's goal of "providing food assistance to raise levels of nutrition among low-income individuals." *Id.* § 2026(b)(1)(B)(i)(I). A pilot project must evaluate the effects of the changes being tested. *Id.* § 2026(b)(1)(B)(i)(II). And the project must seek to (1) improve program administration, (2) increase self-sufficiency of SNAP recipients, (3) test innovative welfare reform strategies, or (4) allow greater conformity with the rules of other pilot programs. *Id.* § 2026(b)(1)(B)(ii). Amici States have designed their pilot projects to serve these exact purposes and to meet these requirements.

A.      Amici States created the subject pilot projects for the very purpose of advancing SNAP's goal—to raise the nutrition levels of low-income individuals by cutting out innutritious junk food. "Rais[ing] levels of nutrition" is not synonymous

with "raising levels of food." "Nutrition" means "a nourishing or being nourished," *Nutrition*, Webster's New World College Edition 992 (4th ed. 2001), and something is "nourishing" when it "contribut[es] to health or growth," *Nourishing*, Webster's New World College Edition 988 (4th ed. 2001). Thus, "rais[ing] levels of nutrition" involves "raising levels of health or growth."

But Amici States have witnessed the deleterious effects that certain SNAP-approved junk foods have on SNAP beneficiaries' health. Sugary drinks, energy drinks, and processed sweets (e.g., candy) all have the inverse effect to "rais[ing] levels of nutrition among low-income individuals." *See* Argument § II.B, *infra*. Not only do these products contribute to numerous bad health outcomes, *see id.*, but every dollar spent on these products could be spent on healthier alternatives that would elevate beneficiaries' nutrition.

And that commonsense notion is exactly what Amici States' pilot projects are designed to test. Amici States hypothesize that by excluding these products from SNAP, beneficiaries will opt for healthier alternatives, thereby improving their self-sufficiency and maximizing the overall efficacy and efficiency of SNAP at achieving its end goal.

B.      Amicus States have unfortunately witnessed how SNAP benefits often work to *lower* levels of nutrition. Consuming excess amounts of added sugars can contribute to chronic diseases such as obesity, type 2 diabetes, and heart disease. *Get the Facts: Added Sugars*, Ctrs. for Disease Control & Prevention (Jan. 5, 2024), https://perma.cc/3RSF-4XNN. And the leading sources of added sugars in the U.S. diet are sugar-sweetened beverages, desserts, and sweet snacks—the foods our

projects target. *Id.* Sugary drinks are especially problematic—daily consumption of sugar-sweetened beverages is linked to a 27% higher risk of type 2 diabetes, a 9% increased risk of cardiovascular disease, and a 14% higher likelihood of obesity in adolescents. Markos Makiso Urogo et al., *Comprehensive review of carbonated soft drink consumption rates and their public health importance*, Nat'l Libr. of Med. (Jan. 10, 2026), https://perma.cc/KA8Y-ZB3A.

SNAP benefits are unfortunately funding many beneficiaries' not-so-nutritious sugar habits. In 2016, the USDA published a report on the allocation of SNAP benefits, finding that the most common purchase with SNAP benefits is soft drinks. Steven Garasky et al., *Foods Typically Purchased by Supplemental Nutrition Assistance (SNAP) Households* 18, USDA (Nov. 2016), https://perma.cc/7JSC-WRUS. Candy (11th place) and cookies (17th) are not far behind—ahead of water, eggs, potatoes, and bacon. *Id.* at 18–19. Combined, sweetened beverages, candy, and "prepared desserts" make up over 18% of SNAP household expenditures. *Id.* at 17. For reference, fruit and vegetables combined for about 11%; bread, milk, and cereal combined for about 13%. *Id.* at 17.

Amici States have paid the price for SNAP's subsidization of these junk foods. In Nebraska, nearly 10% of Nebraska adults have been diagnosed with diabetes. *The Burdens of Diabetes in Nebraska*, Am. Diabetes Ass'n (Aug. 2025), https://perma.cc/E7RQ-LGAR. The average medical expenses spent on a person with diabetes is approximately 2.6 times higher than for those without. *Id.* In Nebraska, total direct expenses on diabetes treatments are estimated to be $1.5 billion in 2022.

*Id.* Estimated productivity losses increase the negative impact by hundreds of millions more. *Id.*

In Iowa, over 10% of adults are diagnosed with diabetes, leading to total direct expenses of $2.6 billion on diabetes treatments and nearly half a billion dollars in lost productivity. *The Burdens of Diabetes in Iowa*, Am. Diabetes Ass'n (Feb. 2025), https://perma.cc/8WS3-S4N9. In Tennessee, 13% of adults have diabetes with estimated total direct medical expenses of $7.4 billion and almost $3 billion in lost productivity. *The Burdens of Diabetes in Tennessee*, Am. Diabetes Ass'n (Feb. 2025), https://perma.cc/4ENC-EMQG. In West Virginia, nearly 16% of adults have diabetes with estimated total direct medical expenses of $1.7 billion and more than $600 million in lost productivity. *The Burdens of Diabetes in West Virginia*, Am. Diabetes Ass'n (March 2025), https://perma.cc/X3S6-5T7E.

And the costs of junk food weigh heavier on lower-income individuals. Nearly one in four nonelderly adults with diabetes depends on Medicaid for health insurance coverage. Sarah Casagrande et al., *Health Insurance and Diabetes*, Nat'l Inst. of Diabetes & Digestive & Kidney Diseases (Dec. 20, 2023), https://perma.cc/9RZ7-ZNHK. Approximately 10 million Medicaid enrollees have diabetes. Boon Peng NG et al., *Medical Expenditures Associated with Diabetes Among Adult Medicaid Enrollees in Eight States* (Sept. 27, 2018), https://perma.cc/T3PF-XMEB. And the overlap between Medicaid and SNAP is significant: Nearly 80% of SNAP beneficiaries are covered by Medicaid. Aubrey Winger et al., *The Implications of Federal SNAP Spending Cuts on Individuals with Medicaid, Medicare, and Other Health Coverage*,

KFF (June 26, 2025), https://perma.cc/7CDN-KLPU. The data paints a clear picture: SNAP benefits contribute to Amici States' diabetes problem.[1]

Energy drinks—even zero- or low-sugar ones—are also negatively impacting our citizens' health. The negative effects of high dosages of caffeine are well documented: Such high levels, especially in children, contribute to increased stress, anxiety, agitation, sleep disturbance, and high blood pressure, leading to difficulties in learning and academic performance. Stephane Green & Raquel Hernadez, *Energy Drinks and Kids: What You Need to Know*, John Hopkins Medicine (June 4, 2024), https://perma.cc/A4N2-6RP9.

Energy drinks have also been shown to adversely affect arterial stiffness and have been associated with cardiac arrest, myocardial infarction, spontaneous coronary dissection, and coronary vasospasm. Sachin A. Shah et al., *Impact of High Volume Energy Drink Consumption on Electrocardiographic and Blood Pressure Parameters*, 8 J. Am. Heart Ass'n (May 29, 2019), https://perma.cc/V38A-67TW; *see also* Nahla Khamis Ibrahim & Rahila Iftikhar, *Energy Drinks: Getting wings but at what health cost?* 30 Pak. J. Med. Sci. 1415, 1416–17 (Apr. 6, 2014), https://perma.cc/KK7N-SXKA. In 2011 alone, 1,499 adolescents aged 12 to 17 years went to the emergency room for an energy-drink-related emergency. *The Buzz on Energy Drinks*, Ctrs. for Disease Control & Prevention (July 22, 2024),

---

[1] SNAP-subsidized soft drinks are also reportedly a popular currency in the black-market economy, commonly exchanged for drugs and sexual favors. Kevin Williamson, *The White Ghetto*, Nat'l Review (Dec. 16, 2013), https://perma.cc/4A69-ZXW8.

https://perma.cc/GUL3-WB9L. Energy drinks ranked in the top 100 commodities purchased with SNAP benefits, outranking foods such as onions and rolls. Garasky et al., *supra*, at 21.

In other words, Amici States do not seek a solution without a problem. They have first-hand experience with the negative health outcomes of low-income individuals caused by excess sugar and caffeine. And given that sugary foods and drinks and energy drinks are leading contributors to negative health outcomes *and* among the most popular items for SNAP beneficiaries, the subject pilot projects are plainly intended to advance SNAP's ultimate goal—improving nutritional outcomes for low-income individuals.

C.    Plaintiffs ask this Court to hold unlawful the pilot projects on the basis that they are arbitrary and capricious. In so arguing, Plaintiffs bemoan that the pilot projects do not account for their individual health needs for sugary or caffeinated products.  Plaintiffs thus try to transform the arbitrary-or-capricious standard into strict scrutiny by arguing that pilot projects—which need only be designed to "test" changes that "might" improve the efficiency and delivery of SNAP, 7 U.S.C. § 2026(b)(1)(A)—must be narrowly tailored to support their unique medical needs. *See* Pls.' Mot. at 20–21. Not so.

The "arbitrary or capricious" standard, 5 U.S.C. § 706(2)(A)–(D), is not strict scrutiny. Agency action satisfies this standard so long as the agency did not "fail[] to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise' is arbitrary

11

and capricious." *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 21 (D.D.C. 2020) (quoting *Gresham v. Azar*, 950 F.3d 93, 99 (D.C. Cir. 2020)). "That is not a high bar." *Id.* (quoting *Judulang v. Holder*, 565 U.S. 42, 45 (2011)).

As discussed, the projects here aim to advance SNAP's goal and the efficiency by which it achieves that goal, as required by statute. A wealth of data supports Amici States' hypothesis that junk foods have a negative health impact on SNAP beneficiaries. It was thus not "arbitrary or capricious" for the Secretary to determine that cutting such foods from SNAP might improve the efficiency and effectiveness of SNAP at achieving its end goal—to elevate low-income nutrition levels.

### CONCLUSION

The Court should grant summary judgment in favor of Defendants.

Dated: May 4, 2026                    Respectfully submitted.

MICHAEL T. HILGERS
Attorney General of Nebraska

/s/ Cody S. Barnett
CODY S. BARNETT*
*Solicitor General*
LINCOLN J. KORELL
*Assistant Solicitor General*
Nebraska Department of Justice
1445 K Street, Room 2115
Lincoln, Nebraska 68508
(402) 471-2683
cody.barnett@nebraska.gov

Counsel for State of Nebraska
*Admitted in D.D.C. without a bar number*

12

On behalf of:

Brenna Bird
Attorney General
State of Iowa

Jonathan Skrmetti
Attorney General
State of Tennessee

John B. McCuskey
Attorney General
State of West Virginia